Sarah Carlson (SBN 344266)
sarah.carlson@sidley.com
SIDLEY AUSTIN LLP
12230 El Camino Real, Suite 300
San Diego, CA 92130
Tel.: (858) 398-0142
Fax: (858) 398-0450

Adriane Peralta (SBN 304357)
adriane.peralta@sidley.com
Alexandria Ruiz (SBN 313286)
aruiz@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Tel.: (213) 896-6000
Fax: (213) 896-6600

Judith Shophet Sidkoff (SBN 267048)
judith.sidkoff@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars 17th Floor
Los Angeles, CA 90067
Tel.: (310) 595-9500
Fax: (310) 595-9501

*Attorneys for Defendant Vesync Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RICK CHEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>VESYNC CORPORATION,<br><br>Defendant. | Case No.  3:23-cv-04458-TLT<br><br>**EXPERT REPORT OF SARAH BUTLER IN SUPPORT OF DEFENDANT VESYNC CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:        September 16, 2025<br>Time:        2:00 p.m.<br>Courtroom:  9 – 19th Floor<br>Judge:  Hon. Trina L. Thompson |

1

Pursuant to the Court's Revised Case Management Scheduling Order (ECF No. 122), and

2

Federal Rule of Civil Procedure Rule 26(a)(2), Defendant Vesync Corporation submits Sarah Butler's

3

Expert Report in support of its forthcoming Opposition to Plaintiff's Motion for Class Certification.

4

5

Dated:  June 20, 2025                          SIDLEY AUSTIN LLP

6

By:  _/s/ Sarah Carlson_____

7

Sarah Carlson (SBN 344266)

8

sarah.carlson@sidley.com
SIDLEY AUSTIN LLP

9

12230 El Camino Real, Suite 300
San Diego, CA 92130

10

Tel.: (858) 398-0142
Fax: (858) 398-0450

11

Adriane Peralta (SBN 304357)

12

adriane.peralta@sidley.com
Alexandria Ruiz (SBN 313286)

13

aruiz@sidley.com
SIDLEY AUSTIN LLP

14

350 South Grand Avenue
Los Angeles, CA 90071

15

Tel.: (213) 896-6000
Fax: (213) 896-6600

16

17

Judith Shophet Sidkoff (SBN 267048)
judith.sidkoff@sidley.com

18

SIDLEY AUSTIN LLP
1999 Avenue of the Stars 17th Floor

19

Los Angeles, CA 90067
Tel.: (310) 595-9500

20

Fax: (310) 595-9501

21

*Attorneys for Defendant*
VESYNC CORPORATION

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICK CHEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VESYNC CORPORATION,<br><br>Defendant. | Case No. 3:23-cv-04458-TLT |

**<u>EXPERT REPORT OF SARAH BUTLER</u>**

1

**EXPERT REPORT OF SARAH BUTLER**

Table of Contents

**I.    QUALIFICATIONS** — 4

**II.   DOCUMENTS REVIEWED** — 6

**III.  ASSIGNMENT AND SUMMARY OF OPINIONS** — 6

**IV.   BACKGROUND** — 11

**V.    PAST PURCHASER SURVEY** — 14
  A.  Survey Methodology — 14
  B.  Population — 14
  C.  Sampling of the Relevant Population — 15
  D.  Pretest — 15
  E.  Quality Control Measures for the Survey — 17
  F.  Screening Questionnaire — 19
  G.  Main Questionnaire — 20
  H.  Past Purchaser Survey Results — 31
  *1.  Consumers Purchase Air Purifiers for a Variety of Reasons* — 35
  *2.  Vast Majority of Respondents Did Not Purchase Purifier for HEPA* — 38
  *3.  Consumers Do Not Have Uniform Understanding of HEPA and Perceptions of HEPA Claim Would Not Have Impacted Purchase Decision* — 51

**VI.   PROSPECTIVE PURCHASER SURVEY** — 60
  A.  Survey Methodology — 61
  B.  Population — 61
  C.  Sampling of the Relevant Population — 61
  D.  Quality Control Measures for the Survey — 62
  E.  Screening Questionnaire — 62
  F.  Main Questionnaire — 62
  G.  Stimuli Shown — 64
  H.  Survey Results — 68

**VII.  RESPONSE TO MR. GASKIN'S SURVEY PROPOSAL** — 74
  A.  Summary of Mr. Gaskin's Research Proposal — 77
  B.  Mr. Gaskin Assumes His Survey Will Yield a Price Premium — 82

C.  Mr. Gaskin Does Not Define True HEPA                          85
D.  Mr. Gaskin's Survey Omits Key Purchase Drivers               89

**VIII. CONCLUSIONS**                                             95

## I.    QUALIFICATIONS

1.    I am a Senior Managing Director at NERA. NERA is a firm providing expert statistical, survey, economic, and financial research and analysis. I have held a variety of leadership roles at NERA, and have, for the past 25 years, reviewed, designed, conducted, and analyzed various forms of consumer and behavioral research. My business address is 4 Embarcadero Center, San Francisco, CA 94111.

2.    Among my responsibilities, I conduct survey research and market research and design and implement statistical samples for matters involving business and consumer decision-making, consumer choice, and consumer behavior. In the course of my career, I have conducted research for leading corporations and government agencies on consumers, employees, and businesses. My work has been included in numerous lawsuits involving allegations of false advertising and consumer perception, trademark and trade dress confusion, fame and secondary meaning, as well as in patent infringement, antitrust, and employment-related litigations. I am a member of the American Association of Public Opinion Research, the American Statistical Association, the Intellectual Property Section of the American Bar Association, and the International Trademark Association (INTA).

3.    I have also worked as a market researcher conducting surveys of consumers and professionals, focus groups, and in-depth interviews. I worked as an independent consultant conducting research for the Department of Environment and Rural Affairs in the United Kingdom. I have taught courses focused on or involving research methodologies in both the United States and Europe. I hold a Master's Degree from Trinity College, Dublin and another Master's Degree from Temple University.

4

4.      I have more than 20 years of experience conducting and using surveys to measure consumer opinions and behaviors regarding products and services, including surveys evaluating: purchase processes and what information consumers rely on to make product decisions, the product attributes that are purchase drivers, how consumers understand advertising claims, consumers' brand awareness and the relative strength of brand, new product research, and communications strategies. During my career in academic and commercial research, I have personally facilitated a wide range of research including large-scale surveys, in-depth interviews, focus groups, and observational studies.

5.      I have submitted expert reports, been deposed, and have testified at trial within the last five years. A list of my testimony is included on my current resume, which is attached as **Exhibit A**.

6.      NERA is being compensated for my time in this matter at my standard rate of $925 per hour. Members of the staff at NERA have worked at my direction to assist me in this engagement. No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

5

## II.    DOCUMENTS REVIEWED

7.    As part of my work, I reviewed the Complaint[1] and Motion for Class Certification[2] filed in this matter. I also reviewed the Declaration and Deposition of Mr. Steven P. Gaskin,[3] among other materials. A list of the specific materials I considered in forming my opinion can be found in **Exhibit B**.

## III.    ASSIGNMENT AND SUMMARY OF OPINIONS

8.    I was asked by Counsel for Defendant VeSync Corporation (hereinafter, "VeSync") to determine the extent to which past purchasers of accused Levoit brand air purifiers bought the product because of HEPA or True HEPA claims and, for those who indicated that HEPA mattered, evaluate what these consumers understood about HEPA. I also designed research to assess the extent to which True HEPA statements or statements made related to 99.97% filtration at 0.3 microns in product advertising would impact a consumer's interest in purchasing a Levoit brand air purifier.

9.    As explained in greater detail below, I conducted two surveys. The Past Purchaser Survey was designed to determine what product features or characteristics caused consumers to purchase a Levoit brand air purifier and determine the extent to which, if at all, True HEPA had an impact on purchasing decisions. The Past Purchaser Survey also examined consumer perceptions of HEPA (if it was a feature that had any impact on purchasing) and measured the

---

[1] Third Amended Class Action Complaint, *Rick Chen and Mindy Aiello, individually and on behalf of all other similarly situated v. VeSync Corporation,* United States District Court Northern District of California, Case No. 3:23-cv-04458-TLT, (hereinafter, "*Complaint*"), dated December 23, 2024.

[2] Plaintiff's Notice of Motion and Motion for Class Certification, *Rick Chen, individually and on behalf of all other similarly situated v. VeSync Corporation,* United States District Court Northern District of California, Case No. 3:23-cv-04458-TLT, (hereinafter, "*Motion for Class Certification*"), dated May 2, 2025.

[3] Declaration of Steven P. Gaskin in Support of Class Certification, dated April 17, 2025 (hereinafter, "*Gaskin Declaration*"); Deposition of Steven P. Gaskin, dated May 14, 2025 (hereinafter "*Gaskin Deposition*").

6

extent to which consumers believed HEPA meant that a specific filtration percent was met or believed that the product was tested to meet a specific standard or protocol. I also conducted a survey of Prospective Purchasers. The Prospective Purchaser Survey tested whether consumers would be less, more, or equally likely to purchase a Levoit air purifier if references to HEPA and/or 99.97% filtration at 0.3 microns were removed from the product advertising.

10.    The results of my surveys demonstrate that consumers who have purchased accused models of Levoit brand air purifiers and air filters purchased these products for reasons other than a HEPA claim. Even for those who indicated HEPA mattered, purchasers did not have a common understanding of the claim. My survey of prospective purchasers also demonstrates that claims in product advertising related to True HEPA and 99.97% filtration at 0.3 microns do not have an impact on a consumer's interest in purchasing a Levoit brand air purifier. A more detailed summary of my results follows.

**Past Purchaser Survey**

11.    I surveyed a total of 298 consumers who purchased a Levoit Core 300 or a Levoit EverestAir model air purifier[4] between 2020 and 2023.[5] Purchasers were asked a series of questions about why they purchased their product and what features caused them to select a Levoit brand air purifier and/or replacement filter. Past purchasers were also asked about their understanding of HEPA. The results of this survey demonstrate that:

---

[4] While the EverestAir was identified in the Complaint (see, e.g., *Complaint*, ¶ 1), I understand that Plaintiff has not included EverestAir Levoit Air Purifier models in its Motion for Class Certification (See *Motion for Class Certification*, p. 1).

[5] I also asked a series of questions about replacement filters for these products.

- Purchasers of the accused Levoit brand air purifiers and replacement filters do not indicate that HEPA, True HEPA, or a specific filtration percentage were reasons for purchasing the product.

- Unlike the Plaintiff, Mr. Richard Chen,[6] purchasers of the accused products indicated that things such as product reviews, size, and other product features, were reasons for purchasing. Across six open-ended questions, only 3.7 percent of respondents reported that HEPA or a specific filtration percentage was a reason for purchase.

- Even when provided with a list of potential product features, almost two thirds of purchasers who bought an accused Levoit air purifier did _not_ select HEPA.

- When asked what HEPA meant, respondents were most likely to indicate HEPA means the product traps pollen, dust, etc. or means that the product has multiple layers of filtration. Even when provided with a list, 27.9 percent of respondents who indicated that HEPA mattered did _not_ indicate that HEPA meant a specific test or a specific filtration percentage.

- In total, only 13 of the 298 purchasers surveyed (or 4.4 percent) indicated that HEPA was a reason for purchasing their Levoit brand air purifier, indicated that HEPA meant a specific testing and/or filtration standard, and indicated that they would have been less likely to purchase the product had they understood that the product was tested using the Institute of Environmental Sciences and Technology standards test (i.e., the "IEST" test)[7] or that the product met a 98.70% filtration standard as opposed to a 99.97% filtration standard.

---

[6] See ¶¶ 76-77 below.

[7] The IEST test refers to the HEPA test from The Institute of Environmental Sciences and Technology standards, which I understand is used in the United States. _Motion for Class Certification_, p. 3.

**Prospective Purchaser Survey**

12.      I also surveyed 795 consumers in the market to purchase an air purifier. My study of consumers who bought an accused Levoit product demonstrates what features mattered to actual purchasers, it does not directly measure the impact of the accused statements relative to the absence of the accused statements within an advertising context. Therefore, in the Prospective Purchaser Survey, I measured to the extent to which claims about True HEPA, H13, or 99.97% filtration at 0.3 microns would have an impact on purchasing decisions for a Levoit brand air purifier.

13.      In this survey, respondents were randomly assigned to one of four groups: (1) Group 1, shown an Amazon product listing page[8] for the Levoit Core 300 which included the accused statements, (2) Group 2, shown the same product listing page with all references to True HEPA and H13 removed,[9] (3) Group 3, shown the same product page with all statements related to 99.97% at 0.3 microns filtration removed, or (4) Group 4, shown the same product page with all references to True HEPA, H13, and 99.97% at 0.3 microns filtration removed. Respondents were asked how likely they would be to purchase the product shown. The results of my Prospective Purchaser Survey demonstrate that:

- Regardless of Group, the majority of consumers indicated that they were likely to purchase the product shown. In fact, there is no statistically significant difference in purchase intentions for those shown the original Levoit product page with the accused statements compared to any of the pages with the statements removed.

- When asked why they would be interested in purchasing the product shown, potential consumers echoed reasons articulated by past purchasers. That is, potential purchasers

---

[8] Mr. Chen purchased his products from Amazon. *Complaint,* ¶ 11.

[9] And/or replaced with "3-Stage filter."

indicated that price, product performance, product reviews, and other features such as smart features were reasons to purchase the product.

- In fact, only 3.5 percent of respondents in the Test Group (Group 1) indicated that HEPA or the filtration percentage was a reason that they would be likely to purchase the product.

14.     My survey of product advertising with prospective purchasers confirms the results and conclusions drawn from my survey of past purchasers of the accused Levoit brand air purifiers. Both surveys demonstrate that, while consumers may purchase or be interested in purchasing Levoit brand air purifiers for a range of reasons (including product reviews, price, or product features), statements related to True HEPA, HEPA, or a specific filtration percentage do not matter to consumers and would not cause them to purchase the product.

15.     In addition, I was asked to review the conjoint survey proposal submitted by Plaintiff's expert Mr. Steven P. Gaskin.[10] Notably, Mr. Gaskin did not conduct any research of his own with consumers;[11] he did not speak to Plaintiff,[12] he did not conduct any focus groups or interviews,[13] he did not conduct any pretests or preliminary interviews with purchasers,[14] and he claims any of these types of exploratory research with consumers was "not necessary."[15] Further, Mr. Gaskin cites no other surveys explaining why consumers purchase air purifiers and what

---

[10] See generally, *Gaskin Declaration.*

[11] *Gaskin Deposition,* pp. 187:11-21, 209:15-20. For example, Mr. Gaskin states that he has not spoken to any consumers of Levoit products because he "has done research with [his] team" on attributes and levels, and that it "wasn't necessary" because he has "enough information as it is."

[12] *Gaskin Deposition,* p. 44:9-23. Mr. Gaskin stated that he did not know Rick Chen prior to the case and that aside from Plaintiff's counsel, personnel at AMS and Mr. Weir, he had not discussed the case with anyone.

[13] *Gaskin Deposition,* p. 169:21-24. ("Q. Do you plan on doing any group – what was the one you've heard of? Focus groups. Do you plan on doing any focus groups? A. No.").

[14] *Gaskin Deposition,* pp. 12:19-21 ("Q. Okay. And you were not asked to pretest any survey at this time? A. Not yet, No."), and 108:9-11 ("Q. And have you run a pretest in this case? A. You've already asked me that, and the answer is no, because it's not time to do it yet.").

[15] *Gaskin Deposition,* p. 207:11-19.

features or factors affect their purchasing decisions. The "research" Mr. Gaskin did conduct essentially entailed a few hours spent reviewing some websites,[16] and there is no information or data to suggest that this review was systematic or in any way reflects the products consumers would have considered or the features they view as important. In fact, Mr. Gaskin's survey proposal is simply an outline of a general type of survey he *assumes* will generate statistically reliable results to support his conclusion that consumers are willing to pay a price premium for True HEPA. Further, Mr. Gaskin's proposal does *no*t describe a survey that would measure the harm alleged by Plaintiff. Rather than designing a survey to test changes in consumer preference for a product with a 99.97% filtration at 0.3-microns relative to a product with, for example, 98.70% filtration at 0.3-microns, Mr. Gaskin proposes to test True HEPA relative to a "Blank," no filtration claim.

16. Unlike Mr. Gaskin, I surveyed more than 1,000 consumers who have either purchased an accused Levoit air purifier or who would be in the market for such a product. My surveys demonstrate that True HEPA and HEPA are not claims that impact consumers' purchases. Further, my data demonstrate that for those consumers who do care about HEPA, their understandings of the statement vary, and many do not view HEPA as meaning there is a specific testing or filtration standard.

## IV.    BACKGROUND

17. VeSync was formed under the laws of California and has its principal place of business in Anaheim, California.[17] I understand that VeSync is "one of the nation's leading air-

---

[16] *Gaskin Deposition,* p. 211:4-10. When asked "How much time did you spend?" in relation to researching the appropriate attributes to include in the survey, Mr. Gaskin stated "I guess an hour or two. Something like that."

[17] *Complaint,* ¶ 17

purifier manufacturers."[18] VeSync produces and sells the following accused models of air purifiers and filters: the Levoit Core 300, Core 300-RAC, Core 300S and Core P350 True HEPA air purifiers, and their replacement filters.[19]

18.    Plaintiff Rick Chen is a citizen of California and resides in the city of San Francisco, California.[20] I understand that Mr. Chen purchased a Levoit Core 300 Air Purifier from Amazon on September 27, 2020.[21] Mr. Chen purchased an additional Levoit Core 300, for his mother, on December 31, 2020.[22] Plaintiff alleges that when purchasing the Levoit Core 300, he relied upon "Defendant's warranties and representations about the Product's HEPA filter and filtration capabilities."[23] Plaintiff also alleges that he relied upon the "H13 HEPA filter" claim.[24]

19.    On December 23, 2024, Plaintiff filed the Third Amended Complaint.[25] In this Complaint,[26] Plaintiff alleges that VeSync advertised the accused Levoit brand air purifiers as "equipped with High Efficiency Particulate Air (HEPA) and H13 filters, when in fact they were not. Defendant also represented that the replacement filters it sells for the Air Purifier were 'H13 True HEPA' filters, when in fact they were not."[27] Further, Plaintiff also alleges that VeSync falsely claimed that the at-issue products "trap at least 99.97% of 0.3-micron airborne particles."[28]

---

[18] *Complaint,* ¶ 64.

[19] *Motion for Class Certification*, pp. 1-3, 23-26.

[20] *Complaint,* ¶ 11.

[21] *Complaint,* ¶ 11.

[22] *Complaint,* ¶ 11.

[23] *Complaint,* ¶ 11.

[24] *Complaint,* ¶ 11.

[25] I understand that named Plaintiff Mandy Aiello was dropped from the claim and the Levoit EverestAir products are no longer at issue in this litigation.

[26] See generally, *Complaint.*

[27]*Complaint,* ¶ 2.

[28] *Complaint,* ¶ 36.

20.     In his Motion for Class Certification, Plaintiff focuses on the True HEPA claim, which is alleged to be present on all advertising and packaging for accused models.[29] Further, Plaintiff asserts that the "True HEPA Claim is false and misleading because the Air Purifiers' filters were not HEPA under the Industry Standards," and as a result consumers allegedly paid a price premium "based on Defendant's misrepresentation that the Air Purifiers came equipped with HEPA filters."[30] Plaintiff alleges that the True HEPA claim "is a signal of quality to consumers – that the air purifier they are buying is of a high grade and worth more than purifiers that do not have a HEPA filter" and that consumers "are willing to pay more for air purifiers that have it in their marketing and labeling."[31] As such, in the Complaint, Plaintiff alleges that "[b]ut for Defendant's HEPA claims, the fair value of its Levoit Air Purifiers would have been substantially lower […] [p]ut differently, Defendant's HEPA misrepresentations allowed it to overcharge the class in the amount of the HEPA-related price premium."[32]

21.     To evaluate Plaintiff's claims, I designed two surveys: one survey of Levoit purchasers to determine the extent to which HEPA was important to their purchasing decision, what these consumers understand HEPA to mean, and whether their understanding aligns with Plaintiff's allegations. I also designed a survey to evaluate the extent to which VeSync's use of the True HEPA, H13, and/or 99.97% filtration of 0.3 micron airborne particles claims in product advertising would impact consumers' purchase intentions.

---

[29] *Motion for Class Certification*, Section II.B. *Complaint*, Section B.

[30] *Motion for Class Certification*, p. 11.

[31] *Complaint*, ¶ 31.

[32] *Complaint*, ¶ 7.

13

## V.    PAST PURCHASER SURVEY

### A. Survey Methodology

22.    The design of my research follows the generally accepted principles for the design of a survey used as evidence in litigation. These general principles are described below:

- The definition of the relevant population;

- The procedures for sampling from the relevant population;

- The survey questions used;

- The stimuli shown to respondents; and

- The protocol for calculating the results from the survey.[33]

23.    The discussion of the survey I designed and conducted is organized around each of these principles.

### B. Population

24.    The relevant population for this survey is comprised of U.S. residents aged 18 years or older who have purchased a Levoit Core Series brand air purifier[34] between 2020 and 2023. The relevant population also includes respondents who, in addition to purchasing a relevant air purifier between 2020 and 2023, also purchased replacement filters for their qualifying air purifier.

---

[33] The Federal Judicial Center. (2004). *Manual for Complex Litigation, Fourth Edition*, §11.493, p. 103 phrases these key areas as:

- the population was properly chosen and defined;
- the sample chosen was representative of that population;
- the data gathered were accurately reported; and
- the data were analyzed in accordance with accepted statistical principles.

[34] I understand that Plaintiff has not included EverestAir Levoit Air Purifier models in its Motion for Class Certification (See *Motion for Class Certification*, p. 1). A total of 52 respondents qualified on purchasing an Everest model (i.e., only purchased an EverestAir model OR purchased both EverestAir and Core models but purchased the EverestAir model most recently and was asked about this model in the survey). The removal of these respondents from my sample does not impact my overall conclusions. See **Appendix 1.7**.

14

## C. Sampling of the Relevant Population

25.     Participants for the Past Purchaser Survey were contacted by Veridata Insights ("Veridata"), an online panel and data collection services company.[35] To ensure the reliability and integrity of the responses, Veridata employs various quality control measures, and adheres to the standards for online survey panels as established by the Insights Association.[36,37] Veridata's standard quality control measures were applied in this study.

26.     The data for my survey were collected between April 11, 2025, and May 5, 2025. Potential respondents were not informed about the survey's purpose or topic and had to meet the screening criteria to qualify. A total of 298 respondents qualified for and completed the survey. The complete questionnaire for the survey is provided in **Appendix 1.1**, and screenshots of the survey as it appeared to respondents are included as **Appendix 1.2**.[38]

## D. Pretest

27.     Prior to fielding the survey, I conducted a scientific pretest of the survey instrument. A total of six respondents were recruited to take the survey online as they normally would, but with a live interviewer present to observe and ask follow-up questions. The pretest interviews were conducted on April 10, 2025.

---

[35] Additional information about Veridata Insights is available on their website at https://veridatainsights.com, last accessed May 14, 2025.

[36] The Insights Association is an organization representing the industry and profession of market research and analytics (https://www.insightsassociation.org/About-Us), last accessed May 28, 2025.

[37] The Insights Association puts out the *Code of Standards and Ethics for Marketing Research and Data Analytics* available at https://www.insightsassociation.org/Portals/INSIGHTS/IA%20Code_1_6_23_Final.pdf, last accessed May 28, 2025.

[38] These appendices, and all appendices hereinafter, have been provided to Plaintiff's counsel. These materials can be provided to the court should they be requested.

15

28.     My pretest interviews were double-blind – neither the interviewer nor the respondents were aware of the research sponsor or intent. Participants were recruited from the population of potential survey respondents by using the screener questionnaire for recruitment.

29.     Each pretest interview lasted approximately 30 minutes. In general, the interviewer asked respondents if they understood the questions and whether the questions were difficult or confusing in any way. The interviewer also specifically asked respondents about their reasons for purchasing an air filter or replacement filters and asked whether the list of reasons for purchasing provided was comprehensive or was missing any key responses.

30.     Respondents who selected HEPA from a list of reasons for purchase were specifically asked about their interpretations of HEPA, and were asked whether the response options in the closed-ended survey question about HEPA meanings was unclear or missing any key options. Respondents were also asked to indicate whether the follow-up questions about HEPA filtration percentages and HEPA standards were unclear or difficult to understand. Similar questions were asked for the respondents who had purchased replacement filters and who indicated that HEPA mattered in their purchase decision. The pretest interviewer script is attached as **Appendix 1.3**. and the pretest data file is attached as **Appendix 1.4**. At least two NERA staff listened to each pretest interview. NERA staff only observed the interviews and did not appear on screen or ask questions of the interviewer or the respondent.

31.     Generally, the pretests demonstrated that respondents found the survey easy to understand, the questions easy to answer, and indicated that the response options provided were comprehensive and complete. Based on feedback from participants, I made some minor changes to the survey. These changes included consistently underlining "between 2020 and 2023" in the screening questions, specifying personal purchase when respondents were asked about air filters,

and changing the response option in the list of purchase reasons from "I or another person in my household has health conditions (not allergies)" to "I or another person in my household has health conditions (e.g., asthma)." I edited the Levoit model screening questions to collapse all Core series models into one response option, "Core," and added images for each model to help respondents identify the model they had purchased. The changes made to the survey based on the pretest interviews are described in detail in **Appendix 1.5**.

### E. Quality Control Measures for the Survey

32.     To ensure that my data are reliable and of the highest quality, I implemented quality control measures in addition to those undertaken by Veridata:

    a.    The survey was conducted in a "double-blind" fashion; that is, neither the staff at Veridata nor any of the survey respondents were informed of the survey sponsor or the ultimate intention of the survey.[39]

    b.    Survey respondents had to correctly answer a Google reCAPTCHA question to ensure that a person, and not a computer or "bot," was taking the survey.[40]

    c.    Survey respondents were required to enter their state of residence and ZIP code, and if these data conflicted with one another, the respondent was excluded.

    d.    Survey respondents who did not understand or who were unwilling to adhere to the survey instructions were also screened out of the survey.[41]

---

[39] Diamond, S. S. (2011). "Reference Guide on Survey Research," Reference Manual on Scientific Evidence, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 359-423, (hereinafter, "*Diamond*"), at pp. 410-411.

[40] "reCAPTCHA leverages a sophisticated and adaptable risk analysis engine to shield against automated software, thwarting abusive activities within an organization's website and mobile apps." https://cloud.google.com/security/products/recaptcha, last accessed May 28, 2025.

[41] *See* Question S1, **Appendix 1.1**.

e.  To ensure that respondents were reading the survey questions and response options carefully, I asked an "attention check" question. If respondents "failed" this attention check, they were screened out of the survey.[42]

f.  Any respondent who had taken a survey on air purifiers in the past six months, or were unsure if they had taken a survey on any of the listed topics, were flagged for a subsequent analysis in which these respondents were removed from the data and the results were reanalyzed to ensure there was no substantive impact on the overall results.[43] As well, any respondent who personally worked for or had a household member who worked for a market research or advertising company, a company that makes or manufactures air purifiers, or who indicated they did not know or were unsure whether they or someone in their household works for any of the listed types of companies was flagged for review.[44] When I remove these respondents as a sensitivity check of my analyses, my conclusions do not change.[45]

33.  In addition to these quality control measures (that were also implemented in the Prospective Purchaser survey),[46] I included additional quality control measures in for the Past Purchaser Survey described below:

---

[42] Question S16 presented respondents with a list of activities and asked, "Approximately how many times each week, if at all, do you do each of the following?" Respondents were presented with an item which asked them to select a specific number of times each week for that item and were screened out if they answered incorrectly (*See* **Appendix 1.1**).

[43] 19 respondents were flagged for this reason.

[44] 5 respondents were flagged for this reason.

[45] For these results, see **Appendix 1.7**.

[46] For the Prospective Purchaser Survey, any respondent who had taken a survey on air purifiers in the past six months, or indicated they were unsure, was flagged for further review. 86 respondents were flagged for this reason.

I also flagged any respondent who personally worked for or had a household member who worked for a market research or advertising company, a company that makes or manufactures air purifiers, or who indicated they did not know or were unsure whether someone in their household works for any of the listed companies. 34 respondents were flagged for this reason. When I remove these respondents as a sensitivity check of my analyses, my conclusions do not change (see **Appendix 2.5**).

a. To ensure respondents accurately identified the brand of air purifier purchased, I included a red herring response brand. Any respondent that selected the fictitious brand, "AeroPure" was screened out of the survey.[47]

b. Similarly, I included a red herring response option for the brand of replacement filter purchased. Any respondent who selected the fictitious brand "Fine Air" was screened out of the survey.[48]

c. Additionally, the first 99 survey respondents were asked to indicate whether anything in the survey was difficult to understand or was unclear, and respondents who indicated "Yes" were asked to describe what was difficult to understand or unclear. These responses were reviewed to ensure that respondents, in general, had no issues with the survey. No respondents indicated that they found the survey difficult to understand or unclear.

34.    The survey program was tested, and the initial set of results were reviewed to ensure that there were no errors in the programming.

## F. Screening Questionnaire

35.    To confirm that the survey respondents were part of the relevant population, I implemented a series of screening questions. Only those who met the criteria defined by these questions were allowed to proceed to the main survey. To qualify, respondents had to:

a. Be a resident of the United States;

b. Be 18 years or older;

c. Indicate that they had purchased an air purifier since 2020;

---

[47] This was question S9. 440 respondents were screened out of the survey for this reason.

[48] This was question S15. 30 respondents were screened out of the survey for this reason.

d.   Indicate that they had purchased a Levoit brand air purifier between 2020 and 2023;

e.   Indicate that the model(s) of the Levoit air purifier purchased between 2020 and 2023 was either (a) a Core Series model, or (b) an EverestAir model.[49]

f.   Pass all quality controls as discussed in Section V.E above.

36.    Respondents were also asked to indicate where they purchased their qualifying Levoit air purifier, whether they had personally purchased replacement filters for their qualifying Levoit air purifier between 2020 and 2023, and to indicate which brand or brands of replacement filters were purchased. Respondents were not disqualified based on their responses to these questions.

## G. Main Questionnaire

37.    Qualified respondents were then taken to the main questionnaire. All respondents were asked a series of questions about their Levoit air purifier, and those who had purchased filters were asked a series of questions about their filter purchases. Prior to beginning the main survey, respondents were given the following instructions:

> Thank you for participating in today's survey. If you do not know or do not have an opinion about any of the questions, please select "Don't know / unsure." Please do not guess. Click "Continue >>" to proceed.

38.    Next, respondents were asked a series of questions to evaluate why they purchased an air purifier generally and why they selected the Levoit brand. First, respondents were asked the open-ended question "In your own words, why did you decide to purchase an air purifier?"[50] After

---

[49] See FN 4 above.

[50] Respondents were also able to indicate "Don't know / unsure."

responding to this question, respondents were asked a closed-ended question to indicate the reasons they decided to purchase an air purifier. The exact question wording was as follows:

Q. You may have already mentioned this, but which of the following, if any, are reasons you decided to purchase an air purifier?
1. A friend or colleague recommended it to me
2. A doctor or medical professional recommended it to me
3. I or another person in my household has allergies
4. I or another person in my household has health conditions (e.g., asthma)
5. To control household odor (e.g., kitchen odor or pet odor)
6. To aerate a particular room in the house (e.g., a basement or a room without windows)
7. To protect from wildfire smoke
8. To use as a sleep/sound machine
9. To eliminate second hand smoke
10. To reduce pollution exposure in home
11. To reduce exposure to bacteria and viruses
12. Saw product advertised
13. To reduce dust
14. To reduce pet dander/hair
15. *Other*
16. None of these
17. Don't know / don't recall

39.    Respondents were then asked what they first considered when shopping for an air purifier: the brand, the specific product or model, the price range (or something else). The exact question wording was as follows:[51]

Q. When you were shopping for an air purifier, which, if any, of the following did you consider <u>first</u>?
1. Brand
2. Model or product
3. Price range
4. Something else
5. Don't know / don't recall

40.    Based on their response to the question shown above, respondents were asked about their reasons for purchasing their Levoit air purifiers. All respondents were shown the introduction

---

[51] This was question Q3.

"You indicated that you purchased the Levoit **[MODEL]** air purifier between 2020-2023. If you purchased more than one of these, please think about the Levoit **[MODEL]** you purchased most recently when answering the next set of questions."

41.    Respondents who selected "Brand" at the previous question were asked the open-ended questions "You indicated that you purchased a Levoit [**MODEL**] air purifier. If you recall, why did you decide to purchase this <u>particular brand</u>?"[52] and then were asked "And why did you select this <u>specific model,</u> the **[MODEL]**?" These respondents were then asked a closed-ended question to indicate reasons why they purchased their Levoit air purifier, and the response options were randomized to guard against order effects. To address the claims made by Plaintiff, the list of response options included "HEPA filter" and "H13."[53] The exact question wording was as follows:[54]

> Q. **[**If you recall / You may have already mentioned this, but**]**[55] which of the following, if any, are reasons you selected the <u>specific model,</u> the **[MODEL]** for purchase?
> 1.   Color
> 2.   Size
> 3.   Price
> 4.   Multiple fan levels
> 5.   Quiet/sleep mode
> 6.   Large coverage area
> 7.   Product/customer reviews
> 8.   Air quality indicator
> 9.   Voice control
> 10.  Brand
> 11.  HEPA filter
> 12.  Availability (in-store or quick delivery)

---

[52] This was Q7. Respondents were able to select "Don't know / unsure."

[53] *Complaint,* ¶ 11.

[54] This question was Q6. The option "Filter subscription service" only appeared to respondents who indicated they purchased filters at S14.

[55] Respondents were shown the language "If you recall" if they selected "Don't know / unsure" to the first open-ended question, (i.e, Q7: You indicated that you purchased a Levoit [**MODEL**] air purifier. If you recall, why did you decide to purchase this <u>particular brand</u>?) , or they were shown the language "You may have already mentioned this, but" if they gave a response to the first open-ended question.

13. Product reputation
14. Filter lifespan
15. Design / overall look
16. Return policy
17. Warranty
18. Targets specific pollutants
19. Smart features/functionalities
20. Energy efficiency
21. Filter subscription service
22. H13
23. NC37[56]
24. Other
25. None of these
26. Don't know / unsure

42.      Respondents who indicated that they first considered the model or the price or something else, were asked a similar series of questions to the respondents who selected "Brand" at this same question. First, respondents were asked the open-ended question, "You indicated that you purchased a Levoit **[MODEL]** air purifier. If you recall, why did you purchase this <u>particular product</u>?"[57] followed by "Any other reasons you selected this product?"[58] After these questions, respondents were asked to select from a list, the reasons for selecting their specific model of air purifier, as shown above in Paragraph 41. However, the question wording was changed to "[If you recall, You may have already mentioned this, but] which of the following, if any, are reasons you purchased your Levoit **[MODEL]** air purifier?"[59]

43.      Respondents who selected "HEPA filter" at either of these closed-ended questions were asked additional questions. All other respondents were either skipped to the Filter Block (if

---

[56] NC37 was a fictitious response option.

[57] Respondents were provided with a "Don't know / unsure" checkbox and skipped the follow-up question if they selected this.

[58] Respondents were also able to indicate "Don't know / unsure."

[59] This was Q6.

they had previously indicated that they had personally purchased a replacement filter for their Levoit air purifier),[60] or the final screener questions.

44.     Respondents who selected "HEPA filter" as one of the reasons for purchase were asked a series of questions about their understanding of the term. First, respondents were asked, in their own words, to indicate what HEPA means.[61] The exact wording of this question was "You indicated that a HEPA filter was one of the reasons you purchased your Levoit **[MODEL]** air purifier. What does a HEPA filter mean to you?" Next, respondents were asked a closed-ended question about their understanding of HEPA. The exact wording of the question and response options were as follows:

> Q. [If you recall, / You may have already mentioned this, but] which of the following, if any, represents your understanding(s) of who HEPA means?
> 1. Product traps environmental pollution
> 2. Product is tested using a specific protocol / standard
> 3. Product meets a specific filtration percentage
> 4. Product traps dust, pollen, mold, and bacteria
> 5. Product has multiple layers of filtration
> 6. Product contains a pleated, mechanical filter with fine mesh
> 7. Product is energy efficient
> 8. Product cleans air over a certain area
> 9. Product neutralizes odors
> 10. Product has a limited warranty
> 11. Other
> 12. None of these
> 13. Don't know / unsure

45.     Respondents who selected "Product is tested using a specific protocol / standard" were then asked the relevant follow-up questions about a specific protocol, described as Product Block A questions, and those who selected "Product meets a specific filtration percentage" were asked the relevant follow-up questions about a specific filtration percentage, described as Product

---

[60] Those who indicated they purchased replacement filters in S14 were asked questions in the Filter Block.

[61] Respondents were also able to indicate "Don't know / unsure."

Block B. If respondents selected both statements, they were asked both sets of follow-up questions.[62]

46.    The questions in Blocks A and B were designed to evaluate the extent to which consumers believe HEPA means a specific testing protocol or filtration percentage is met, and if so, whether knowing that was not the case would have impacted their purchasing decision. In Product Block A, respondents were asked:

> Q. You indicated that you think HEPA means the product is tested using <u>a specific protocol / standard</u>. Do you think when a product is tested there is one HEPA standard/protocol or more than one HEPA standard/protocol?[63]
> 1.  One HEPA standard/protocol
> 2.  More than one HEPA standard/protocol
> 3.  Don't know / unsure

> Q. There are a number of different HEPA tests. Your Levoit air purifier was tested using one of these tests, the Institute of Environmental Science Technology's ("IEST") test. Would this information have had an impact on your decision to purchase the product?[64]
> 1.  Yes
> 2.  No
> 3.  Don't know / unsure

47.    Respondents who selected "No" or "Don't know / unsure" at this question skipped to the Product Block B, questions about their filter purchased (described as the Filter Block of questions),[65] or the end screener. Respondents that selected "Yes" were asked an additional closed-ended question, as follows:

> Q. You indicated that your Levoit air purifier being tested using the Institute of Environmental Science Technology ("IEST") test would have had an impact on your decision to purchase the product. Would it have made you…?[66]

---

[62] The blocks were randomized.

[63] This is Q12. The order of "one HEPA standard/protocol" or "more than one HEPA standard/protocol" was randomized in the question to match the randomization of the response options.

[64] This is Q13. Response options one and two were randomized to guard against order effects.

[65] Those who indicated they purchased replacement filters in S14 were asked questions in the Filter Block.

[66] This is Q14. Response options one and three were randomized to guard against order effects.

      1.  More likely to purchase
      2.  Neither more nor less likely to purchase
      3.  Less likely to purchase
      4.  Don't know / unsure

48.     Respondents who selected "Don't know / unsure" were skipped to Product Block B, the Filter Block, or the end screeners. All other respondents were asked to describe what makes them say that,[67] and then were skipped to the next relevant section.

49.     Respondents who indicated that HEPA meant "Product meets a specific filtration percentage" were asked Product Block B. All respondents were first asked the following two questions:

Q. You indicated that you think HEPA means the product meets <u>a specific filtration percentage</u>. Do you think there is one filtration percentage that meets HEPA standards, more than one filtration percentage that meets HEPA standards, or do you not know?[68]
      1.  One filtration percentage that meets HEPA standards
      2.  More than one filtration percentage that meets HEPA standards
      3.  Don't know / unsure

Q. Levoit air purifiers are tested at 99.97% efficient at 0.3 microns. If your product had a rating of 98.70% efficiency at 0.3 microns, would this information have had an impact on your decision to purchase the product?[69]
      1.  Yes
      2.  No
      3.  Don't know / unsure

50.     Respondents who selected "No" or "Don't know / unsure" skipped to either Product Block A,[70] the Filter Block, or the end screeners. Respondents that selected "Yes" were asked an additional closed-ended question, as follows:

---

[67] Respondents could select "Don't know / unsure" at this question.

[68] The order of "one filtration percentage that meets HEPA standards" and "more than one percentage that meets HEPA standards" was randomized in the question stem to match the order of the response options.

[69] The first two response options were randomized to guard against order effects.

[70] If they qualified for Block A and it had not already been asked.

Q. You indicated that if your Levoit air purifier had a rating of 98.70% efficiency at 0.3 microns, it would have had an impact on your decision to purchase the product. Would it have made you…?[71]

1. More likely to purchase
2. Neither more nor less likely to purchase
3. Less likely to purchase
4. Don't know / unsure

51.    Respondents who selected "Don't know / unsure" were skipped to the next block or end screeners. All other respondents were asked to describe what makes them say that before they were skipped to the next block.

52.    Respondents were next asked the Filter Block if they indicated that they had personally purchased replacement filters for their Levoit air purifier between 2020 and 2023. If respondents did not indicate that they had personally purchased replacement filters, they were skipped to the final screener section. Prior to being asked any questions in the Filter Block, respondents were shown the following instruction:

The following section will ask you about the **[BRAND]** air purifier <u>filters</u> that you purchased.

53.    Then, all respondents were asked why they purchased the particular brand of replacement filters that they indicated in the screener questions. The exact wording of the question was, "You indicated that you purchased **[BRAND]** air purifier <u>filters</u>. If you recall, why did you purchase this particular brand of replacement filters?"[72] Respondents who did not select "Don't know / unsure" were asked a follow-up open-ended question about any other reasons they selected that brand of replacement filter.[73]

---

[71] Response options one and three were randomized to guard against order effects.

[72] This was question Q20. Respondents could also select "Don't know / unsure."

[73] Respondents could also indicate they did not know or were unsure at this question.

54.    All respondents were then asked closed-ended questions about their reasons for purchasing that particular brand of air purifier filter. Similar to the Product Block, to address the at-issue claims from Plaintiff, this question includes response options HEPA and H13. The exact wording of the question was:[74]

Q. [If you recall, / You may have already mentioned this, but] which of the following, if any, are reasons you purchased your **[BRAND]** air purifier <u>filters</u>?
1.    Advertised as compatible with product
2.    Same brand
3.    Brand reputation
4.    Price
5.    Quality
6.    Multi pack
7.    HEPA
8.    Availability (in store or quick delivery)
9.    Product reviews
10.    Filter lifespan
11.    Design
12.    Return policy
13.    Targets specific pollutants
14.    Energy efficiency
15.    Available via a subscription service
16.    Odor control
17.    Availability of specialty filters (e.g., pet allergy or smoke removal)
18.    H13
19.    NC37[75]
20.    Other
21.    None of these
22.    Don't know / unsure

55.    If respondents had purchased a Levoit replacement filter AND selected HEPA at this question AND had not selected "HEPA Filter" as a reason for purchase in the Product Block, they were asked a series of follow-up questions about their understanding of HEPA. Respondents

---

[74] This was question Q22. If respondents selected "Levoit" at S15 (brand of filter replacement purchased) they were shown "Same brand". If respondents selected any other brand S15 they were shown "Advertised as compatible with product" and "Brand reputation."

[75] NC37 was a fictitious response option.

who selected HEPA at this question and had selected "HEPA Filter" as a reason for purchase in the Product Block, or had not purchased a Levoit replacement filter, were skipped to the end screeners, as were respondents who did not select HEPA at this question.

56.     Respondents who qualified to continue with the Filter Block were asked the same series of questions about HEPA as respondents in the Product Block with the language altered to specify air purifier filters. These questions are described in detail in paragraphs 44-50 above. For example, as with the Product Block, after indicating HEPA was a reason for purchasing air purifier filters, respondents were asked the same closed-ended question "[If you recall / you may have already mentioned this, but] which of the following if any, represents your understanding(s) of what HEPA means?" The response options were identical to the comparable question in the Product Block except the word "Product" in the response option stem was changed to "Filter," as below:

> Q. [If you recall, /You may have already mentioned this, but] which of the following, if any, represents your understanding(s) of what HEPA means?[76]
> 1. Filter traps environmental pollution
> 2. Filter is tested using a specific protocol / standard
> 3. Filter meets a specific filtration percentage
> 4. Filter traps dust, pollen, mold, and bacteria
> 5. Filter has multiple layers of filtration
> 6. Filter contains a pleated, mechanical filter with fine mesh
> 7. Filter is energy efficient
> 8. Filter cleans air over a certain area
> 9. Filter neutralizes odors
> 10. Filter has a limited warranty
> 11. Other
> 12. None of these
> 13. Don't know / unsure

---

[76] Response options were randomized to guard against order effects.

57.    As with the Product Block, respondents that indicated "Filter is tested using a specific protocol / standard" represents their understanding of what HEPA means were then asked questions from Filter Block A. Respondents who selected "Filter meets a specific filtration percentage" were asked Filter Block B. The questions asked in Filter Block A and Filter Block B were almost identical to those asked in Product Block A and Product Block B except for the language altered to specify "air purifier filter" instead of "air purifier." As with the Product Block, respondents who selected both statements were asked both blocks in a randomized order. All other respondents were skipped to the final screener questions.

58.    After completing the Filter Block, respondents were taken to the end screener questions and were shown the following introduction: "We have just a few more questions for you." Respondents were first asked to indicate what their household income was during the past year (2024) so that I could utilize the data from this question to conduct sensitivity checks of my results.[77] Respondents were able to select their annual household income category, and were also given the option of indicating that they preferred not to answer or did not know or were unsure. This question, and the income categories that respondents were able to select from,[78] is shown below:

Q. Which of the following best describes your household income in the <u>past year</u> (2024)?
   1.  $0-$9,999
   2.  $10,000-$24,999
   3.  $25,000-$49,999
   4.  $50,000-$74,999
   5.  $75,000-$99,999
   6.  $100,000-$149,999
   7.  $150,000+
   8.  Prefer not to answer

---

[77] Irrespective of which subgroup of respondents I look at by household income, my results do not change. See **Appendix 1.7** for the results of these analyses.

[78] Response options one through seven were rotated to guard against order effects.

9. Don't know / unsure

59.     Respondents were then asked two final questions about their past survey participation and their or their household members' industries of employment. These questions were used to identify respondents who may have specialized knowledge about the topic of the survey.[79] Any respondent who had taken a survey on air purifiers in the past six months, or answered "Don't know / unsure" in response to this question,[80] and any respondent who worked for, or had a household member who worked for, a market research or advertising company, a company that makes or manufactures air purifiers, or answered "Don't know / unsure" was flagged for further review.[81] As described above in paragraph 32.f, when I remove these respondents from my analysis, my key results do not change.[82]

## H. Past Purchaser Survey Results

60.     A total of 298 respondents qualified and completed the Past Purchaser Survey. The data are attached as **Appendix 1.6**.

61.     As shown in **Table 1,** below, respondents were a mix of men and women, and a mix of age groups. As shown in **Table 2,** below, respondents were geographically distributed across the United States. A total of 70 respondents were residents of California.

---

[79] Barber, W. G., & Yaquinto, G. E. (2022). "The Universe," *Trademark and Deception Advertising Surveys, Law Science and Design, Second Edition*, pp. 31-56, at p. 56.

[80] 19 respondents were flagged for this reason.

[81] 5 respondents were flagged for this reason.

[82] *See* **Appendix 1.7** for the results of these analyses.

31

**Table 1. Age and Gender Distribution**

| Response | Male | | Female | | Overall | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| 18-34 | 33 | 21.3% | 27 | 19.3% | 62 | 20.8% |
| 35-54 | 81 | 52.3% | 52 | 37.1% | 133 | 44.6% |
| 55+ | 41 | 26.5% | 61 | 43.6% | 103 | 34.6% |
| **Total Respondents** | **155** | **100.0%** | **140** | **100.0%** | **298** | **100.0%** |

Note: 2 respondents, aged 18-34, identified as non-binary, and one respondent aged 55+ selected "Prefer not to answer."

Source: NERA Past Purchaser Survey, April-May 2025

**Table 2. Respondents' Regional Distribution**

| Response | Count | Percent |
|---|---|---|
| Northeast | 72 | 24.2% |
| Midwest | 47 | 15.8% |
| South | 80 | 26.8% |
| West | 99 | 33.2% |
| **Total Respondents** | **298** | **100.0%** |

Source: NERA Past Purchaser Survey, April-May 2025

62.    Respondents indicated that they purchased their Levoit air purifier in different years between 2020 to 2023. As shown below in **Table 3**, the vast majority of the sample qualified based on purchasing a model from the Core Series (86.6 percent). Roughly 20 percent of respondents indicated that they had purchased an EverestAir model, however, only 17.4 percent of respondents qualified on this basis alone.[83] Some respondents had also purchased other models in addition to

---

[83] Of the 57 respondents who indicated that they owned an "EverestAir" model, 40 respondents only purchased an EverestAir and not a Levoit Core series model, and an additional 12 respondents purchased both an EverestAir and Core series model but indicated that they most recently purchased an EverestAir (and therefore were asked about this model in the survey). In other words, 52 (40 + 12) respondents out of the 298 respondents in the survey, or 17.4 percent, qualified and were asked about the EverestAir model in this survey.

I understand that the Levoit EverestAir air purifier is no longer an accused model. If I remove the 52 respondents asked about the EverestAir model from my results, my conclusions do not change. See **Appendix 1.7**.

32

the Core or EverestAir, including LV-H132 (8.7 percent), CoreMini (8.4 percent) and Vital 100 (7.4 percent).

**Table 3. Model of Levoit Air Purifier Purchased**

| Response | Count | Percent[1] |
|---|---|---|
| Core[2] | 258 | 86.6% |
| EverestAir[2] | 57 | 19.1% |
| LV-H132 | 26 | 8.7% |
| CoreMini | 25 | 8.4% |
| Vital 100 | 22 | 7.4% |
| Vital 100s | 18 | 6.0% |
| Other | 0 | 0.0% |
| None of these | 0 | 0.0% |
| Don't know / don't recall | 0 | 0.0% |
| **Total Respondents** | **298** | |

*S11. What model or models of Levoit air purifier did you purchase between 2020 and 2023?*

Notes: [1] Percent does not sum to 100 because respondents could select multiple options.

[2] Respondents must have selected "Core," or "EverestAir" to qualify for the survey.

Source: NERA Past Purchaser Survey, April-May 2025

63.    A majority of survey respondents (67.4 percent) indicated that they had purchased their air purifier from Amazon.com. Respondents also purchased from other retailers, including in-store at Walmart (13.1 percent) or at Target.com (10.7 percent). The distribution is shown below in **Table 4**.

33

**Table 4. Where Levoit Air Purifier Was Purchased**

| Response | Count | Percent[1] |
|---|---|---|
| Amazon.com | 201 | 67.4% |
| In-store at Walmart | 39 | 13.1% |
| Target.com | 32 | 10.7% |
| Walmart.com | 27 | 9.1% |
| In-store at Target | 17 | 5.7% |
| Costco.com | 16 | 5.4% |
| In-store at Costco | 16 | 5.4% |
| In-store at Macy's | 7 | 2.3% |
| In-store at Staples | 5 | 1.7% |
| Macys.com | 2 | 0.7% |
| Staples.com | 1 | 0.3% |
| Other | 14 | 4.7% |
| None of these | 1 | 0.3% |
| Don't know / don't recall | 1 | 0.3% |
| **Total Respondents** | **298** | |

*S13. Please think of the Levoit [MODEL NAME FROM S11/S12] air purifier you purchased <u>between 2020 and 2023</u>. Where did you purchase this air purifier?*

Note: [1] Percent does not sum to 100 because respondents could select multiple options.

Source: NERA Past Purchaser Survey, April-May 2025

64.    As shown below in **Table 5**, approximately three quarters of respondents (73.5 percent) indicated that they had personally purchased replacement filters for their Levoit brand air purifier between 2020 and 2023. While the majority of respondents (66.1 percent) purchased Levoit branded replacement filters, roughly 5.4 percent of respondents indicated that they had purchased another brand of replacement filter to use with their Levoit air purifier.

34

**Table 5. Brand of Replacement Filter Purchased**

| Response | Count | Percent[1] |
|---|---|---|
| Levoit | 197 | 66.1% |
| Nispira | 8 | 2.7% |
| isinlive[2] | 5 | 1.7% |
| Colorfullife[2] | 4 | 1.3% |
| Cabiclean[2] | 3 | 1.0% |
| Funmit[2] | 2 | 0.7% |
| Improvedhand[2] | 1 | 0.3% |
| Leemone[3] | 1 | 0.3% |
| Fine Air[4] | 0 | 0.0% |
| Other | 2 | 0.7% |
| None of these | 2 | 0.7% |
| Don't know / don't recall | 15 | 5.0% |
| Not asked[5] | 79 | 26.5% |
| **Total Respondents** | **298** | |

*S15. Between 2020 and 2023, which brand or brands of replacement filters have you purchased for your Levoit [MODEL NAME FROM S11 OR S12] air purifier?*

Notes: [1] Percent does not sum to 100 because respondents could select multiple options.

[2] Response options only shown if "Core" and not "EverestAir" selected at S11 / S12.

[3] Only shown if "EverestAir" and not "Core" selected at S11 / S12.

[4] Respondent show selected this fake response option were screened out of the survey.

[5] Only respondents who indicated they purchased replacement filters at S14 were asked S15.

Source: NERA Past Purchaser Survey, April-May 2025

## 1. *Consumers Purchase Air Purifiers for a Variety of Reasons*

65.    While Plaintiff alleged that purchases of Levoit brand air purifiers was largely driven by the "pandemic and consumer fear,"[84] my survey results demonstrate that consumers

---

[84]*Motion for Class Certification,* p. 2.

purchased air purifiers for many reasons, including those unrelated to concerns about COVID or concerns about viruses more broadly. While some respondents, when asked an open-ended question about why they purchased a Levoit air purifier, indicated a variety of health-related reasons (including managing dust, pollen, allergies, and pet dander),[85] others indicated they purchased a device to manage household odors,[86] because of low air quality[87] or fires,[88] or to help them sleep.[89]

66.    Only two respondents mentioned HEPA in response to the initial purchasing questions.[90] Specifically, Respondent 11759 stated "Air purifiers with HEPA filters can trap airborne allergens like pollen, pet dander, dust mites, and mold spores that reducing allergy symptoms such as sneezing coughing and itchy eyes,"[91] and Respondent 6169 typed in "HEPA filter" when asked what they considered first when shopping for an air purifier.[92] Only one respondent mentioned the filtration percentage, indicating "filter absorbs 99% of hair debris to avoid allergen-induced coughs."[93]

---

[85] One respondent who was coded as indicating a health-related reason as to why they purchased a Levoit air purifier mentioned the pandemic in their response. This was respondent 2856 who said "During pandemic." An additional 18 respondents mentioned COVID-19 or the pandemic as a reason for purchase across any of the open-ended questions.

[86] For example, Respondent 5023 said "to help control odors and allergens," Respondent 5776 said "to help with pet odors and allergies," and Respondent 8964 indicated "to help get smells out of the air."

[87] For example, Respondent 11802 said "sometimes in daily life, the air quality will be very bad." Respondent 11872 indicated "the air quality in the area where you live is very bad…" and Respondent 13074 indicated "The air quality has been getting worse in recent years."

[88] For example, Respondent 11733 said that they purchased an air purifier because "of the excessive wildfire smoke in my area." Respondent 14678 said "to ensure air quality, especially during times where wildfires are happening outside." And Respondent 18817 said, "bought because the Canadian wildfires affected the air quality here in NYC."

[89] Respondent 11880 said "the quality of sleep is not particularly good, and the air filter is used as a sleep companion," Respondent 2722 said "I am addicted to the white noise for sleeping."

[90] i.e., Q1-Q3.

[91] See Respondent 11759 at Q1.

[92] This was a closed-ended question Q3, which read "When you were shopping for an air purifier, which, if any, of the following did you consider first?" This respondent selected the response option "Something else" and gave the response "Hepa filter" (Respondent 6169).

[93] See Respondent 11726 at Q1.

67.    When asked a closed-ended question, respondents similarly indicated that they purchased an air filter for a variety of reasons. As shown below in **Table 6**, respondents were most likely to select reducing dust (60.1 percent), reducing exposure to bacteria and viruses (47.3 percent), reducing pollution exposure (46.3 percent), or managing allergies (43.3 percent). A number of the selected reasons for purchase were unrelated to specific health claims such as: controlling household odor (39.3 percent), reducing pet dander (37.6 percent), aerating a particular room (16.4 percent), and for use as a sleep machine (8.4 percent).

37

**Table 6. Reasons for Purchasing an Air Purifier**

| Response | Count | Percent[1] |
|---|---|---|
| To reduce dust | 179 | 60.1% |
| To reduce exposure to bacteria and viruses | 141 | 47.3% |
| To reduce pollution exposure in home | 138 | 46.3% |
| I or another person in my household has allergies | 129 | 43.3% |
| To control household odor (e.g., kitchen odor or pet | 117 | 39.3% |
| To reduce pet dander/hair | 112 | 37.6% |
| I or another person in my household has health conditions (e.g., asthma) | 67 | 22.5% |
| To aerate a particular room in the house (e.g., a basement or a room without windows) | 49 | 16.4% |
| A friend or colleague recommended it to me | 39 | 13.1% |
| A doctor or medical professional recommended it to me | 37 | 12.4% |
| To protect from wildfire smoke | 34 | 11.4% |
| To eliminate second hand smoke | 33 | 11.1% |
| To use as a sleep/sound machine | 25 | 8.4% |
| Saw product advertised | 20 | 6.7% |
| Other | 2 | 0.7% |
| None of these | 1 | 0.3% |
| Don't know / don't recall | 0 | 0.0% |
| **Total Respondents** | **298** | |

*Q2. You may have already mentioned this, but which of the following, if any, are reasons you decided to purchase an air purifier?*

Note: [1] Percent does not sum to 100 because respondents could select multiple options.

Source: NERA Past Purchaser Survey, April-May 2025

## 2. *Vast Majority of Respondents Did <u>Not</u> Purchase an Air Purifier for HEPA*

68.     When asked to describe why they purchased their Levoit brand air purifier or their specific Levoit model air purifier, respondents provided a wide range of reasons including reviews and recommendations, price, performance, size, features such as quiet mode and smart technology,

and the brand. Examples of respondents who mentioned price and reviews as purchase drivers include:

- It had a good price point with excellent reviews. (Respondent 1811)

- I made the decision to purchase the brand based on the price and features that were compared. Levoit seemed to offer the most value. (Respondent 11732)

- It had a good price point with excellent reviews. (Respondent 1811)

- The reviews where [sic] good and filters were inexpensive. (Respondent 204)

- I saw that it had a lot of good reviews on amazon and I saw some videos on Tiktok with people raving about how good it is. (Respondent 572)

- It was in the price range and had good reviews. (Respondent 2375)

- It had great reviews, it was within my price range and it worked well for the square footage I needed to run that purifier in. (Respondent 3177)

- Was on sale and had good user reviews. (Respondent 6952)

    69.    Examples of respondents who mentioned the size of the product are below:

- It was a good size (Respondent 189)

- It's small and doesn't take up much space (Respondent 6534)

- The size was right (Respondent 5764)

- The product was compact… (Respondent 11743)

- It was the right size for what I needed (Respondent 18027)

- I thought the size would be appropriate for my space. (Respondent 23631)

    70.    Others mentioned the filtration coverage area, for example:

- I like that it can purify over 3000 sq feet. It was a larger area than the other models, so I felt I was getting a powerful purifier. I like it also works with Alexa and has 3 in 1 filtration. (Respondent 7967)

- At the time of purchase, it is the latest product, and the area covered by the product is also the largest, which has a good value. (Respondent 11880)

- Has the range to purify the area I need. Automatic adjust. (9688)

71.   Some respondents specifically identified smart features and quiet or sleep mode as purchase drivers:

- The sleep quiet feature (Respondent 14533)

- Supports remote operation and real-time monitoring or air quality (Respondent 11593)

- It's [sic] smart feature was nice because it could turn itself off without you having to remember to (Respondent 22932).

- Because I know that they are a leader in air purifier systems, and because they offer smart control of their products. (Respondent 6927)

72.   While others emphasized Levoit's brand reputation:

- Its [sic] a really reputable brand… (Respondent 655)

- I trust that company (Respondent 8444)

- Because this brand has a good reputation (Respondent 11857)

- Top brand (Respondent 23412)

- It was a trusted brand (Respondent 23531)

- The brand has a good and reliable reputation (Respondent 23947)

73.    Only seven respondents, or 2.3 percent,[94] mentioned HEPA[95] as a reason for purchasing their qualifying Levoit air purifier. None of these respondents referenced "True HEPA." As shown below, respondents who mentioned HEPA were also identifying other product features such as coverage area, reviews, and product appearance. In other words, HEPA was not the only reason for purchasing the Levoit air purifier.

- I purchased the Levoit Core air purifier because of the given square footage of effectiveness and the initial cost and filter replacement. Cost was a big one. I have had a number of Honeywell air purifiers and the HEPA filters are very expensive to replace…if you can even find them anymore (Respondent 2722)

- I decided to buy the brand based on the positive reviews online about its quiet operation and HEPA filter. This model was chosen by me because it had a genuine HEPA filter and was within my budget due to its price (Respondent 11716)

- This model was selected by me based on its features, including the 3-stage filtration (HEPA + activated carbon), which was precisely what I required for allergies and odors (Respondent 11733)

- H13 HEPA filter, strong adsorption odor (Respondent 11860)

- Compact appearance with HEPA filter. I like it because it is quiet (Respondent 16455)

- It was affordable and used HEPA filters. I liked the design (Respondent 23132)

- My best friend highly recommend [sic] it. Hepa filter is good. (Respondent 24609)

---

[94] Only counting respondents that mentioned "HEPA" at Q4, Q5, Q7 and Q8. An additional respondent (Respondent 11759) indicated HEPA was a reason for purchasing an air filter at Q1. They said "Air purifiers with HEPA filters can trap airborne allergens like pollen, pet dander, dust mites, and mold spores that reducing allergy symptoms such as sneezing, coughing and itchy eyes." One additional respondent at Q1 mentioned the filtration percentage, stating "filter absorbs 99% of hair debris" (Respondent 11726). Another respondent, Respondent 6169 mentioned "Hepa filter" when asked what they considered first when purchasing their air purifier at Q3.

[95] One respondent, Respondent 11860, mentioned H13 in their response, which was "H13 HEPA filter, strong adsorption odor."

74.     One additional respondent, Respondent 11861, mentioned the filtration level stating "Its overall design appearance and the degree of air purification rate meet the aesthetic and needs of my family and me."

75.     I coded the open-ended responses to the questions asking why respondents decided to purchase their qualifying Levoit brand air purifier. As shown below in **Table 7**, reviews and recommendations and the price or value of the product were the two most common types of responses.

**Table 7. Reasons for Purchase – Coded Open-Ended Responses**

| Response | Count | Percent[1] |
|---|---|---|
| Reviews / recommendations | 136 | 45.6% |
| Price / value | 132 | 44.3% |
| Performance / good product / works well | 50 | 16.8% |
| Size / portability | 45 | 15.1% |
| Features (e.g., quiet mode, smart features) | 42 | 14.1% |
| Brand / familiarity | 41 | 13.8% |
| Design | 27 | 9.1% |
| Health reasons (allergies, dust, pet hair, bacteria, odor etc.) | 24 | 8.1% |
| Availability | 19 | 6.4% |
| Quality / durability | 15 | 5.0% |
| Coverage area / range | 13 | 4.4% |
| HEPA / True HEPA | 7 | 2.3% |
| Product description and advertising | 6 | 2.0% |
| Filtration technology | 5 | 1.7% |
| Filtration rate | 1 | 0.3% |
| Other response | 8 | 2.7% |
| Don't know / unsure | 27 | 9.1% |
| **Total Respondents** | **298** | |

*Q4. You indicated that you purchased a Levoit [pipe: hS12] air purifier. If you recall, why did you purchase this particular product?*

*Q5. Any other reasons you selected this product?*

*Q7. You indicated that you purchased a Levoit [pipe: hS12] air purifier. If you recall, why did you decide to purchase this particular brand?*

*Q8. And why did you select this specific model, the [pipe: hS12]?*

Notes: [1] Percent does not sum to 100 because respondents could be coded for more than one category.

Source: NERA Past Purchaser Survey, April-May 2025

76.    The reasons given by the more than 200 consumers surveyed for purchasing their Levoit brand air purifier are markedly divergent from the singular reason provided by Plaintiff, Mr. Richard Chen. While Mr. Chen stated he did not look at product reviews,[96] consider a product

---

[96] *Chen Deposition*, pp. 74:25-75:2 ("Q. Did you read any customer reviews about the Core 300? A. Not that I remember.").

for his allergies,[97] notice the square footage coverage,[98] care about the size or appearance of the product,[99] or review any other features such as sleep mode or a timer,[100] these were all features of the accused products that caused relevant consumers to purchase their Levoit brand air purifier, and were features identified as a reason for purchase at far greater rates than HEPA.

77.    Across these initial open-ended questions (i.e., why purchase an air purifier and why purchase the Levoit brand/model) a total of eleven respondents,[101] or 3.7 percent, stated that HEPA, or specific filtration percentage, was one of the reasons they purchased their Levoit air purifier. These data demonstrate that neither HEPA, nor a specific filtration percentage, were significant purchase drivers for the vast majority of consumers surveyed. In fact, unlike Mr. Chen, 96.3 percent of respondents who purchased a Levoit brand air purifier did not mention HEPA when asked why they purchased an air purifier and did not mention HEPA as a reason for purchasing the Levoit brand when asked an open-ended question. These data are shown below in **Table 8.**

---

[97] *Chen Deposition*, p. 77:18-25 ("Q. Do you remember whether the Levoit air purifier was labeled fights allergies and unwanted odors? A. I don't remember. Q. Would that have been important to you? A. No. I was looking for HEPA. Q. So you – this was – this purchase was not related to your allergies? A. No. I was looking for an air purifier . . . .").

[98] *Chen Deposition*, p. 78:15-20. ("Q. Do you remember whether the Levoit air purifier was labeled as appropriate for a specific square footage? A. I don't remember. Q. Would that have been important to you? A. I don't know. I'm just looking for HEPA.").

[99] *Chen Deposition*, pp. 84:2-18 ("Q. Was the size of the Core 300 important to your purchase? A. No. I was primarily trying to buy a HEPA air purifier. Q. Do you think that other consumers may value the size of an air purifier? [objections] Q. Do you think that other consumers may value the size of an air purifiers [objections] A. I don't know. Q. Was the appearance of the Core 300 important? A. No. I was primarily looking for it being a HEPA air purifier."), and 85:4-18. ("Q. Was the color of your Core 300 important? A. No. I was primarily looking for a HEPA air purifier. Q. Okay Do you think that other consumers would value the color of an air purifier? [objection] A. Sorry. Could you – Q. Do you think that other consumers may value the color of the air purifier they're purchasing? A. I – [objection] I – I don't know.").

[100] *Chen Deposition*, pp. 78:21-79:11. ("Q. Do you remember whether the Levoit air purifier was labeled night mode for quiet sleep? A. I don't remember. Q. Do you know what that means, night mode for quiet sleep? A. I don't know. Q. And can I infer that you do not remember whether any of the other air purifiers were labeled night mode for quiet sleep? A. I just don't remember. Q. Okay. Do you remember whether the Levoit air purifier was labeled 0 to 8-hour timer? A. I don't remember. Q. Would that have been important to you? A. No. I was primarily looking for HEPA air purifiers.").

[101] There were seven respondents who mentioned "HEPA" in response to one or more of Q4, Q5, Q7, or Q8 and one respondent that mentioned the filtration percentage across these same questions, Q4, Q5, Q7, Q8. An additional three respondents across Q1 and Q3 mentioned "HEPA" or the filtration rate.

**Table 8. Mentions of HEPA and Filtration Rate Across Initial Open-Ended Questions**

| Response | Count | Percent[1] |
|---|---|---|
| Total unique mentions of HEPA or filtration rate | 11 | 3.7% |
| *HEPA / True HEPA / H13* | *9* | *3.0%* |
| *Filtration rate* | *2* | *0.7%* |
| **Total Respondents** | **298** | |

*Q1. In your own words, why did you decide to purchase an air purifier?*

*Q3. When you were shopping for an air purifier, which, if any, of the following did you consider* first*?*

*Q4. You indicated that you purchased a Levoit [MODEL] air purifier. If you recall, why did you purchase this particular product?*

*Q5. Any other reasons you selected this product?*

*Q7: You indicated that you purchased a Levoit [MODEL] air purifier. If you recall, why did you decide to purchase this particular brand?*

*Q8. And why did you select this specific model, the [MODEL]?*

Notes: [1] Percent does not sum to 100 because only a subset of respondents mentioned HEPA.

Source: NERA Past Purchaser Survey, April-May 2025

78.     Open-ended responses such as those described above reflect the top-of-mind, most salient reasons for purchase,[102] and the survey data indicate that HEPA and a specific filtration percentage did not impact consumers' purchasing decisions. To ensure my data reflected a complete and comprehensive set of consumers' reasons for purchase, I also asked a closed-ended question. While a closed-ended question can help respondents recall less salient features or reasons for purchase, it can also cause respondents to guess or prompt them with reasons that they may not have originally considered.[103]

79.     As shown below in **Table 9**, even when provided with list from which they could select as many features as possible, only 32.2 percent of respondents, when prompted, selected HEPA filter. In other words, even with HEPA appearing on a list, with no limitations on the

---

[102] *Diamond*, pp. 393-394. Open ended questions "gauge what comes first to a respondent's mind."

[103] *Diamond*, pp. 393-394.

number of features they could select, more than two thirds of respondents didn't select HEPA as a feature that mattered in any way (as discussed in the following paragraphs, these consumers do not have a uniform perception of what HEPA means). The top reasons selected included price (56.7 percent) and product/customer reviews (46.6 percent), followed by size (36.6 percent), and design (32.2 percent).

80.    I understand that Plaintiff alleged in the Complaint that H13 is also a misleading representation,[104] but Plaintiff's expert, Mr. Gaskin, does not intend on testing this claim[105] and it is not a part of Plaintiff's Motion for Class Certification.[106] As described in footnote 94, only one respondent mentioned H13 at the open-ended question as a reason for why they purchased their Levoit brand air purifier.[107] As shown in the below table, even when prompted with a list, only nine respondents, or 3.0 percent, selected H13. The rate at which respondents selected H13 (3.0 percent) was similar to the rate that respondents selected the fictitious designation NC37 (1.7 percent) suggesting that respondents selecting H13 were likely guessing or were randomly selecting items from the list.

---

[104] *See*, e.g., *Complaint*, ¶ 2.

[105] As Mr. Gaskin testified at his deposition, his survey is intended only to measure the "true HEPA" claim. *Gaskin Deposition*, pp. 13:1-25-14:15.

[106] *See* generally *Motion for Class Certification*.

[107] This was respondent 11860 who said "H13 HEPA filter, strong adsorption odor."

**Table 9. Reasons for Purchase - Closed-Ended Responses**

| Response | Count | Percent[1] |
|---|---|---|
| Price | 169 | 56.7% |
| Product/customer reviews | 139 | 46.6% |
| Size | 109 | 36.6% |
| Design / overall look | 96 | 32.2% |
| HEPA filter | 96 | 32.2% |
| Product reputation | 93 | 31.2% |
| Large coverage area | 86 | 28.9% |
| Air quality indicator | 82 | 27.5% |
| Brand | 74 | 24.8% |
| Availability (in-store or quick delivery) | 68 | 22.8% |
| Quiet/sleep mode | 59 | 19.8% |
| Filter lifespan | 59 | 19.8% |
| Multiple fan levels | 56 | 18.8% |
| Energy efficiency | 54 | 18.1% |
| Smart features/functionalities | 47 | 15.8% |
| Targets specific pollutants | 39 | 13.1% |
| Color | 25 | 8.4% |
| Warranty | 22 | 7.4% |
| Return policy | 19 | 6.4% |
| Voice control | 16 | 5.4% |
| Filter subscription service | 13 | 4.4% |
| H13 | 9 | 3.0% |
| NC37 | 5 | 1.7% |
| Other | 5 | 1.7% |
| None of these | 2 | 0.7% |
| Don't know / unsure | 3 | 1.0% |
| **Total Respondents** | **298** | |

*Q6. [If you recall / You may have already mentioned this, but] which of the following, if any, are reasons you purchased your Levoit [MODEL NAME FROM S11 OR S12] brand air purifier?*

*Q9. [If you recall / You may have already mentioned this, but] which of the following, if any, are reasons you selected the <u>specific model</u>, the [MODEL NAME FROM S11 OR S12] brand air purifier?*

Notes: [1] Percent does not sum to 100 because respondents could select multiple options.

[2] "Filter subscription service" was only shown to respondents who indicated they had purchased replacement filters for their Levoit air filter.

Source: NERA Past Purchaser Survey, April-May 2025

47

81.     Similarly, when asked about reasons for purchasing a particular brand of replacement air filter, respondents gave a variety of answers. When asked an open-ended question, respondents mentioned purchasing their Levoit filter because it was the same brand as the product, or because of availability and price. Just five respondents who purchased Levoit replacement filters mentioned HEPA and/or filtration percentage as a reason for purchase:[108]

- They use HEPA filteration [sic] (Respondent 933)

- It was the manufacturer of the product and the filters were HEPA certified and had good reviews and were available (Respondent 3177)

- Many models claim to remove 99.97% of particles as small as 0.3 microns (Respondent 11759)

- It was HEPA certified which is a top of the line filter (Respondent 13949)

- The filtration effect is guaranteed (Respondent 23945)

82.     As shown below in **Table 10**, even when prompted with a list (from which they were able to select as many features as desired), only 23.7 percent of respondents who purchased replacement filters indicated that they purchased their replacement filter because the filters were "HEPA."[109] As with respondents' answers pertaining to the air purifiers themselves (described above in paragraphs 79 and 80), the majority of respondents did not indicate that HEPA mattered in any way to their purchasing decision, even when given the opportunity to select as many features as possible. Instead, the top reasons why respondents indicated that they purchased replacement

---

[108] One additional respondent, respondent 20601, purchased non-Levoit brand replacement filter and mentioned HEPA at Q20, stating "Price, and also considered a hepa filter."

[109] Of those who purchased Levoit brand air filters, 51 respondents, or 25.9 percent, mentioned "HEPA."

filters were because the filter brand was the same as the product (53.0 percent), the quality of the

filters (40.2 percent), based on product reviews (32.4 percent), or price (26.5 percent).

**Table 10. Closed-Ended Responses to Why Respondents Purchased Their Brand of Replacement Filters**

| Response | Count | Percent[1] |
|---|---|---|
| Same brand | 116 | 53.0% |
| Quality | 88 | 40.2% |
| Product reviews | 71 | 32.4% |
| Price | 58 | 26.5% |
| HEPA | 52 | 23.7% |
| Availability (in-store or quick delivery) | 52 | 23.7% |
| Filter lifespan | 44 | 20.1% |
| Odor control | 40 | 18.3% |
| Targets specific pollutants | 33 | 15.1% |
| Availability of specialty filters (e.g., pet | 32 | 14.6% |
| Multi pack | 28 | 12.8% |
| Energy efficiency | 23 | 10.5% |
| Design | 22 | 10.0% |
| Available via a subscription service | 19 | 8.7% |
| Return policy | 15 | 6.8% |
| H13 | 4 | 1.8% |
| NC37 | 3 | 1.4% |
| Brand reputation | 2 | 0.9% |
| Advertised as compatible with product | 0 | 0.0% |
| Other | 0 | 0.0% |
| None of these | 3 | 1.4% |
| Don't know / unsure | 2 | 0.9% |
| Not asked[2] | 18 | 8.2% |
| **Total Respondents[3]** | **219** | |

*Q22. [If you recall, / You may have already mentioned this, but] which of the following, if any, are reasons you purchased your [INSERT "Levoit" OR PIPE OTHER BRAND] air purifier* filters*?*

Note: [1] Percent does not sum to 100 because respondents could select multiple options.

[2] Respondents were only asked Q22 if they indicated they had purchased replacement filters for their air purifier at S14. Respondents who indiciated "Other" "None of these" or "Don't know / don't recall" when asked the brand of their replacement filters at S15 were not asked Q22.

[3] Total respondents represents the total respondents that indicated they had purchased a replacement filter.

Source: NERA Past Purchaser Survey, April-May 2025

50

83.    I tabulated the total number of respondents who, at any of the purchasing questions, identified HEPA as a reason for purchasing their Levoit Air Purifier or replacement filter. This tabulation includes any mention of HEPA,[110] either at an open-ended or close-ended question. Across a total of 11 questions,[111] 109 respondents (out of 298), or 36.6 percent, indicated that HEPA or the filtration level was one of the reasons for purchasing their Levoit air purifier or replacement filter, and 86.2 percent of these respondents identified HEPA/filtration only after being prompted by a list of all possible features.[112] These data demonstrate that, even when provided with multiple opportunities, only 5 percent of consumers who purchased a Levoit brand air purifier  independently identified HEPA/filtration as a reason for purchase and more than two thirds did not select HEPA even when prompted with a list.

### 3. Consumers Do <u>Not</u> Have Uniform Understanding of HEPA and Perceptions of HEPA Claim Would Not Have Impacted Purchase Decision

84.    Respondents who indicated that HEPA was a reason for purchase, including those who selected HEPA only when prompted with a list, were asked to explain what HEPA means in their own words. Respondents offered a range of descriptions of HEPA, with many providing answers about general quality, or the ability to trap dust, pollen, allergens or environmental pollution. Only six respondents referenced something about a filtration percentage or level. Similarly, only six respondents mentioned that the product is tested using some standard. In total,

---

[110] Or who mentioned that the product provided a specific filtration level.

[111] Q1, Q3, Q4, Q5, Q6, Q7, Q8, Q9, Q20, Q21, Q22.

[112] Two respondents (Respondents 11716, 11759) mentioned HEPA at an open-ended question, but did not select HEPA at either of the closed-ended questions. These respondents are included in this calculation. Additionally, this calculation includes three respondents (Respondent 11726, 11861, and 23945) who mentioned the filtration rate in an open-ended question response but did not select HEPA at the closed-ended questions.

ten respondents, or 9.6 percent[113] of those asked, described HEPA as related to some standard or as related to some level of filtration. In other words, 90.4 percent of respondents asked to describe HEPA in their own words did *not* offer a definition related to standards or filtration percentages. These small number of responses referencing anything about standards or filtration are shown below.

- Hepa filter represent [sic] the gold standard for air purification (Respondent 933)

- To me, HEPA filters means that the air filtration is highly effective in that it traps particles down to the size that meets a stringent criteria. HEPA filtration is the allergy doctor recommended type of filtration recommended by allergy and asthma doctors. (Respondent 2722)

- It is certified to do a specific level of filtration which is certified and overseen by regulatory agencies (Respondent 3177)

- It means that it needs [sic] the standards of environmental environment, protection, and energy efficiency (Respondent 7310)

- The reason I chose this replacement filter brand is because it captures 99.97% of small particles, such as dust, pollen and pet dander. (Respondent 11733)

- HEPA filters more than 99.97% of particulate matter $\geq 0.3$ micron (Respondent 11860)

- It's a standard of purification that I trust (Respondent 15118)

- It means that the filter is rated regarding the types and sizes of pollutants it removes. (Respondent 18027)

- Removes 99% of contaminantes [sic] (Respondent 19934)

---

[113] Six respondents mentioned HEPA and an additional four respondents mentioned the filtration level = 10 respondents total. 10 / 104 = 9.6 percent.

- Removes particulates in the air larger then [sic] .005 or so mm (Respondent 20601)

85.    I also asked respondents who indicated that HEPA was a reason for purchase including those who selected HEPA from a list, a closed-ended question about its meaning. These results are shown below in **Table 11**. The most common response was that HEPA meant that product filtered out dust, pollen, mold, and bacteria, followed by an understanding that HEPA means multiple levels of filtration.

**Table 11. Closed-Ended Responses to Understanding of HEPA**

| Response[2] | Count | Percent[1] |
|---|---|---|
| Product / Filter traps dust, pollen, mold, and bacteria | 85 | 28.5% |
| Product / Filter has multiple layers of filtration | 68 | 22.8% |
| Product / Filter meets a specific filtration percentage | 58 | 19.5% |
| Product / Filter traps environmental pollution | 56 | 18.8% |
| Product / Filter is tested using a specific protocol / standard | 43 | 14.4% |
| Product / Filter cleans air over a certain area | 37 | 12.4% |
| Product / Filter contains a pleated, mechanical filter with fine mesh | 34 | 11.4% |
| Product / Filter neutralizes odors | 29 | 9.7% |
| Product / Filter is energy efficient | 14 | 4.7% |
| Product / Filter has a limited warranty | 4 | 1.3% |
| Other | 0 | 0.0% |
| None of these | 0 | 0.0% |
| Don't know / unsure | 1 | 0.3% |
| Not asked[3] | 194 | 65.1% |
| **Total Respondents** | **298** | |

*Q11 / Q24. [If you recall / You may have already mentioned this, but] which of the following, if any, represents your understanding(s) of  what HEPA means?*

Note: [1] Percent does not sum to 100 because respondents could select multiple options.

[2] Respondents asked Q11 were shown the "Product" language while respondents asked Q24 were shown the "Filter" language.

[3] Respondents were only asked Q11 if they selected "HEPA" at Q9. Respondents were only asked Q24 if they qualified as a filter purchaser, selected HEPA at Q22, and were not asked Q11 (i.e., did not select "HEPA" at Q9).

Source: NERA Past Purchaser Survey, April-May 2025

53

86.     The list of response options included two statements related to Plaintiff's claims; one indicating that HEPA means a specific filtration standard is met and another indicating that the filter is tested with a specific standard or protocol. More than one quarter of these respondents did *not* indicate that HEPA meant either of these things.[114] In other words, 27.9 percent of the respondents who said HEPA was a reason for purchase do not believe that HEPA means a specific filtration standard is met nor do they believe the filter is tested with a specific standard or protocol.

87.     In the *Complaint*, Plaintiff alleges that HEPA meets a specific filtration level and more specifically asserts that,  to be called a HEPA filter, the filter must "remove at least 99.97% of dust, pollen, mold, bacteria, and any airborne particles with a size of 0.3 microns."[115] Therefore, respondents who indicated that HEPA means a specific filtration standard is met or who indicated that they believe the filter is tested with a specific standard or protocol were asked whether there was a <u>single</u> standard or a <u>single</u> protocol. In fact, as shown in **Tables 12** and **13** below, respondents were as likely to indicate that there was more than one filtration standard or testing protocol than to indicate that there was only one.

---

[114] A total of 104 of the 298 respondents indicated that HEPA was a reason for purchasing their Levoit air purifier or replacement filter when presented with "HEPA" in a list of response options. Of these 104 respondents, 29 did not select either of the two statements (29 / 104 = 27.9 percent).

[115] *Complaint,* ¶ 25.

**Table 12. HEPA Testing Protocol – One or More than One**

| Response | Overall | | Air Purifier | | Filter | |
|---|---|---|---|---|---|---|
| | **Count** | **Percent** | **Count** | **Percent** | **Count** | **Percent** |
| One HEPA standard/protocol | 11 | 3.7% | 10 | 3.4% | 1 | 0.5% |
| More than one HEPA standard/protocol | 9 | 3.0% | 9 | 3.0% | 0 | 0.0% |
| Don't know / unsure | 23 | 7.7% | 21 | 7.0% | 2 | 0.9% |
| Not asked[1] | 255 | 85.6% | 258 | 86.6% | 216 | 98.6% |
| **Total Respondents** | **298** | **100.0%** | **298** | **100.0%** | **219** | **100.0%** |

*Q12. You indicated that you think HEPA means the product is tested using a specific protocol / standard. Do you think there is [RANDOMIZE ORDER: "one HEPA testing standard/protocol, more than one HEPA testing standard/protocol," OR "more than one HEPA testing standard/protocol, one HEPA testing standard/protocol,"] or do you not know?*

*Q25. You indicated that you think HEPA means the air purifier filter is tested using a specific protocol / standard. Do you think there is [RANDOMIZE ORDER: "one HEPA testing standard/protocol, more than one HEPA testing standard/protocol," OR "more than one HEPA testing standard/protocol, one HEPA testing standard/protocol,"] or do you not know?*

Note: [1] Respondents were only asked Q12 if they selected "Product is tested using a specific protocol / standard" at Q11, and were only asked Q25 if they selected "Filter is tested using a specific protocol / standard" at Q24.

Source: NERA Past Purchaser Survey, April-May 2025

**Table 13. HEPA Filtrations Percentage – One or More than One**

| Response | Overall | | Air Purifier | | Filter | |
|---|---|---|---|---|---|---|
| | **Count** | **Percent** | **Count** | **Percent** | **Count** | **Percent** |
| One filtration percentage that meets HEPA standards | 11 | 3.7% | 10 | 3.4% | 1 | 0.5% |
| More than one filtration percentage that meets HEPA standards | 18 | 6.0% | 17 | 5.7% | 1 | 0.5% |
| Don't know / unsure | 29 | 9.7% | 27 | 9.1% | 2 | 0.9% |
| Not asked[1] | 240 | 80.5% | 244 | 81.9% | 215 | 98.2% |
| **Total Respondents** | **298** | **100.0%** | **298** | **100.0%** | **219** | **100.0%** |

*Q16. You indicated that you think HEPA means the product meets a specific filtration percentage. Do you think there is [RANDOMIZE ORDER: "one HEPA filtration percentage that meets HEPA standards, more than one HEPA filtration percentage that meets HEPA standards," / "more than one HEPA filtration percentage that meets HEPA standards, one HEPA filtration percentage that meets HEPA standards,"] or do you not know?*

*Q29. You indicated that you think HEPA means the air purifier filter meets a specific filtration percentage. Do you think there is [RANDOMIZE: "one HEPA filtration percentage, more than one HEPA filtration percentage," OR "more than one HEPA filtration percentage, one HEPA filtration percentage,"] or do you not know?*

Note: [1] Respondents were only asked Q16 if they selected "Product meets a specific filtration percentage" at Q11, and were only asked Q29 if they selected "Filter meets a specific filtration percentage" at Q24.

Source: NERA Past Purchaser Survey, April-May 2025

88.     Regardless of whether they believed there was a single test or protocol or more than one test/protocol (or they did not know), respondents were asked whether knowing the Levoit air

purifier/filter was tested using the Institute of Environmental Science Technology's ("IEST") test would impact their purchasing decision. As shown in **Table 14** below, respondents were equally likely to indicate that using an IEST test would not have an impact or they don't know whether it would have an impact, compared to those who said it would have any impact.

**Table 14. IEST Test Impact on Purchasing Decision**

| Response | Overall | | Air Purifier | | Filter | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| Yes | 22 | 7.4% | 20 | 6.7% | 2 | 0.9% |
| *More likely to purchase* | *19* | 6.4% | *17* | 5.7% | *2* | 0.9% |
| *Neither more nor less* | *2* | 0.7% | *2* | 0.7% | *0* | 0.0% |
| *Less likely to purchase* | *1* | 0.3% | *1* | 0.3% | *0* | 0.0% |
| *Don't know / unsure* | *0* | 0.0% | *0* | 0.0% | *0* | 0.0% |
| No | 10 | 3.4% | 10 | 3.4% | 0 | 0.0% |
| Don't know / unsure | 11 | 3.7% | 10 | 3.4% | 1 | 0.5% |
| Not asked[1] | 255 | 85.6% | 258 | 86.6% | 216 | 98.6% |
| **Total Respondents** | **298** | **100%** | **298** | **100%** | **219** | **100%** |

*Q13. There are a number of different HEPA tests. Your Levoit air purifier was tested using one of these tests, the Institute of Environmental Science Technology's ("IEST") test. Would this information have had an impact on your decision to purchase the product?*

*Q26. There are a number of different HEPA tests. Your Levoit air purifier filter was tested using one of these tests, the Institute of Environmental Science Technology's ("IEST") test. Would this information have had an impact on your decision to purchase the air purifier filter?*

*Q14. You indicated that your Levoit air purifier being tested using the Institute of Environmental Science Technology ("IEST") would have had an impact on your decision to purchase the product. Would it have made*

*Q27. You indicated that your Levoit air purifier filter being tested using the Institute of Environmental Science Technology ("IEST") would have had an impact on your decision to purchase the product. Would it have made*

Note: [1] Respondents were only asked Q13 if they selected "Product is tested using a specific protocol / standard" at Q11. Respondents were only asked Q26 if they selected "Filter is tested using a specific protocol / standard" at Q24 and indicated at S15 that they purchased Levoit replacement filters.

Source: NERA Past Purchaser Survey, April-May 2025

89.    Similarly, I asked respondents, regardless of whether they believed there was a specific filtration percentage being met, whether knowing that Levoit air purifiers are tested at 99.97% efficient at 0.3 microns and the product had a rating of 98.70% efficiency at 0.3 microns,

56

would have had an impact on their purchasing decision. Of those asked, more than a third indicated that this information would have no impact on their purchase decision.[116] As shown in **Table 15** below, of those who said it would impact their purchase decision, respondents were equally likely to indicate that this information would have a positive impact on their purchase likelihood (would make them more likely to have purchased the product), as they were to say it would have a negative impact on their purchase likelihood (12 of the 27 respondents who said the information  would have an impact on their purchasing decision said it would make them more likely to purchase compared to 12 respondents who said it would make them less likely).

---

[116] Of the 58 respondents asked, 18 indicated it would have no impact and three indicated that it would have no impact on their decision to purchase the air purifier.

**Table 15. Rating of 98.70% Efficiency at 0.3 Microns Impact on Purchasing Decision**

| Response | Overall | | Air Purifier | | Filter | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| Yes | 27 | 9.1% | 25 | 8.4% | 2 | 0.9% |
| *More likely to purchase* | *12* | *4.0%* | *11* | *3.7%* | *1* | *0.5%* |
| *Neither more nor less* | *3* | *1.0%* | *2* | *0.7%* | *1* | *0.5%* |
| *Less likely to purchase* | *12* | *4.0%* | *12* | *4.0%* | *0* | *0.0%* |
| *Don't know / unsure* | *0* | *0.0%* | *0* | *0.0%* | *0* | *0.0%* |
| No | 18 | 6.0% | 16 | 5.4% | 2 | 0.9% |
| Don't know / unsure | 13 | 4.4% | 13 | 4.4% | 0 | 0.0% |
| Not asked[1] | 240 | 80.5% | 244 | 81.9% | 215 | 98.2% |
| **Total Respondents** | **298** | **100.0%** | **298** | **100.0%** | **219** | **100.0%** |

*Q17. Levoit air purifiers are tested at 99.97% efficient at 0.3 microns. If your product had a rating of 98.70% efficiency at 0.3 microns, would this information have had an impact on your decision to purchase the product?*
*Q30. Replacement filters for Levoit air purifiers are tested at 99.97% efficient at 0.3 microns. If your Levoit replacement filters had a rating of 98.70% efficiency at 0.03 microns Would this information have had an impact on your decision to purchase the air purifier filter?*
*Q18. You indicated that if your Levoit air purifier had a rating of 98.70% efficiency at 0.3 microns, it would have had an impact on your decision to purchase the product. Would it have made you…?*
*Q31. You indicated that if your Levoit air purifier had a rating of 98.70% efficiency at 0.3 microns, it would have had an impact on your decision to purchase the product. Would it have made you…?*

Note: [1] Respondents were only asked Q17 if they selected "Product meets a specific filtration percentage" at Q11.
Respondents were only asked Q30 if they selected "Filter meets a specific filtration percentage" at Q24 and indicated at S15 that they had purchased Levoit replacement filters.

Source: NERA Past Purchaser Survey, April-May 2025

90.    Finally, I can evaluate the extent to which, overall, a particular understanding of HEPA had an impact on consumer purchasing decisions. As shown in **Table 16** below, only 36.6 percent of Levoit brand air purifier owners indicated that HEPA had any role in their purchasing decision for either the product or the air filter. Furthermore, only 25.2 percent of respondents indicated that HEPA had an impact on their purchasing decision and believed that HEPA was related to a rate of filtration or some standard. Only 13 respondents out of the total 298, or 4.4 percent, indicated (1) HEPA was a reason for purchase, (2) indicated that HEPA meant some

standard or filtration percentage was being met, and (3) said that information about testing using the IEST standard or achieving a rating of 98.70 percent would have made them less likely to purchase their Levoit brand air purifier or air filters. The 4.4 percent has a 95 percent confidence interval between 2.0 and 6.7 percent.[117] This estimate means that the estimated share of consumers in the total population of purchasers who would have been less likely to purchase the Levoit product if they understood that the product was tested using the IEST standard and/or that the product met a 98.7 percent filtration rather than a 99.97 percent filtration could be as little as two percent of all purchasers or a maximum of seven percent.

**Table 16. Overall Impact of Asserted HEPA Claims**

| Response | Count | Percent[1] |
|---|---|---|
| Indicated HEPA filter is a reason for purchase | 109 | 36.6% |
| Indicated they believe HEPA means a specific filtration percentage is met  OR the product is tested using a specific standard | 75 | 25.2% |
| Indicated they believe that one filtration percent is met OR tested with one standard / protocol | 19 | 6.4% |
| Indicated less likely to purchase | 13 | 4.4% |
| **Total Respondents** | **298** | |

Note: [1] Percent does not sum to 100 as not all respondents are categorized.

Source: NERA Past Purchaser Survey, April-May 2025

91.     The results of the Past Purchaser Survey of almost 300 consumers who purchased an accused Levoit brand air purifier demonstrates that the brand and model were selected for a wide range of reasons. Many consumers indicated that they relied on product reviews and the price, or on other product features such as the size, coverage area, and/or design. Unlike Plaintiff, more

---

[117] The confidence interval is calculated at the 95 percent level and is equal to the sample mean $\pm$ margin of error. The margin of error = $z \times \sigma/\sqrt{n}$ where z = z-score, $\sigma$ = standard deviation, and $n$ = sample size. Applying this formula, $1.96 \times (0.2046 / \sqrt{298}) = 0.0232$ = margin of error.

than 95 percent of consumers did not identify HEPA when asked to explain why they purchased the product. Even when provided with HEPA on a list, the majority of respondents who purchased a Levoit brand air purifier did not indicate they purchased the product because it was advertised as HEPA or True HEPA. The majority of respondents who indicated HEPA had some role in their purchase (and the vast majority of these were individuals who selected HEPA because it appeared on a list of features), do not think HEPA means that there is a specific testing standard/protocol or specific filtration percentage being met, nor do these consumers have a uniform or common understanding (if they have a perception at all) as to what HEPA means or what constitutes the filtration percentage or testing standard.

## VI.   PROSPECTIVE PURCHASER SURVEY

92.    While my survey of past Levoit purchasers demonstrates that there are a wide range of reasons for purchase and varying interpretations of HEPA, if this was a claim that mattered at all, these data are retrospective and do not directly measure the impact of the accused statements relative to the absence of the accused statements as they appear on product advertising. Therefore, to evaluate the extent to which Levoit product descriptions or advertising containing the accused statements would have an impact on consumer interest in purchasing the product, relative to advertising without these statements, I conducted a second study using a simple choice experiment design (also known as an experimental design).[118] The results of this study provide concrete, reliable, and statistically valid evidence demonstrating that removing statements related to True

---

[118] As one author notes, "a simple choice experiment can be more effective at isolating the causal impact of the key allegations without artificially focusing respondents' attention on them. In other words, a well-designed choice experiment that minimizes demand effects is less likely to artificially inflate the value of the at-issue feature for respondents." Steckel, J., Kirk Fair, R., Shampanier, K., & Cai, A. (2023). "Choice Experiments: Reducing Complexity and Measuring Behavior Rather than Perception." *The Cambridge Handbook of Marketing and the Law*; edited by Gersen, J. E. and Steckel, J., pp. 207-220 at p. 218.

HEPA, H13, and 99.97% filtration at 0.3 microns has no impact on consumer interest in purchasing a Levoit brand air purifier.

## A. Survey Methodology

93.    In addition to a survey of actual purchasers of Levoit brand air purifiers, I evaluated the extent to which advertising and product packaging including references to True HEPA, H13, and 99.97% efficient at 0.3 microns, would have an impact on purchasing intentions. As with the Past Purchaser Survey, the design of my research for the Prospective Purchaser Survey follows the generally accepted principles for the design of a survey used as evidence in litigation. These general principles are described in Section V.A.

## B. Population

94.    The relevant population for the Prospective Purchaser Survey is U.S. residents aged 18 or older who indicated that in the next year they are likely to personally purchase an air purifier for their own use or for their household. Respondents also needed to indicate that they were likely to shop for an air purifier on Amazon.com. Plaintiff Richard Chen purchased his air purifiers from Amazon.com.[119] Respondents also needed to indicate that they would pay $100 or more for an air purifier.[120]

## C. Sampling of the Relevant Population

95.    Sampling for the Prospective Purchaser Survey was similar to the Past Purchaser Survey. As described in Section V.C., respondents to the Prospective Purchaser Survey were also contacted by Veridata, and Veridata's standard quality control measures were applied in this study.

---

[119] *Complaint*, ¶ 11.

[120] I set a quota such that approximately 70 percent of my sample would be willing to pay between $100 and $200 at most, as I understand this is the general price range for the Core series products. Plaintiff Rick Chen purchased the Levoit Core 300 Air Purifier for $99.99 for (*Complaint*, ¶ 11).

96.     The data for this survey were collected between April 11, 2025, and April 28, 2025. Potential respondents were not informed about the survey's purpose or topic and had to meet the screening criteria to qualify. A total of 795 respondents qualified for and completed the survey. The complete questionnaire for the survey is provided in **Appendix 2.1**, and screenshots of the survey as it appeared to respondents are included as **Appendix 2.2**.[121]

### D.  Quality Control Measures for the Survey

97.     To ensure that my data are reliable and of the highest quality, I implemented the same quality control measures as the Past Purchaser Survey, as described in Paragraph 32.

### E.  Screening Questionnaire

98.     To confirm that the survey respondents were part of the relevant population, I implemented a series of screening questions. Only those who met the criteria defined by these questions were allowed to proceed to the main survey. To qualify, respondents had to:

    a.  Be a resident of the United States;

    b.  Be 18 years old or older;

    c.  Report that they are likely to purchase an air purifier within the next year;

    d.  Indicate that they would be likely to shop for an air purifier on Amazon.com;

    e.  Indicate that they would pay $100 or more for an air purifier;

    f.  Pass all quality controls as discussed in Paragraph 32 above.

### F.  Main Questionnaire

99.     A total of 795 respondents qualified for the survey and were then taken to the main questionnaire. They were first given the instructions:

---

[121] Full-sized images of the survey stimuli can be found in **Appendix 2.3**.

On the following screen, you will be shown a webpage for a product you might consider purchasing. Please look at the webpage as you normally would if you were considering making a purchase.

Please take as much time as you would like to review the webpage, and then click the "Continue >>" button at the bottom of the screen when you are ready to move on to the survey questions.

100.    Respondents were then randomized into one of four groups: a Test Group and three Control Groups. Respondents in the Test Group were shown an actual product webpage for the Levoit Core 300 air purifier for sale on Amazon.com.[122] Respondents in the Control Groups were shown the same product and webpage from Amazon.com, except I made the following changes: (1) I removed all references to HEPA  and True HEPA and in some instances replaced this language with "3-Stage Filter"; or (2) I removed the references to 99.97% at 0.3 microns. I also created a Control stimulus which removed both sets of claims. Further details on the stimuli shown to the Control Groups are provided in Section VI.G. below.

101.    After viewing the webpage corresponding to their randomly assigned group, respondents were asked to indicate how likely they would be to purchase the product shown. Respondents selected their answer from a five-point scale ranging from "very likely" to "very unlikely"[123] and were also able to indicate that they did not know or were unsure. Respondents were also asked to indicate why they selected the answer they did. The exact phrasing of these two questions is below:

Q. Based on the product information shown, how likely would you be to purchase this product?
1.    Very likely
2.    Somewhat likely
3.    Neither likely nor unlikely

---

[122] https://web.archive.org/web/20230106105701/https://www.amazon.com/LEVOIT-Purifier-Home-Allergies-Pets/dp/B07VVK39F7, last accessed May 14, 2025.

[123] The scale was rotated to guard against order effects.

    4.   Somewhat unlikely

    5.   Very unlikely

    6.   Don't know / unsure

Q. What makes you say that you would be **[INSERT RESPONSE]** to purchase this product?[124]

102.    After completing these questions, respondents were taken to the end screener questions, which were identical to the ones described in the Past Purchaser Survey, as described above in Paragraphs 58-59. As with the Past Purchaser Survey, when I remove respondents flagged for their responses in the final screening questions from my analysis, my key results do not change.[125]

103.    After answering this series of questions, respondents were thanked for their participation and the survey ended.

### G. Stimuli Shown

104.    As noted above, each respondent was randomly assigned to one of four groups and was shown the actual or modified webpage for the Levoit Core 300 product as sold on Amazon.com.[126] Respondents assigned to the Test Group were shown the actual product page which contained a description of the product including statements related to HEPA / True HEPA / H13 HEPA, and 99.97% at 0.3 microns. An excerpt of the Amazon page shown to respondents in the Test Group is shown below in **Figure 1**.[127]

---

[124] Respondents were provided with a "Don't know / unsure" checkbox.

[125] *See* **Appendix 2.5** for the results of these analyses.

[126] https://web.archive.org/web/20230106105701/https://www.amazon.com/LEVOIT-Purifier-Home-Allergies-Pets/dp/B07VVK39F7, last accessed May 14, 2025.

[127] The complete and full-sized webpage shown to respondents can be seen in **Appendix 2.3**.

**Figure 1. Prospective Purchaser Survey – Test Group Stimulus**



105.    The survey included three Control Groups which allows me to examine whether HEPA/True HEPA/H13 has an impact on purchasing intentions, whether 99.97% efficiency at 0.3 microns has an impact on purchasing intentions or whether the statements together have an impact. Respondents in Control Group 1 were shown the exact Amazon page as respondents in the Test Group but with the following changes: (1) mentions of H13 True HEPA or True HEPA were removed and replaced with "3-Stage Filter," (2) mentions of HEPA (i.e., not including H13 or True) were removed,[128] (3) the "Filter Type" under "Product Information" was changed from

---

[128] For example, the statement "Enhanced with HEPASmart Technology…" was changed to "Enhanced with Smart Technology," and the page categorization of "HEPA Air Filter" was changed to "Air Filter." Statements that included "True HEPA" or "H13" in addition to "3-Stage" had the "True HEPA" or "H13" language removed. For example, "True HEPA 3-Stage Original Filter" was changed to "3-Stage Original Filter."

65

HEPA to "3-Stage Filter." This Group included the 99.97% efficiency at 0.3 microns language. An excerpt of the stimuli for Control Group 1 is shown below in **Figure 2**.[129]

**Figure 2. Control Group 1 Stimulus**
**No HEPA, True HEPA or H-13**



106.    Respondents in Control Group 2 were shown the same exact stimulus as the Test Group respondents, but the statement 99.97% efficiency at 0.3 microns was removed. References to HEPA, True HEPA, and H13 were not removed. An excerpt of the Control Group 2 stimulus is shown below in **Figure 3**.[130]

---

[129] The complete and full-sized webpage shown to respondents can be seen in **Appendix 2.3.**

[130] The complete and full-sized webpage shown to respondents can be seen in **Appendix 2.3.**

**Figure 3. Control Group 2 Stimulus**
**No Mentions of 99.97% efficiency at 0.3 Microns**



107.    Respondents in Control Group 3 were shown a stimulus with the changes from both Control Group 1 and Control Group 2 implemented. Specifically, all mentions of HEPA, True HEPA and H13 were removed and/or replaced with "3-Stage Filter" and all references to 99.97% at 0.3 microns were removed. As in Control Group 2, I removed references from the page which discuss the testing and "Official Third Party Certification." While I understand this portion of the page does not specifically refer to HEPA testing, I chose to be conservative and remove it from the page. An excerpt of the stimulus for Control Group 3 is shown below in **Figure 4**.[131]

---

[131] The complete and full-sized webpage shown to respondents can be seen in **Appendix 2.3.**

**Figure 4. Control Group 3 Stimulus**
**No Mentions of HEPA / True HEPA / H13 HEPA/ 99.97% at 0.3 Microns**



## H. Survey Results

108.     A total of 795 respondents qualified for and completed the Prospective Purchaser

Survey. The data are attached as **Appendix 2.4**.

109.     As shown below in **Table 17**, respondents were a mix of men and women, across

different age groups. As shown in **Table 18**, respondents were geographically distributed across

the United States. Of the 795 total respondents, 125 were California residents.

**Table 17. Age and Gender Distribution**

|  | Male | | Female | | Overall | |
|---|---|---|---|---|---|---|
| Response | Count | Percent | Count | Percent | Count | Percent |
| 18-34 | 176 | 38.7% | 152 | 45.1% | 330 | 41.5% |
| 35-54 | 221 | 48.6% | 123 | 36.5% | 345 | 43.4% |
| 55+ | 58 | 12.7% | 62 | 18.4% | 120 | 15.1% |
| **Total Respondents** | **455** | **100.0%** | **337** | **100.0%** | **795** | **100.0%** |

Note: 2 respondents aged 18-34 and 1 respondent 35-54 identified as "non-binary".

Source: NERA Prospective Purchaser Survey, April 2025

**Table 18. Respondents' Regional Distribution**

| Response | Count | Percent |
|---|---|---|
| Northeast | 266 | 33.5% |
| Midwest | 111 | 14.0% |
| South | 249 | 31.3% |
| West | 169 | 21.3% |
| **Total Respondents** | **795** | **100.0%** |

Source: NERA Prospective Purchaser Survey, April 2025

110.    Most respondents in this survey were likely to spend between $100 and $200 on an air purifier, while the remaining 26.9 percent[132] of respondents indicated they are likely to purchase a product for more than $200. These data are shown below in **Table 19**.

---

[132] 138 + 76 / 795 = 26.9 percent.

**Table 19. Likely Spend on Air Purifier**

| Response | Count | Percent |
|---|---|---|
| Less than $100[1] | 0 | 0.0% |
| Between $100 and $150 | 293 | 36.9% |
| Between $151 and $200 | 288 | 36.2% |
| Between $201 and $300 | 138 | 17.4% |
| More than $300 | 76 | 9.6% |
| Other[1] | 0 | 0.0% |
| Don't know / unsure[1] | 0 | 0.0% |
| **Total Respondents** | **795** | **100.0%** |

*S10. What is the <u>most</u> you are likely to spend on an air purifier?*

Note: [1] Respondents that selected "Less than $100," "Other," or "Don't know / unsure" were screened out of the survey.

Source: NERA Prospective Purchaser Survey, April 2025

111.    As described in Section VI.G., respondents were randomly allocated to one of four conditions before proceeding to the main questionnaire. In the main questionnaire, respondents were first asked to indicate "Based on the product information shown, how likely would you be able to purchase this product?" As shown below in **Table 20**, the vast majority of respondents in each group indicated that they would be very likely or somewhat likely to purchase the product shown.

112.    A total of 58.1 percent of respondents shown the product advertising which included the HEPA and 99.97% at 0.3 microns claims indicated that they would be very likely to purchase the product, this compares to 53.8 percent for the "No HEPA" group (Control 1), 56.8 percent for the "No filtration" group (Control 2), and 59.3 percent for the "No HEPA and no filtration" group (Control 3). In other words, potential purchasers of air purifiers were just as likely (if not slightly more likely) to indicate that they would purchase the product when it was shown

70

without any reference to HEPA/True HEPA/H13 or 99.97% efficiency at 0.3 microns. These results demonstrate that the accused language would have no material impact on consumers' interest in purchasing the Levoit air purifier.

**Table 20. Likelihood of Purchasing Product Shown**

| Response | Test | | Control 1: No HEPA | | Control 2: No Filtration | | Control 3: No HEPA and No Filtration | |
|---|---|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| *Very + somewhat likely* | *185* | *93.4%* | *183* | *92.0%* | *183* | *92.0%* | *187* | *94.0%* |
| Very likely | 115 | 58.1% | 107 | 53.8% | 113 | 56.8% | 118 | 59.3% |
| Somewhat likely | 70 | 35.4% | 76 | 38.2% | 70 | 35.2% | 69 | 34.7% |
| Neither likely nor unlikely | 9 | 4.5% | 5 | 2.5% | 9 | 4.5% | 7 | 3.5% |
| Somewhat unlikely | 4 | 2.0% | 3 | 1.5% | 5 | 2.5% | 3 | 1.5% |
| Very unlikely | 0 | 0.0% | 6 | 3.0% | 2 | 1.0% | 1 | 0.5% |
| Don't know / unsure | 0 | 0.0% | 2 | 1.0% | 0 | 0.0% | 1 | 0.5% |
| **Total Respondents** | **198** | **100.0%** | **199** | **100.0%** | **199** | **100.0%** | **199** | **100.0%** |

*Q2. Based on the product information shown, how likely would you be to purchase this product?*

Source: NERA Prospective Purchaser Survey, April 2025

113.    To confirm that there is no meaningful difference in purchase intentions between the groups, I ran a series of statistical tests. First, I compared the rates of respondents who selected "Very likely" or "Somewhat likely" across the four groups. Here, I find no statistically significant difference between the groups.[133] I can also compare the overall distribution of responses, across all categories from "Very likely" to "Very unlikely," and again find no statistically significant differences.[134] In other words, statements related to HEPA and/or True HEPA and/or references to a filtration level of 99.97% at 0.3 microns have **_no_** statistically significant impact on the purchase intentions of consumers in the market for a product such as the Levoit Core 300.

---

[133] I conducted a z-test for the top two boxes (i.e., the share of respondents who selected "Very likely" and "Somewhat likely") between the Test Group and Control Group 3. See **Appendix 2.6** for the results.

[134] I conducted a chi-squared test of the full distribution. See **Appendix 2.6.**

71

114.     As shown below in **Table 21,** respondents who indicated they were "Very likely" or "Somewhat likely" to purchase the product shown gave a variety of reasons for their responses. The most common reason provided was the price or value of the product shown. Notably, while there are some small differences in the rate at which respondents indicated that "performance" was a reason for purchase interest across the groups, the differences are not systematic. For example, a greater number of respondents shown the product without references to HEPA (Control Groups 1 and 3) indicated that product performance was a reason for being interested in purchasing the product compared to the product with references to HEPA (Test Group and Control Group 2). Further, the rate at which any group indicated the product's ability to address "health concerns" (e.g., allergies or bacteria) as a reason for purchase interest is less than 15 percent for each group and the rates are not statistically significantly different across groups.[135]

---

[135] I conducted a z-test between the Test Group and each Control Group and found no statistically significant difference. The results of this test can be found in **Appendix 2.6**.

**Table 21. What Makes Respondents Say They Were "Very Likely" or
"Somewhat Likely" to Purchase the Product Shown**

| Response | Test | | Control 1: No HEPA | | Control 2: No Filtration | | Control 3: No HEPA and No Filtration | |
|---|---|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| Price / value | 92 | 49.7% | 91 | 49.7% | 76 | 41.5% | 90 | 48.1% |
| Performance / good product / works well | 43 | 23.2% | 52 | 28.4% | 36 | 19.7% | 46 | 24.6% |
| Reviews / recommendations | 41 | 22.2% | 31 | 16.9% | 36 | 19.7% | 38 | 20.3% |
| Features (e.g., quiet mode, smart features) | 35 | 18.9% | 38 | 20.8% | 30 | 16.4% | 34 | 18.2% |
| Health reasons (allergies, dust, pet hair, bacteria, odor etc.) | 23 | 12.4% | 14 | 7.7% | 15 | 8.2% | 19 | 10.2% |
| Size / portability | 20 | 10.8% | 9 | 4.9% | 15 | 8.2% | 22 | 11.8% |
| Design | 19 | 10.3% | 15 | 8.2% | 23 | 12.6% | 25 | 13.4% |
| Quality / durability | 12 | 6.5% | 18 | 9.8% | 15 | 8.2% | 27 | 14.4% |
| Product description and advertising | 10 | 5.4% | 6 | 3.3% | 12 | 6.6% | 7 | 3.7% |
| Brand / familiarity | 7 | 3.8% | 12 | 6.6% | 15 | 8.2% | 18 | 9.6% |
| General filtration quality | 6 | 3.2% | 7 | 3.8% | 7 | 3.8% | 3 | 1.6% |
| HEPA / True HEPA | 6 | 3.2% | 0 | 0.0% | 2 | 1.1% | 0 | 0.0% |
| 99.7 percent filtration / 0.3 microns | 1 | 0.5% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% |
| Other response | 12 | 6.5% | 17 | 9.3% | 26 | 14.2% | 8 | 4.3% |
| Don't know / unsure | 3 | 1.6% | 0 | 0.0% | 3 | 1.6% | 1 | 0.5% |
| **Total Respondents[1]** | **185** | | **183** | | **183** | | **187** | |

*Q3.What makes you say that you would be [Q2 RESPONSE] to purchase this product?*

Note:  [1] Base sizes only including respondents who selected"Very Likely" or "Somewhat Likely" to purchase the product at Q2.

Source: NERA Prospective Purchaser Survey, April 2025

115.    The results of the Prospective Purchaser Survey confirm the findings from the Past Purchaser Survey, that is, almost none of the respondents indicated that HEPA or filtration was a reason to purchase the product. Only six respondents in the Test Group indicated HEPA or True HEPA was a reason they were likely to purchase the product and only one respondent in the Test Group mentioned 99.97% filtration at 0.3-microns. Together, only 3.5 percent[136] of respondents in the Test Group indicated that HEPA or the filtration percentage was a reason they would be likely to purchase the product. These results confirm the findings from the statistical comparison: HEPA/True HEPA/H13 and 99.97% at 0.3 microns filtration statements do not impact consumers' interest in and likelihood of purchasing the at-issue Levoit products.

## VII.    RESPONSE TO MR. GASKIN'S SURVEY PROPOSAL

116.    To support his allegations, Plaintiff hired Mr. Steven P. Gaskin. Mr. Gaskin proposes, but does not conduct, research he claims will demonstrate "whether the [True HEPA] Claim is economically material to a reasonable person."[137] Mr. Gaskin does not propose research to determine what consumers understand True HEPA (or HEPA) to mean, nor does Mr. Gaskin indicate that he will conduct any research related to the 99.97% filtration at 0.3 microns claim. In fact, Mr. Gaskin's proposed survey will not address any purported "harm" or change in preferences related to a product with 99.97% filtration at 0.3 microns relative to a product with a different filtration rate.

117.    As discussed below, Mr. Gaskin's declaration is simply a general proposal about a type of survey that *could* be designed, and while Mr. Gaskin assumes his survey will yield a price

---

[136] 7/198 = 3.54 percent.

[137] *Motion for Class Certification*, p. 10.

premium associated with the True HEPA claim, he has no data or evidence to demonstrate that his survey will be statistically reliable or will yield useful estimates.

118.    Mr. Gaskin's proposed research is flawed methodologically for a number of reasons. Rather than test or evaluate filtration percentages, Mr. Gaskin proposed to test "True HEPA," but he provides no indication how this claim will, or should be, interpreted by his hypothetical respondents. As my survey of actual purchasers demonstrates, consumers have multiple and varied interpretations of HEPA, many of which do not align with Plaintiff's allegations.[138] As designed, Mr. Gaskin's survey will provide no measure of the "premium" associated with a belief that True HEPA means the product complies with a specific testing protocol or a filtration percentage per micron size. Nor will it provide any data to demonstrate that there is a "premium" associated with a 99.97% filtration at 0.3-microns standard relative to some different filtration standard. In fact, even if Mr. Gaskin's survey was well designed in every other way (and it is not), the estimated values will be inflated because some share of respondents will likely exhibit preferences for True HEPA simply because they believe HEPA means the product neutralizes odor or cleans the air over a certain area.[139] Further, Mr. Gaskin's attempt to attribute value to an undefined True HEPA statement may be unreliable because True HEPA (or HEPA) may be describing to consumers the same or similar features listed in his distractor labels. For example, Mr. Gaskin suggests that one of his "distractor" labels will indicate that the product will

---

[138] For example, as noted above in ¶ 84, when asked to describe in their own words what HEPA means, many respondents gave answers related to quality, or the ability to trap dust, pollen, allergens, or environmental pollution. To give just a few examples, Respondent 16459 said "it filters out more particulates/pollution/dust than a regular filter does.", Respondent 7501 said "Better quality filter.", and Respondent 7967 said "It means all the tiny particles like dust , pollen , mold, etc. that are in the air will be trapped along with the larger ones.". Further, as shown in **Table 11**, respondents also commonly indicated in response to a closed-ended question that HEPA means that the product or filter "traps dust, pollen, mold, and bacteria" or "has multiple layers of filtration."

[139] *See* **Table 11**.

"fight allergies & unwanted odors," but as shown in my survey, many respondents believe that HEPA means exactly that.[140]  It is entirely unclear how Mr. Gaskin will resolve the overlapping nature of his True HEPA and distractor features.

119.    Furthermore, aside from a review of a few websites, Mr. Gaskin has made no effort to identify the relevant set of product features to include in his survey.  Instead, Mr. Gaskin appears to have arbitrarily selected statements that appear on the product's packaging as the relevant features/labels to include in his survey.[141] It is unclear why Mr. Gaskin believes the packaging is the most relevant source of product descriptions, when in fact, most consumers, including the named Plaintiff, purchased their air purifier online.[142] Further, Mr. Gaskin has done nothing to systematically identify or select the specific product features that matter to consumers when purchasing an air purifier.[143] In fact, my survey data demonstrates that Mr. Gaskin has omitted key features that drive consumers' purchases of air purifiers, such as product size, design, and color.[144] By omitting key attributes, Mr. Gaskin is proposing a survey that will not reliably represent how consumers make choices and will likely inflate the value of the True HEPA claim.

---

[140] *See* **Table 11**.

[141] *Gaskin Deposition,* p. 210:15-25. Mr. Gaskin baselessly assumes that all statements on the product packaging to be important, for example, when asked "Which of the attributes would you consider important attributes to a consumer?" Mr. Gaskin states "I'd say all of these are important" because "They are shown on the package. If they weren't important, the company wouldn't put them on the package." Mr. Gaskin also states that he did not review any consumer reviews in developing his labeling claims, and that his team only spent an hour two researching appropriate attributes to include in the study (*Gaskin Deposition,* pp. 209:15-20; 211:1-10).

[142] See **Table 4** above.

[143] For example, Mr. Gaskin indicates that did not discuss important attributes with any consumers (*Gaskin Deposition,* p. 209:15-20), he did not conduct any focus groups (*Gaskin Deposition*, p. 169:21-24) ("Q. Do you plan on doing any group – what was the one you've hear of? Focus groups. Do you plan on doing any focus groups? A. No."), and he did not consult any consumer reviews to identify important attributes (*Gaskin Deposition,* p. 211:1-3) (Q. And did you review any consumer reviews in developing these labeling claims? A. Not that I know of."). Instead, Mr. Gaskin states vaguely that his team at AMS "looked at what different products offered to come up with the list of attributes and levels (*Gaskin Deposition,* p. 49:21-25).

[144] See **Table 7**, above.

120.    Generally, Mr. Gaskin states that his sample will include respondents who purchased a Levoit air purifier or a competitive brand of air purifier during the Class Period (2019 to 2023).[145] It appears that Mr. Gaskin has no quota for how many Levoit purchasers he plans to include in his sample,[146] and without a quota in place there may be an insufficient sample to analyze Levoit purchasers in isolation. Mr. Gaskin has also failed to screen respondents on the price they paid for their air purifier. The lowest price for the at-issue Levoit Core products is $100,[147] and as such, respondents who did not spend $100 or more on their qualifying air purifier are not relevant consumers in this case. Mr. Gaskin himself agrees that respondents that qualify for his survey may spend less or more than what the at-issue products costs, stating that the competitive products listed in his survey "could cost less or more."[148]

## A. Summary of Mr. Gaskin's Research Proposal

121.    Mr. Gaskin states that his study will include 300 respondents[149] who will be "United States residents at least 18 years of age who indicated that they have purchased or shared in the decision to purchase a Levoit air purifier or a competitive brand of air purifier during the Class Period (2019 to 2023)."[150]

---

[145] *Gaskin Declaration*, ¶ 34.

[146] *Gaskin Deposition*, p. 190:2-6. When asked "What proportion of your sample will be comprised of Levoit purchasers?" Mr. Gaskin stated, "However it works out in the sample or falls naturally based on the purchasing habits that are out there." Mr. Gaskin specifically states that he will not have a quota (*Gaskin Deposition,* p. 191:6-18).

[147] This is the Levoit Core 300 which Mr. Chen purchased. *Complaint*, ¶ 11.

[148] *Gaskin Deposition*, p. 194:16-21.

[149] *Gaskin Declaration*, ¶ 39.

[150] *Gaskin Declaration*, ¶ 34. Respondents will be able to answer the survey on desktop, laptop, tablet or smartphone (*Gaskin Declaration,* ¶ 30). Mr. Gaskin noted in his deposition that respondents would also be asked the model of Levoit air purifier purchased during the class period, and only respondents that purchased the 300 Series products would qualify (*Gaskin Deposition,* p. 115:11-21) ("A. It – it will ask which model of Levoit, either the 200, 300 or 400 series, if they bought any of those. If they bought one of the 300 series, then they will qualify. If they bought only the 200 or 400, they would not. Q. Does it ask when specifically during the class period the respondent made the purchase of the Levoit product? A. No. Just during the class period. That's all that's needed.").

122.    After qualifying for the survey, Mr. Gaskin states that respondents will be shown an introduction to the conjoint task and asked to make certain assumptions while completing it.[151] Mr. Gaskin also indicates that respondents will be "shown a set of descriptions of the features."[152]

123.    The features, or attributes, Mr. Gaskin intends to include in his study are (1) Brand, (2) Price, and (3) "Labels."[153] The "Labels" attribute "refers to the variable packaging labels and statements available on the Class products at issue in this lawsuit."[154] Mr. Gaskin's "Labels" attribute includes six groups, named Label A-Label F. Label A corresponds to the feature Mr. Gaskin intends to use to calculate his price premium and includes three levels: (1) True HEPA; (2) HEPA; and (3) Blank.[155] The specific attributes and levels proposed by Mr. Gaskin are described below in **Figure 6**.

**Figure 6. Attributes and Levels in Gaskin's Proposed Conjoint[156]**

| Attribute | Attribute Group | Levels |
|---|---|---|
| Price | N/A | 1.  85.99<br>2.  127.24<br>3.  168.49<br>4.  209.74<br>5.  250.99 |
| Brand | N/A | 1.  Levoit<br>2.  Coway<br>3.  Winix<br>4.  Medifyair<br>5.  Honeywell |
| Labels | Label A | 1.  True HEPA |

---

[151] *Gaskin Declaration*, ¶ 44, FN 32. Mr. Gaskin does not articulate the exact text for his introduction but does include some examples in FN 32 of what assumptions it might include.

[152] *Gaskin Declaration*, ¶ 45

[153] *Gaskin Declaration*, ¶ 27.

[154] *Gaskin Declaration*, ¶ 28.

[155] *Gaskin Declaration*, p. 22.

[156] *Gaskin Declaration*, pp. 20-23.

| Attribute | Attribute Group | Levels |
|---|---|---|
| | | 2. HEPA |
| | | 3. Blank |
| | Label B | 1. Energy Star-certified |
| | | 2. Blank |
| | Label C | 1. The Doctor's Choice! |
| | | 2. #1 Brand Recommended by Allergists |
| | | 3. Independently Tested. Consumer Trusted. |
| | Label D | 1. Fight Allergies & Unwanted Odors |
| | | 2. Carb certified |
| | | 3. A Better Breath of Air |
| | Label E | 1. Covers up 155 Sq. Ft. |
| | | 2. Covers up to 219 Sq. Ft. |
| | | 3. Covers up to 360 Sq. Ft. |
| | | 4. Blank |
| | Label F | 1. Night Mode for Quiet Sleep |
| | | 2. 0-8 Hour Timer |
| | | 3. Blank |

124.    Mr. Gaskin indicates that respondents will be asked to complete 12 choice tasks,[157] in which they will be asked to select one of the three hypothetical product profiles that they would be most likely to purchase.[158] Mr. Gaskin proposes to use a "Dual-response None" methodology, whereby after selecting their preferred product profile, respondents will be asked: "Given your knowledge of the market, would you or would you not **actually be willing to buy the air purifier option that you chose above with the brand, labels, and price shown?**"[159] An example of a hypothetical choice task is shown below in **Figure 7**.

---

[157] *Gaskin Declaration*, ¶ 46.

[158] *Gaskin Declaration*, ¶¶ 46-47.

[159] *Gaskin Declaration*, ¶ 47. [Emphasis in the original].

79

**Figure 7. Replication of Proposed Choice Task in Gaskin Survey[160]**



125.    Mr. Gaskin indicates that he will pretest the questionnaire with 20 respondents.[161] None of these pretest interviews were conducted at the time Mr. Gaskin submitted his report or at the time of his deposition,[162] and he had not spoken with any purchasers of the accused products.[163]

---

[160] *Gaskin Declaration,* p. 8, Figure 1.

[161] *Gaskin Declaration,* ¶ 33.

[162] *Gaskin Deposition,* pp. 12:19-21, 108:9-11. ("Q. Okay. And you were not asked to pretest any survey at this time? A. Not yet, no.); (Q. And have you run a pretest in this case? A. You've already asked me that, and the answer is no, because it's not time to do it yet.).

[163] *Gaskin Deposition,* p. 187:11-21. Mr. Gaskin states that he has not spoken to any consumers of Levoit products because he "has done research with [his] team" on attributes and levels, and that it "wasn't necessary" because he has "enough

126.    Based on the survey data collected, Mr. Gaskin asserts he will calculate "the market price premium," which he describes as "the difference in market value of the Class Products with the True HEPA Claim compared to the market value of the Class Products without the True HEPA Claim."[164] For this analysis, Mr. Gaskin proposes using the simulation tool in Sawtooth Software with Randomized First Choice ("RFC") Simulation to predict consumers' choices.[165] The proposed simulation would include a hypothetical market with two alternatives: one product with the True HEPA claim and one without this claim.[166] The other levels of the two alternatives, except for price, will be held constant.[167] Mr. Gaskin states that he will reduce the price of the product without the True HEPA claim such that the market share of the two products equalizes, i.e., the market share for both is 50 percent.[168] Mr. Gaskin states that the "market price premium equals the difference between two prices that compensates for the presence or absence of the True HEPA Claim."[169]

127.    Mr. Gaskin states that he will conduct this process for each of the five price levels. In the first five iterations, Mr. Gaskin will set the price of the product with the True HEPA claim to each of the five price levels, and then reduce the price of the product without the claim until the market share is equalized.[170] Mr. Gaskin will then conduct five more iterations with the price of

---

information as it is." See also *Gaskin Deposition,* p. 209:15-20, where Mr. Gaskin is asked "When deciding which of the attributes to include on the six packaging label groups, you did not discuss this with any consumers?" Mr. Gaskin responded "We've established this. I use secondary research to do this."

[164] *Gaskin Declaration,* ¶ 17.

[165] *Gaskin Declaration,* ¶ 51.

[166] *Gaskin Declaration,* ¶¶ 51-52.

[167] *Gaskin Declaration,* ¶ 53.

[168] *Gaskin Declaration,* ¶ 53.

[169] *Gaskin Declaration,* ¶ 53.

[170] *Gaskin Declaration,* ¶ 53.

the product **without** the True HEPA claim to each of the five price levels, and then increase the price of the product **with** the True HEPA claim until the market share is equalized.[171] To calculate one measure of price premium, Mr. Gaskin indicates that he will choose the smallest price difference obtained from this process.[172]

## B. Mr. Gaskin Assumes His Survey Will Yield a Reliable Statistical Estimate of a Price Premium

128.    Mr. Gaskin asserts his proposal is "scientifically and economically sound, reliable, and valid,"[173] but his assumptions about the direction and statistical reliability of his results suggest otherwise. While Mr. Gaskin concedes it is possible that the price premium could be zero and there would be no damages,[174] he speculates that the data he collects, using a survey that is only in draft form, will yield statistically robust results and will accurately reflect relevant consumers' actual purchasing behavior.[175] Mr. Gaskin goes further and claims that he has "some judgement" that the price premium will be "reasonably large."[176] It appears, then, that Mr. Gaskin has concluded, prior to talking with any consumers, conducting any pretests, fully designing or conducting any systematic research, that his conjoint survey will yield results favorable to Plaintiff.

129.    While he has done no systematic research in this matter and has not talked with any purchasers of Levoit brand air purifiers, Mr. Gaskin indicates that he has "performed similar

---

[171] *Gaskin Declaration*, ¶ 53.

[172] *Gaskin Declaration*, ¶ 53.

[173] *Gaskin Declaration*, ¶ 11.

[174] *Gaskin Deposition*, p. 154:1-11. Mr. Gaskin states that it is possible that "the premium could be zero" from his research which would mean "that there's no market price premium" and agrees that there would consequently be no damages.

[175] Mr. Gaskin does not, in his report or in his deposition testimony, propose any tests to demonstrate that his results would have any external validity.

[176] *Gaskin Deposition*, p. 139:12-21. Mr. Gaskin also asserts his judgement has been informed by a price difference reported in the Complaint, although he acknowledges, he does not know "how reliable that number is," *Gaskin Deposition*, p. 140:6-13.

analyses using similar methodologies before."[177] But surveys evaluating automobile defects, software features, university fees during COVID, iPhones, sugar levels in cereal, etc., are unlikely to be good predictors of buying behaviors for air purifiers.[178] Simply because Mr. Gaskin has used a general methodology in the past does not mean this method will generate reliable and statistically valid results for this particular matter.

130.    None of the research or academic articles cited by Mr. Gaskin suggest that one can or should predict the outcome of a conjoint exercise without actually conducting the survey. Unsurprisingly, academic citations (including those relied on by Mr. Gaskin) indicate that the reliability of output from a conjoint survey depends on the extent to which the study has been carefully designed, the target population has been appropriately identified, the sample drawn accurately reflects the population, the data have been accurately collected, and the analysis is correctly conducted and all appropriate statistical tests have been run.[179] For example, using an HB analysis (Hierarchical Bayesian), the researcher must compute the confidence interval and the significance level when creating estimates of value associated with particular attributes.[180] Mr. Gaskin of course agrees that he has not calculated an error rate or calculated a confidence interval

---

[177] *Gaskin Declaration,* ¶ 13.

[178] *Gaskin Declaration,* ¶ 13. Mr. Gaskin makes similar comparisons in his deposition, stating that he is confident that his results will be reliable and valid in this case because of other cases he has worked on with the same methodology.

[179] See for example, Orme, B. K. (2020). "Formulating Attributes and Levels in Conjoint Analysis," *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research, Fourth Edition,* pp. 49-56, (hereinafter, "*Orme, Formulating Attributes*"*),* at p. 50. Also cited by Mr. Gaskin, see *Gaskin Declaration,* p. B-2. Orme, B. K., & Chrzan, K. (2017). "Reducing Hypothetical Bias," *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros*, pp. 11-20, at p. 13. Also cited by Mr. Gaskin, see *Gaskin Declaration,* p. B-2.

[180] Orme, B. K., & Chrzan, K. (2017). "Statistical Testing," *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros*, pp. 169-190, at p. 183. Also cited by Mr. Gaskin, see *Gaskin Declaration,* p. B-2.

because "you would have to run the survey first," and he has no data, not even preliminary results, upon which to create any estimates.[181]

131.    There is no evidence in Mr. Gaskin's declaration to support his claim that his survey will, for sure, yield statistically reliable results that will accurately reflect the purchasing behavior of relevant consumers. Mr. Gaskin provides limited descriptions of his survey and sample design and little information on the exact statistical testing and analyses he will undertake to ensure the validity of his results. In fact, based on the information produced, it is likely that Mr. Gaskin's survey will yield inflated and unreliable estimates that are not appropriately tied to Plaintiff's claims in this matter. Furthermore, although both Mr. Gaskin and Plaintiff's damages expert Mr. Weir testified that arriving at a statistically significant estimate of a price premium indicates that the price premium is in fact material to consumers,[182] this is simply not the case. There is not necessarily a corollary between statistical significance and substantive importance, especially if that estimate of price premium is derived from a flawed survey such as the one that Dr. Gaskin has proposed.

---

[181] *Gaskin Deposition,* pp. 100:12-15 ("Q. Well, you've not calculated the error rate for your proposed survey; is that correct? A. Right. I have not run the survey. You would have to run the survey first.") and 227:3-23 ("Q. And because you haven't conducted the survey, you haven't conducted the error rate of the price premium; is that right? A. Right. There's no way to calculate that without data. Q. And because you haven't calculated the survey, you can't calculate the confidence interval with respect to the price premium either; is that right? [Objection] A. You said when I – I haven't calculated the survey. That's not really a term. Q. Because you haven't run the survey, you haven't calculated the confidence interval either with respect to the price premium; is that correct? A. That's correct. The conjoint analysis has been found to be a reliable and valid method by the courts.").

[182] *Gaskin Deposition,* p. 197:18-24 ("A. Materiality is – can be determined by the conjoint results. If there's a price premium that's statistically significant and greater than zero, then I can say that HEPA – true HEPA claim was material to consumers because it affected the – their purchase decisions."); Deposition of Colin B. Weir, dated June 9, 2025, p. 141:18-142:5 ("A. With the caveat, the determination of the materiality of the claim would be part and parcel to the calculation and determination of whether or not there is a statistically significant price premium that is solely attributable to the use of the claim. In other words, I am more than comfortable testifying that the Gaskin conjoint will be able to determine materiality. But in terms of whether or not the claim is material, we would need the results of that survey.").

## C. Mr. Gaskin Does Not Define True HEPA

132.    As noted above, Mr. Gaskin's proposal will not test or establish any purported "price premium" that results from consumer preferences for a product with 99.97% filtration at 0.3 microns relative to a product with a different filtration standard. Instead, Mr. Gaskin states he will test a product with a True HEPA claim relative to a product without this claim, i.e., the level "Blank."[183] Mr. Gaskin does not intend to define True HEPA in his conjoint study.[184] Indeed, it is unclear what Mr. Gaskin intends True HEPA to mean within the context of his survey or how it will be interpreted by his respondents. While Mr. Gaskin states he is "relying on the Complaint and images of the product labels for the choice and wording of the True HEPA Claim that will be included in the survey,"[185] it appears that Mr. Gaskin does not intend to provide respondents with any additional wording to describe the True HEPA claim.[186]

133.    Mr. Gaskin states that it is appropriate to leave True HEPA undefined because it is "not defined on the package,"[187] but of course, in the real world, the True HEPA claim did not

---

[183] Specifically, Mr. Gaskin states that he will compare two alternatives in the choice set: "one with the True HEPA Claim, and the other without the True HEPA Claim." See *Gaskin Declaration*, ¶ 52, p. 22. See also *Gaskin Deposition*, p. 14:12-15 ("A. It could since that's one of the attribute levels, but I'm – my assignment is to measure the – the change in price resulting from the use of the true HEPA claim."). See also *Gaskin Deposition*, p. 212:19-25 ("Q. Do you intend to calculate the price premium for true HEPA relative to HEPA? A. I don't intend to, no. Q. Do you intend to calculate the price premium for true HEPA relative to a product with no mention of HEPA whether true or not? A. That's correct.").

[184] *Gaskin Deposition*, p. 181:7-11 ("Q. Will you define what true HEPA means for the respondents? A. No, because it's not defined on the package right there where it says true HEPA. I'm just looking at that claim in particular.").

[185] *Gaskin Declaration*, ¶ 28.

[186] See *Gaskin Declaration*, Figure 1, reproduced as Figure 7 above. See also *Gaskin Declaration*, p. 22, in which he lists the "labels" that will appear as part of his survey. In neither of these examples does Mr. Gaskin provide any additional wording or language to describe "True HEPA." Mr. Gaskin confirmed in his deposition that he does not intend to provide any additional wording. Specifically, when asked "[w]ill you define what true HEPA means for the respondents" Mr. Gaskin states "No, because it's not defined on the package right there when it says true HEPA" (*Gaskin Deposition*, p. 181:7-25).

[187] *Gaskin Deposition*, pp. 181:3-11 ("Q. Will your pretest ask respondents what true HEPA means? A. I would say probably not because that's not something I'm trying to measure in my survey. Q. Will you define what true HEPA means for the respondents? A. No, because it's not defined on the package right there where it says true HEPA. I'm just looking at that claim in particular.") and 183:15-24 ("A. It's what's right there on the package. When it says true HEPA, it doesn't include a definition. Q. Right. My question though is does that same reasoning apply to all of the attributes and levels, not just the HEPA? A. I think so. I mean, generally they aren't defined further. They're just said on the package.").

appear on its own, in isolation. Rather, it was shown alongside other information, which may have informed consumer understandings of the claim. For example, one of the product pages Mr. Gaskin relied on for his label claims described the product's filtration in a number of ways including "True HEPA, Activated Carbon, HEPA-Type, Pre-Filter," and characterized the filtering details as "True HEPA, 360-degree filtration, 3-stage, Nylon, Granular activated carbon."[188] Another product was described as having "**MULTIPLE FILTER OPTIONS**: It's your pick, Choose between our 3 customized replacement filters to fit your needs: the Pet Allergy Filter, Toxin Absorber Filter, or the Smoke Remover Filter. Or search "Core 300-RF" to find our Levoit 3-Stage Original Filter when you need a replacement," and the filtration technology, True HEPA, appears above the "Contaminants Captured: Cough & Sneeze Debris, Allergens, Dust, Bacteria, Debris."[189] Mr. Gaskin appears to ignore all of the other information in product descriptions and product packaging that may have contextualized the meaning of True HEPA for consumers. Instead, he simply assumes no "definition" was provided and further assumes that consumers did not and would not rely on additional information on the box or in the product description to inform their understanding of True HEPA. Again, Mr. Gaskin has not talked to any consumers and has done nothing to systematically demonstrate that additional information in product descriptions or the product packaging has not informed consumer understanding of the term. In fact, Mr. Gaskin states it would create a bias to provide information to survey respondents that is unlike what they would

---

[188] https://www.ebay.ca/itm/325526022541, last accessed May 30, 2025.

[189] https://www.ebay.com/p/24048608911, last accessed May 30, 2025. Notably, one of the Levoit product pages Mr. Gaskin references as one which he relied on for his label claims does not appear to include the True HEPA phrase on the packaging and this statement only appears in a seller provided product description. See, https://www.ebay.com/itm/197000215974?chn=ps&mkevt=1&mkcid=28&google_free_listing_action=view_item&gQT=2, last accessed June 13, 2025.

experience in the real world,[190] but his survey proposes to do just that by isolating a True HEPA claim from any and all other information that consumers may have used to understand this term.

134.    Mr. Gaskin's design, which provides no information or context for the True HEPA statement, is inconsistent with standard conjoint design principles and would render his results unreliable and impossible to use for evaluating the value attributable to Plaintiff's assertions in this matter. Good survey design for a conjoint study requires that the attributes and levels include descriptions that are "concise statements with concrete meaning," with "specific language" to quantify "the exact meaning of the level."[191] Mr. Gaskin offers no descriptions and instead will assume that respondents interpret the isolated True HEPA statement to mean whatever Plaintiff has alleged.[192] Therefore, Mr. Gaskin will have no way, given the research proposal offered, to determine whether any respondent in his survey actually understands True HEPA to mean the product meets efficiency standards under any particular testing standard.

135.    As shown in my survey, actual purchasers have multiple interpretations of HEPA (if they notice it at all), and many of these do *not* correspond to Plaintiff's allegations.[193] Given Mr. Gaskin's proposed research, there will be no way to determine the extent to which the "premium" estimated is attributable to a perception that a particular standard or filtration percentage is being met.[194] As a result, any and/or all portions of Mr. Gaskin's estimate related to

---

[190] *Gaskin Deposition,* p. 181:19-25 ("Q. If during the pretesting the participants are having difficulty interpreting true HEPA, will you offer a definition for your survey? A. No, because it's not defined right there on the package. It would be biasing to give them more information than they get in the real world.").

[191] *Orme, Formulating Attributes,* p. 50.

[192] Plaintiff appeared to be unclear as to whether there was or was not a distinction between True HEPA and HEPA. For example, Mr. Chen states, "I understand True HEPA to mean that it is HEPA," and when asked "is there a difference between HEPA and True HEPA in your mind?" Mr. Chen responded "I don't know. Or like no." *Chen Deposition,* p. 71:2-15.

[193] See ¶ 85, above.

[194] In fact, Mr. Gaskin does not intend to test the "99.97% filtration efficiency at 0.3 microns" claim at all. *Gaskin Deposition*, p. 15:4-17.

True HEPA may simply reflect respondents' beliefs that the product generally traps dust and pollen, has multiple layers of filtration, cleans the air over a certain area, neutralizes odors, etc.[195] All of which are actual consumer understandings of HEPA.

136.    The lack of definition for his "Labels" is further problematic because Mr. Gaskin's attributes are not mutually exclusive.[196] Because consumers understand HEPA in a variety of ways, Mr. Gaskin's other "Label Claims" potentially overlap with his undefined HEPA claims. For example, Label C includes the level, "#1 Brand Recommended by Allergists," and Label D includes the level, "Fight Allergies & Unwanted Odors." However, my survey demonstrates that some consumers believe HEPA is a reference to the product's ability to trap pollen and neutralize odor.[197] The overlapping nature of the Labels is problematic because it is unclear how a respondent should interpret a product that has a HEPA claim but does not claim that it "Fights Allergies & Unwanted Odors." Should the respondent assume that the (True) HEPA designation means the product can still address allergies and odor even though it does not explicitly include this description, or should the respondent assume that the product without "Fights Allergies & Unwanted Odors" means that HEPA indicates some other set of characteristics? Here the other Labels in Mr. Gaskin's survey may change or influence respondents' interpretations of the True HEPA claim. As another example, Label E includes the coverage area for three ranges, 155 Sq. Ft., 219 Sq. Ft., and 360 Sq. Ft. As my survey demonstrated, some consumers believe HEPA is a description of coverage area.[198] Thus, it is unclear how a respondent in Mr. Gaskin's survey should

---

[195] See **Table 11**.

[196] *Orme, Formulating Attributes,* pp. 51-52.

[197] See **Table 11**.

[198] See **Table 11**.

interpret a product described as True HEPA with a coverage area of 155 Sq. Ft. compared to a product with no HEPA claim and a coverage area of, for example, 360 Sq. Ft. Will this respondent view the coverage area as inaccurate or be confused about the meaning of True HEPA?

137.    Furthermore, even assuming that Mr. Gaskin is correct, and that it is proper for him to assume Plaintiff's allegation as to the meaning of True HEPA is accurate,[199] his survey design provides no way to determine what share of his estimated price premium would be solely attributable to Plaintiff's assertions as to the meaning of True HEPA. As shown above in **Table 11**, consumers have multiple interpretations of HEPA, including that the product neutralizes odors, cleans over a certain area, and/or has a mechanical filter with fine mesh. Some of the value Mr. Gaskin proposes to measure for True HEPA, therefore, may include the value consumers place on these understandings (or others) that are unrelated to Plaintiff's claims about specific testing standards or filtration percentages. Mr. Gaskin proposes no method for determining what share of the True HEPA claim is related to Plaintiff's allegations, has done nothing to confirm that consumers' perceptions align with the allegations, and entirely ignores the possibility that, even assuming Plaintiff was correct, consumers may have additional understandings of HEPA that could contribute to his estimated "premium."

### D. Mr. Gaskin's Survey Omits Key Purchase Drivers

138.    Mr. Gaskin has not undertaken any research with consumers to understand how they purchase air purifiers. He also has not talked to a single purchaser to evaluate what features were important when making a purchasing decision. In his testimony, Mr. Gaskin repeatedly suggests that the little attention and scant research he conducted to identify his survey attributes is

---

[199] And my research with almost 300 purchasers demonstrates purchasers of Levoit brand air purifiers do not understand HEPA in the manner alleged.

sufficient because distractors need not be attributes that are important to consumers.[200] Further, Mr. Gaskin conjectures his results will be reliable and valid because conjoint methods, generally as a whole, are well-recognized and he has conducted conjoint studies of other products in the past.[201]

139.     In contrast to his assertion that the attributes and levels in a conjoint survey can be identified by looking at a handful of webpages and the Complaint,[202] authors in the field, including those cited by Mr. Gaskin, emphasize that attribute selection and definition is the one of the most important, if not the most important element, in designing a proper conjoint survey. As one author notes, "defining proper attributes and levels is arguably **the most fundamental aspect** of designing a good conjoint study."[203] Another set of authors explain:

> The researcher should consider providing a theory for including and excluding certain product attributes (and attribute levels) in the survey. A potential approach is to refer to prior studies that identified the most important attributes of a particular product category for consumers or to rely on empirical research, such as results from focus groups with relevant consumers.[204]

140.     Indeed, it is well-acknowledged that when designing a conjoint survey, the researcher must select attributes that represent "the most salient drivers of consumers' choice

---

[200] *Gaskin Deposition,* p. 211:4-10 ("Q. How much time did you spend researching the appropriate attributes to include? A. My team did it on – under my direction, and then we discussed it. I don't know how much time they spent. Q. How much time did you spend? A. I guess an hour or two. Something like that.").

[201] *Gaskin Deposition,* p. 148:9-25 ("A. It means it gives a reliable answer – a valid and reliable answer, but from both a mathematical and an economical point of view. Q. And you're saying from the outset, having not conducted the actual survey or fully designed the actual survey, you can say from the outset that it is – that it's reliable? A. I've given you reasons why conjoint analysis is very popular and used frequently with great frequency by businesses and et cetera, et cetera. It's the most popularly used marketing science technique. I'm using essentially the same method as I've used in many other cases where it's been found to be reliable and valid. And so I think it would be reliable and valid here, too.").

[202] *Gaskin Declaration*, ¶ 27.

[203] *Orme, Formulating Attributes,* p. 49. [Emphasis added].

[204] Befurt, R., MacMenamin, N., & Mohammad, A.P. (2023). "Use of Conjoint Analysis in Litigation: Challenges, Best Practices, and Common Mistakes." *The Cambridge Handbook of Marketing and the Law*; edited by Gersen, J. E. and Steckel, J., pp. 221-235 (hereinafter, "*Befurt*"), at p. 230.

90

processes in the real world."[205] This ensures that estimates from the survey reflect actual consumer purchasing decisions. When important attributes are omitted, the value of the included features may be inflated or overweighted due to focalism bias.[206] As such, researchers should undertake rigorous research to inform the selection of attributes and levels.[207]

141.    Mr. Gaskin states that he "consulted the Complaint, used information from Levoit's website pages, reviewed the brand websites and third-party websites of Levoit's competitors, reviewed retailers' websites, examined the product packaging for Levoit's air purifiers, and reviewed sales data,"[208] to determine his survey attributes. Further, Mr. Gaskin indicated that he did not conduct any exploratory research with consumers because he believed this was "not necessary."[209] But it is unclear how the materials reviewed by Mr. Gaskin specifically informed his selection of attributes. For example, Mr. Gaskin cites to "Levoit's website pages" to define his attributes[210] but his cited materials only lists the brand's homepage.[211] Other than the logo, there is no indication what information Mr. Gaskin selected or relied on from the current Levoit website,

[205] *Befurt*, p. 230.

[206] Bedi, S., & Reibstein, D. (2021). "Damaged Damages: Errors in Patent and False Advertising Litigation," *Alabama Law Review, 73*(2), pp. 385-436, (hereinafter, "*Bedi & Reibstein*") at p. 415. "[W]hen presented with features that are minor (i.e., not really used in a real-life decision context), a consumer will overweigh those attributes because her attention will be drawn to them. This phenomenon is called "focalism." In effect, when a consumer is told about features that he otherwise would not consider in buying a product, he tends to overweigh the importance of those features in a choice task."

[207] *Orme, Formulating Attributes*, p. 50. Also cited by Mr. Gaskin, see *Gaskin Declaration,* p. B-2.

[208] *Gaskin Declaration,* ¶ 27.

[209] *Gaskin Deposition*, p. 207:11-19 ("Q. For this case, is it important to make decisions about the attributes and levels that will be present on the conjoint survey before conducting the research? A. Well, the only qualitative research I'm doing is the pretest. I have to have the attributes and levels ready before that. I'm not conducting exploratory research because I think it's not necessary.").

[210] *Gaskin Declaration,* ¶ 27.

[211] *Gaskin Declaration,* Exhibit B, p. B-2.

what pages he reviewed, or how the homepage, which includes many other types of products, informed his selection of survey attributes for air purifiers.[212]

142.    Mr. Gaskin looked to the product packaging (i.e., the boxes) to inform the labels/features to be shown to respondents in his survey. His materials cited indicates he reviewed air filter products being sold on eBay, Sears, and Walmart to define his label claims.[213] While Mr. Gaskin states that all claims appearing on product packaging *must* be important to the manufacturer,[214] he provides no evidence that the simple appearance of a claim on a package means it has importance to a consumer. In fact, many consumers who bought the product online might not have seen the product packaging until after purchase.[215] Moreover, Mr. Gaskin provides no explanation for his selection of some attributes over than others and omits highly visible and important features such as the product size, design, and color.[216]

143.    Including attributes in a conjoint survey that are not important, and omitting those that are important, will yield biased and unreliable results.[217]As shown below, a number of product pages Mr. Gaskin consulted contain extensive lists and descriptions of product features. For example, one product page cited by Mr. Gaskin includes multiple pictures of the Levoit Core 300-

---

[212] It appears that for two of the "competitive" products, Mr. Gaskin did not look at the actual product sites, but rather a site with product logos (i.e., Honeywell and Conway). For Medify, it also appears that Mr. Gaskin did not review a product page but rather a blog, and for Winix, it appears as though Mr. Gaskin relied on the European product site. See *Gaskin Declaration,* Exhibit B,

[213] Mr. Gaskin referenced Amazon.com for "Pricing Data" but does not list Amazon pages as one which informed his label claims. *Gaskin Declaration,* B-3-5.

[214] Mr. Gaskin states that the distractor labels "are shown on the package. If they weren't important, the company wouldn't put them on the package." *Gaskin Deposition*, p. 210:19-21. [Emphasis added].

[215] Plaintiff Chen purchased his product on Amazon.com. (*Complaint*, ¶ 11) Some air purifiers sold on Amazon are shown without the product packaging visible, for example see the Test Stimuli for my Prospective Purchaser Survey (**Appendix 2.3**).

[216] See **Table 7** above. *Gaskin Deposition*, p. 70:21-71:10. Mr. Gaskin suggests he wouldn't "rule out product size," and claims, when identifying competitors, he was "looking at filters that are reasonably the same size, as far as I know."

[217] *Bedi & Reibstein,* p. 415.

RAC (notably, Mr. Gaskin does not plan to include any product images[218] in his survey, and it appears that he does not intend to ask respondents anything about the design, color, size, or appearance of the product) and includes the following product description:

Specifications:[219]
- Filtering Details
- Filter type True HEPA
- Filter features 360-degree filtration, 3-stage
- Pre-filter details Nylon
- Additional filter details Granular activated carbon
- Typical Replacement Filter Price $20 (*Indicative only. Average price at research time)
- Main filter product number Core 300-RF (Levoit also offers pet allergy, toxin absorber, and mold/bacteria filters)
- Purifying Performance
- Clean Air Delivery Rate for pollen 143 cubic feet / minute
- Clean Air Delivery Rate for dust 138 cubic feet / minute
- Clean Air Delivery Rate for smoke 140 cubic feet / minute
- General Clean Air Delivery Rate 135 cubic feet / minute
- Coverage area (square feet) 215 sqr. Feet
- Air Changes Per Hour 5 (over 210 square feet)
- Air fan speeds 3
- Voltage 120 (60Hz)
- Watts 45 (0.8W standby power)
- Noise level at Low 24dB (decibels)
- Noise level at Max. 50dB (decibels)
- Filter micron rating 0.3
- Filtration percentage 99.97 %
- On-off timer 8 hour(s) (2/4/6/8 hours)
- Other Specs & Features
- Display details Display lock
- Certifications AHAM, Energy Star, CARB, FCC, CA Prop 65, ETL
- Sub-category Portable, mini
- Indicator lights (for fan speed and timer)
- Warranty 1 year (1 year according to user manual, 2 years according to product page)
- Control Location Top

---

[218] *Gaskin Deposition,* p. 208:22-24 ("Q. And you do not intend to show an image of the actual product to the respondents. A. That's correct…").

[219] https://www.ebay.com/p/5047265694, last accessed May 15, 2025.

- Preset programs Silent/Sleep Mode

144.    Another page Mr. Gaskin relied on shows images of the product and includes the following list of features:[220]

- Filters at least 99.97% of 0.3-micron airborne particles
- Reduces odors
- Traps airborne particles such as dust, pollen, and smoke
- Quiet operation
- 219 ftsq
- #1 Air Purifier Brand in the US
- Built in timers
- 3 fan speeds
- Sleep mode
- Display screen
- Display lock
- 3-Stage Filtration
- High-Efficiency Activated Carbon Filter
- Energy Star
- Warranty

145.    Other product postings cited by Mr. Gaskin similarly show lengthy lists of product specifications and claims.[221]

146.    None of the pages reviewed by Mr. Gaskin indicate which of the multiple features listed on the product packaging matter most to consumers, and it appears that Mr. Gaskin arbitrarily selected which specific claims to include,[222] particularly since he indicates he spent "an

---

[220] https://www.ebay.com/itm/197000215974?chn=ps&mkevt=1&mkcid=28&google_free_listing_action=view_item&gQT=2, last accessed June 13, 2025.

[221] See e.g., eBay Listing for the Core 300
https://www.ebay.com/itm/387095153190?chn=ps&norover=1&mkevt=1&mkrid=711-117182-37290-0&mkcid=2&mkscid=101&itemid=387095153190&targetid=2299003535955&device=c&mkty, last accessed May 14, 2025.

See also, https://www.walmart.com/ip/Medify-Air-MA-40-Air-Purifier-with-HEPA-H13-Filters-250-Sq-ft-Coverage-for-Pollen-White-1-Pack/484605507?wmlspartner=wlpa&selectedSellerId=101039042&sourceid=dsn_ad_82a1172e, last accessed May 14, 2025. Several specifications are listed under "about this item."

[222] When asked why he included specific labels in his conjoint survey, Mr. Gaskin only states that this is because they appear on one of more of the labels of the brands he decided to include in the survey, not even necessarily a Levoit product. For example, when asked why he included the Label C levels "Doctors Choice!" "#1 Recommended by Allergists" and

hour or two" researching appropriate attributes.[223] By excluding key purchase drivers from his conjoint survey, Mr. Gaskin's survey design will further inflate and undermine the reliability of any estimated premium attributable to the True HEPA claim.[224]

## VIII. CONCLUSIONS

147.    I surveyed more than 1,000 consumers who have either purchased an accused Levoit air purifier or who would be in the market for such a product. My surveys demonstrate that True HEPA is not a claim that impacts consumer purchases. The large majority of purchasers of accused Levoit brand air purifiers do not indicate that HEPA or True HEPA was a reason for purchasing their product.[225] Further, my data demonstrate that for those consumers who do care about HEPA, their understanding of the claim varies. Many consumers indicate that HEPA means the product collects dust or pollen, covers a certain area, or neutralizes odor, amongst other perceptions.[226] The majority of relevant consumers do not believe that HEPA means a particular testing standard or filtration protocol is being met.[227] My survey of prospective purchasers confirms the results and conclusions drawn from my survey of past purchasers of the accused Levoit brand air purifiers. This survey demonstrates that statements related to True HEPA, H13, and 99.97% filtration at 0.3 microns in real world product advertising would not have caused

---

"Independently Tested. Consumer Trusted." Mr. Gaskin offered the following explanation, "[b]ecause they appear on one or more of the products in the survey." When asked whether these statements appeared on Levoit products, Mr. Gaskin was unsure if this was even the case, stating "I'd have to look back." (*Gaskin Deposition*, p. 214:10-17). Mr. Gaskin provides this same rationale for the levels of Label D, staying "Because it's on one or more of the products" (*Gaskin Deposition*, p. 215:23-216:11). Again, Mr. Gaskin presents no data or evidence that these particular claims represent the key purchase drivers for consumers.

[223] *Gaskin Deposition*, p. 211:4-10. When asked "How much time did you spend?" in relation to researching the appropriate attributes to include in the survey, Mr. Gaskin stated "I guess an hour or two. Something like that."

[224] *Bedi & Reibstein*, p. 415.

[225] See **Tables 7, 9,** and **10.**

[226] See **Table 11**.

[227] See **Table 11**.

95

consumers to be more interested in purchasing a Levoit Core 300 brand air purifier compared to consumers shown the same product without the accused statements.[228] In other words, while consumers may be interested in purchasing Levoit brand air purifiers for a range of reasons (including product reviews, price, or product features), the accused statements would not have a material impact on purchasing decisions.

148.    My research contrasts plainly with the assumptions made by Mr. Gaskin as to the reliability of his proposed conjoint survey. While I surveyed over 1,000 consumers, Mr. Gaskin has not surveyed or spoken with a single consumer. Instead, he suggests his draft survey, based on a few hours of research on a few internet sites, will certainly yield statistically reliable and helpful results for Plaintiff. Mr. Gaskin's conclusions are not informed by data or even qualitative work with consumers but are largely predicated on his experience doing conjoint surveys for other products and Plaintiff's allegations from the Complaint which suggests there is a substantial price differential between products with and without a HEPA label (information which Mr. Gaskin did not independently verify or confirm). Simply put, Mr. Gaskin has not conducted sufficient research for this matter to determine that his design would yield reliable results that could be used to create estimates of consumer behavior in the real world. Further, Mr. Gaskin's assumption that his test of an isolated True HEPA claim will yield a price premium that can entirely be attributed to Plaintiff's alleged interpretation is erroneous. Mr. Gaskin testified that he is not testing 99.97% filtration at 0.3 microns, and his proposed survey would not provide any "price premium" associated with consumer preferences for a product with 99.97% filtration at 0.3 microns compared to a product with, for example, 98.70% filtration at 0.3 microns. My data demonstrate that

---

[228] See ¶¶ 112, 113 and **Table 20**.

consumers have many, varied interpretations of HEPA, many of which are unrelated to Plaintiff's assertions related to testing standards or filtration protocols. Mr. Gaskin's proposed method provides no way to determine how much of his premium, if any, would be tied to Plaintiff's claim. Finally, Mr. Gaskin's proposed survey omits features that matter to consumers when purchasing an air purifier and as such his estimates of True HEPA will likely be inflated.

149.    My conclusions have been reached through the proper application of survey methods and using standard methodologies relied upon by experts in the field of survey and market and consumer research. My opinions will continue to be informed by any additional material that becomes available to me. I reserve the right to update and/or supplement my opinions if I am provided with additional information. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Sarah Butler, Senior Managing Director
June 20, 2025

97

# Exhibit A



**Sarah Butler**
Senior Managing Director

NERA Economic Consulting
4 Embarcadero, Suite 400
San Francisco, CA 94111
+ 1 415 291 1000 Fax + 1 415 291 1010
Direct dial: + 1 415 291 1022
sarah.butler@nera.com
www.nera.com

# SARAH BUTLER, M.A.
## SENIOR MANAGING DIRECTOR

Ms. Butler is an expert in survey research, market research, sampling, and statistical analysis. She has applied her expertise in a wide range of litigation and strategic business cases. Her litigation and project experience includes survey research, market research, the design of samples, and the statistical and demographic analysis of large data files in a number of areas including:

Intellectual Property

- Trademark and Trade Dress Infringement: Design, analysis, and critique of surveys used to measure consumer confusion, secondary meaning, and dilution in trademark and trade design infringement cases.

- False and Misleading Advertising: Design, analysis and critique of surveys used to measure consumer perceptions and the materiality of advertising claims.

- Patent Infringement: Sample designs and surveys to the value of patented feature of a larger product and to establish rates at which infringing material exist in populations of products.

- Copyright infringement: Sampling plans and analysis of the rates of infringing material in populations of shared information (such as through websites or other sharing medium).

Mass Torts/Class Actions

- Conduct surveys and design samples providing evidence on issues of commonality and consumers' awareness of key documents or facts and reliance on representations.

- Analyze large databases of claims files to generate invoices, estimate future liabilities and calculate policy shares for insurer liabilities in asbestos, tobacco and pharmaceuticals.

- Design, analyze and critique surveys and sampling plans used to evaluate employment and promotion records. Review and design surveys for purposes of estimating key facts in labor class actions including time to complete activities, exempt/nonexempt activities, and meal and rest break issues.

Sarah Butler

Antitrust

- Design, analysis and critique of surveys and other market research used as evidence of consumer purchasing and switching behavior in the areas of CPG, entertainment, automobiles, public transportation, sports and consumer electronics.

- Design, analysis and critique of surveys used to demonstrate consumer price sensitivities and willingness to pay.

Prior to joining NERA, Ms. Butler worked in market research, conducting survey research, focus groups and in-depth interviews.

## Education

**Temple University**
Applied Sociology, coursework, exams and dissertation proposal complete (2005).

**Temple University**
M.A. Sociology, (2000).

**Trinity College, Dublin Ireland**
M.Phil. (1997).

**Wellesley College**
B.A. Sociology and History (with honors). (1995).

## Professional Experience

July 2006 - Present        **Senior Consultant – Senior Managing Director**
                           NERA Economic Consulting
                           San Francisco, California, USA

Oct 2005 – May 2006        **Special Consultant**
                           NERA Economic Consulting
                           London, England

Jan 2003 – Oct 2005        **Senior Analyst - Consultant**
                           NERA Economic Consulting
                           Philadelphia, Pennsylvania, USA

2002 - 2003                **Consultant**
                           Integrated Marketing Associates
                           Bryn Mawr, PA, USA

Sarah Butler

| | |
|---|---|
| Oct 1998 - Jan 2002 | **Research Associate – Analyst**<br>NERA Economic Consulting<br>Philadelphia, Pennsylvania, USA |
| Sept 1998 – May 2003 | **Adjunct Professor**<br>Temple University<br>Philadelphia, Pennsylvania, USA |
| Jan 1997 – Feb 1998 | **Manager of Member Research**<br>Society for Neuroscience<br>Washington DC, USA |

# Expert Analysis and Testimony

<u>2025</u>

*Intellectual Property Matters*

<u>Lowtech Studios, LLC* v. Kooapps LLC, Jonathan Chang, and Chun-Kai Wang.</u> United States District Court for the Western District of Texas Austin Division. *Expert Report.*

<u>Cognipower, LLC v. Samsung Electronics Co., LTD.; Samsung Electronics America, Inc.*</u> United States District Court for the Eastern District of Texas Marshall Division. *Expert Report.*

<u>Madaket, LLC* v. Sweet Grace Distilling Company, LLC, Premium Distributors of Washington, D.C., L.L.C., Safeway, Inc., and Uncorked, LLC.</u> United States District Court District of Columbia. *Expert Report. Rebuttal Report.*

<u>The Toronto Dominion Bank* v Thomas John Dyas d/b/a TD Benefit Solutions.</u> Federal Court (Canada). *Expert Report.*

<u>Headwater Research, LLC v. Verizon Communications Inc., Cellco Partnership, d/b/a Verizon Wireless, Verizon Corporate Services Group Inc.*</u> United States District Court for the Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

<u>Headwater Research, LLC v. T-Mobile US, Inc., T-Mobile USA, Inc., and Sprint Corp.*</u> United States District Court for the Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

<u>Headwater Research, LLC v. AT&T Inc., AT&T Services, Inc., AT&T Mobility, LLC and AT&T Corp.*</u> United States District Court for the Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

Sarah Butler

*Other Matters*

John Doe One, Richard Roe, in his capacity as executor for John Doe Two, John Doe Six, and John Doe Seven, on behalf of themselves and all others similarly situated for the benefit of the general public v. CVS Pharmacy, Inc; Caremark, LLC; Caremark California Specialty Pharmacy, LLC; Garfield Beach CVS, LLC' CaremarkPCS Health, LLC, and DOES 1 – 10, inclusive.* United States District Court for the Northern District of California, San Francisco Division. *Expert Report. Deposition.*

Sage Chemical, Inc. et al* v. Supernus Pharmaceuticals, Inc. et al. United States District Court for the District of Delaware. *Expert Report. Deposition.*

2024

*Intellectual Property Matters*

Maxell, LTD. v. Samsung Electronics Co., LTD and Samsung Electronics America, Inc.* United States District Court for Eastern Districts of Texas Texarkana Division. *Rebuttal Report. Deposition.*

HomeVestors of America, Inc. v. Warner Bros. Discovery, Inc.* United States District Court for the District of Delaware. *Expert Report. Deposition.*

Carhartt, Inc. v. Costa Del Mar, Inc.* United States District Court for the Eastern District of Michigan. *Rebuttal Report. Deposition. Reply Report.*

Virtru Corporation v. Microsoft Corporation.* United States District Court for the Western District of Washington at Seattle. *Expert Report. Deposition.*

Copperweld Bimetallics, LLC* v. Cerro Wire, LLC, Southwire Company, LLC, Christel Hunter, and Dave Watson. United States District Court for the Northern District of Alabama, Eastern Division. *Expert Report. Reply Report. Deposition.*

Medline Industries, LP.* v. C.R. Bard, Inc. United States District Court Northern District of Georgia Atlanta Division. *Expert Report. Deposition.*

Seattle Metropolitans Hockey LLC v. Seattle Hockey Partners LLC.* United States District Court Western District of Washington at Seattle. *Expert Report. Rebuttal Report.*

City and County of San Francisco* v. City of Oakland, and Port of Oakland. United States District Court Northern District of California. *Expert Report. Reply Report.*

Fluidmaster, Inc., v. Danco, Inc.* United States District Court Northern District of Texas Dallas Division. *Rebuttal Report. Deposition.*

In the Matter of H&R Block, Inc., HRB Digital LLC, HRB Tax Groups, Inc. United States Federal Trade Commission, Washington DC. *Expert Report. Rebuttal Report. Deposition.*

Sarah Butler

<u>Punchbowl, Inc. v. AJ Press LLC.</u>* United States District Court Central District of California. *Expert Report.*

<u>SharkNinja Operating LLC and SharkNinja Sales Company v. Dyson Inc. and Dyson Technology Limited.</u>* United States District Court District of Massachusetts. *Expert Report. Deposition.*

<u>Applied Innovation, Inc. v. Lowery Corporation DBA Applied Innovation.</u>* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

<u>Puma SE v. Zhang Kang.</u>* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report. Deposition.*

<u>Headwater Research LLC v. Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc.</u>* United States District Court Eastern District of Texas Marshall Division. *Rebuttal Report. Deposition.*

<u>CoStar Group, Inc. and Costar Realty Information, Inc.</u>* v. Commercial Real Estate Exchange, <u>Inc.</u> United States District Court Central District of California. *Rebuttal Report. Deposition.*

<u>Motiv Power Systems, Inc. v. Motive Technologies Inc.</u>* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report. Reply Report.*

<u>WEX Inc.* v. HP Inc. and Hewlett-Packard Development Company, L.P.</u> United States District Court District of Maine. *Declaration. Rebuttal Declaration.*

<u>Proximo Spirits, Inc.* v. Green Lake Brewing Co., LLC d/b/a Fremont Brewing Co,; and Does 1-10, inclusive.</u> United States District Court Central District of California, Western Division. *Expert Report.*

<u>Gesture Technology Partners, LLC v. Motorola Mobility LLC.</u>* United States District Court Northern District of Illinois, Eastern Division. *Rebuttal Report.*

<u>General Access Solutions, Ltd. v. Verizon Communications, Inc. et al.</u>* United States District Court Eastern District of Texas, Marshall Division. *Expert Report. Deposition.*

<u>Benefit Cosmetics, LLC v. e.l.f. Cosmetics, Inc.</u>* United States District Court Northern District of California, San Francisco Division. *Expert Report. Reply Report. Deposition. Trial Testimony.*

<u>Corephotonics, LTD v. Apple Inc.</u>* United States District Court Northern District of California. *Rebuttal Report. Deposition.*

<u>Nutramax Laboratories, Inc. and Nutramax Laboratories Veterinary Sciences, Inc. v. Zesty Paws LLC and Health and Happiness (H&H) US International Incorporated.</u>* United States District Court Middle District of Florida, Orlando Division. *Expert Report. Deposition. P.I. Testimony.*

Sarah Butler

Blue Yonder Group, Inc.* v. Kinaxis Inc. and Kinaxis Corp. United States District Court Northern District of Texas, Dallas Division. *Expert Report*.

Puma SE, and Puma North America Inc. v. Brooks Sports, Inc.* United States District Court Southern District of Indiana, Indianapolis Division. *Expert Report. Deposition.*

*Class Action Matters*

Lori DeCostanzo, individually and on behalf of all others similarly situated v. Glaxosmithkline PLC and Glaxosmithkline LLC. United States District Court Eastern District of New York. *Expert Report. Deposition.*

Veronica Shirley, individually and on behalf of all others similarly situated v. Reynolds Consumer Products LLC.* United States District Court Northern District of Illinois Eastern Division. *Expert Report. Rebuttal Report.*

Tanysha Newman, individually and on behalf of all others similarly situated v. Bayer Corporation and Bayer Healthcare LLC.* United States District Court for the Southern District of New York. *Expert Report. Rebuttal Report. Deposition.*

Clark Alexandre, individually and on behalf of all others similarly situated v. Alcon Laboratories, Inc.* United States District Court for the Southern District of New York, White Plains Courthouse. *Expert Report.*

Jeffrey Albert Sjobring, on behalf of himself and all others similarly situated* v. First American Title Insurance Company, First American Title Company, and Does 1 – 500. Superior Court of the State of California in and for the County of Los Angeles. *Declaration. Deposition.*

Claudia Newton and Brandy Leandro v. R.C. Bigelow, Inc., and Does 1 through 10.* United States District Court Eastern District of New York. *Rebuttal Report. Deposition. Trial Testimony.*

Miguel Frias, Jessica Avilez, and Roy Campbell, individually and behalf of all others similarly situated v. Mars Wrigley Confectionary US LLC.* United States District Court Southern District of New York. *Rebuttal Report.*

In RE: Marriott International Inc., Customer Data Security Breach Litigation. City of Chicago* v. Marriott International, Inc. and Starwood Hotels & Resorts Worldwide, LLC. United States District Court for the District of Maryland, Southern Division. *Expert Report. Rebuttal Report. Deposition.*

Edward Pistorio et al. v. FCA US LLC.* United States District Court Eastern District of Michigan. *Expert Report. Deposition.*

Cat Brooks and Rasheed Shabazz, individually and on behalf of all others similarly situated* v. Thompson Reuters Corporation. United States District Court for the Northern District of California, San Francisco Division. *Expert Report.*

Sarah Butler

Nicholas Usler, et al., v. Vital Farms, Inc., et al.* United States District Court for the Western District of Texas. *Expert Report.*

William Lessin and Carol Smalley et al., on behalf of themselves and all others similarly situated v. Ford Motor Company, a Delaware corporation; and Does 1 through 10 inclusive.* United States District Court, Southern District of California. *Expert Report. Deposition.*

*Other Matters*

Megan White, Jeronimo Aguilar, Loren Wayne Kidd, Lyric Nash, Nicollette Jones, and Odette Zapata* v. Sacramento Police Department; The City of Sacramento; Daniel Hahn, and Does 1 – 200 (the names and numbers of which are currently unknown). United States District Court, Eastern District of California, Sacramento Division. *Expert Report. Deposition. Trial Testimony.*

2023

*Intellectual Property Matters*

SpaceTime3D, Inc. v. Apple Inc.* United States District Court Western District of Texas, Austin Division. *Expert Report. Deposition.*

PWNHealth, LLC d/b/a Everly Health Solutions v. Walgreen Co.* American Arbitration Association Case No. 01-22-0002-4919. *Rebuttal Report. Arbitration Testimony.*

Evolve Biosystems, Inc.; and the Regents of the University of California, a corporation* v. Abbott Laboratories. United States District Court for the Northern District of Illinois, Eastern Division. *Expert Report. Deposition.*

Lincare Holdings Inc. and Lincare Licensing Inc.* v. Doxo, Inc. United States District Court for the Middle District of Florida Tampa Division. *Expert Report. Deposition. Reply Report.*

Revelry Vintners, LLC, v. Mackay Restaurant Management Group, Inc., Fire & Vine Holdings, LLC, and Yellowhawk Resort WW, LLC.* United States District Court Eastern District of Washington at Spokane. *Rebuttal Report.*

Macy's IP Holdings, LLC,* v. Aroma360, LLC. United States District Court Southern District of New York. *Expert Report. Reply Report.*

Vans, Inc. and VF Outdoor, LLC, v. Walmart, Inc., The Doll Maker, LLC, and Trendy Trading, LLC.* United States District Court Central District Of California. *Rebuttal Report. Deposition.*

Smack Apparel Company v. Seattle Hockey Partners, LLC (dba Seattle Kraken), NHL Enterprises, LP, and National Hockey League.* United States District Court Western District of Washington. *Expert Report.*

Nike, Inc. v. StockX LLC.* United States District Court Southern District of New York. *Rebuttal Report. Deposition.*

Sarah Butler

Casa Tradición S.A. de C.V. v. Casa Azul Spirits, LLC.* United States District Court Southern District of Texas, Houston Division. *Rebuttal Report. Deposition. Trial Testimony.*

Tari Labs, LLC v. Lightning Labs, Inc.* United States District Court Northern District of California, San Francisco Division. *Expert Report.*

Edible IP, LLC and Edible Arrangements LLC* v. 1-800-Flowers.com, Inc. and 800-Flowers, Inc. United States District Court Northern District of Georgia Atlanta Division. *Expert Report. Rebuttal Report. Deposition.*

GOLO, LLC* v. Goli Nutrition Inc. United States District Court District of Delaware. *Expert Report. Reply Report. Deposition. Trial Testimony.*

NetEase, Inc., NetEase Information Technology Corporation, and Hong Kong NetEase Interactive Entertainment Limited, v. Krafton, Inc. and PUBG Santa Monica, Inc.* Superior Court of California, County of Alameda. *Expert Report. Reply Report. Deposition. Trial Testimony.*

*Class Action Matters*

Tamika Miller and Julianne Chuanroong, individually and on behalf of themselves, the general public, and those similarly situated, v. Travel Guard Group, Inc., AIG Travel, Inc., And National Union Fire Insurance Company of Pittsburgh, PA.* United States District Court for the Northern District of California. *Expert Report. Reply Declaration. Deposition.*

Bruce Puterbaugh v. Oorah, Inc,; Kars4Kids, LLC (Erroneously Sued Herein as Kars4Kids and J.O.Y. of Our Youth) and DOES 1-50.* United States District Court for the Central District of California. *Expert Report. Rebuttal Report. Deposition.*

Tammy La Barbera v. Olé Mexican Foods, Inc.* United States District Court for the Central District of California. *Rebuttal Report. Deposition.*

Tamara Moore, Greta Ervin, Raff Arando, Nichols Smith, Renee Edgren, and Cynthia Welton, on behalf of themselves and all others similarly situated, v. Mars Petcare US, Inc, Hill's Pet Nutrition, Inc., and Royal Canin USA, Inc.* United States District Court for the Northern District of California. *Expert Report*.

Tiffany Coleman, Keli Swann, and Heather Brooke, individually and on behalf of all others similarly situated, v. Britax Child Safety Inc.* United States District Court of South Carolina, Rock Hill Division. *Expert Report. Deposition.*

William Rushing and Elizabeth Perlin, individually and on behalf of all others similarly situated, v. Williams-Sonoma, Inc.* United States District Court for the Northern District of California, San Francisco Division. *Expert Report. Reply Report.*

Kevin Shenkman v. Tesla, Inc. and DOES 1 to 50, inclusive.* Superior Court of California, County of Alameda. *Expert Report. Deposition.*

Sarah Butler

*Other Matters*

Apple Inc.* v.  Masimo Corporation and Sound United, LLC; Ceracor Laboratories, Inc. United States District Court for the District of Delaware. *Rebuttal Report. Deposition.*

Hawaii Foodservice Alliance, LLC v. Meadow Gold Dairies Hawaii, LLC, Hollandia Dairy, Inc., Heritage Distributing Company (dba Ninth Avenue Foods), and Saputo Dairy Foods USA, LLC.* United States District Court for the District of Hawaii. *Rebuttal Report. Deposition.*

Moxie Pest Control* v. Kyle Nielsen, et.al. United States District Court for the District of Utah, Central Division. *Expert Report. Reply Report. Deposition.*

AliveCor, Inc. v. Apple Inc.* United States District Court Northern District of California. *Expert Report. Deposition.*

2022

*Intellectual Property Matters*

Sports Marketing Monterrey Group, LLC* v. Socios Services US Inc., and Mediarex Enterprises Limited. United States District Court for the Northern District of California, San Francisco Division. *Declaration. Reply Declaration.*

Xerox Corporation (USA) v. Fujifilm Business Innovation Corp. (formerly known as Fuji Xerox Co., Ltd.) (Japan).* International Court of Arbitration of the International Chamber of Commerce. *Expert Report.*

F21 OPCO, LLC* v. AIRWAIR INTERNATIONAL LTD. United States District Court for the Central District of California, Western Division. *Expert Report. Rebuttal Report. Deposition.*

Florida Virtual School v. K12 Inc., and K12 Florida LLC.* United States District Court Middle District of Florida Orlando Division. *Expert Report. Deposition.*

ImprimisRX, LLC* v OSRX, Inc.; Ocular Science, Inc., United States District Court Southern District of California. *Expert Report. Deposition.*

WSOU Investments, LLC d/b/a Brazos Licensing and Development v. Dell Technologies, Inc., Dell Inc., and EMC Corporation.* (Case No. 6:20-cv-473-ADA). United States District Court Western District of Texas Waco Division. *Expert Report. Deposition.*

Bluebonnet Internet Media Services, LLC* v. Pandora Media, LLC. United States District Court Western District of Texas Waco Division. *Expert Report.*

In re Application of Wine.com LLC.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

Sarah Butler

Bilt Technologies, Inc. v. BILT, Inc.* United States District Court for The Southern District of New York. *Expert Report. Rebuttal Report. Deposition.*

Sazerac Brands, LLC* v. Eagle Trace Brewing Company LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report*.

UV RML NL ASSETS LLC* v. Coulter Ventures LLC. United States District Court Central District of California. *Expert Report. Rebuttal Report.*

Tortilla Factory, LLC v. GT's Living Foods, LLC.* United States District Court for The Central District of California. *Expert Report. Trial Testimony.*

Sazerac Brands, LLC* v. Buffalo City Distillery, LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report. Deposition.*

Thrive Natural Care, Inc. v. Le-Vel Brands, LLC.* United States District Court Central District of California, Southern Division. *Expert Report. Deposition.*

Crystal Lagoons U.S. Corp and Crystal Lagoons Technologies, Inc. v. Desert Color Manager LLC, Desert Color St. George LLC, AJ Construction, Inc., Cole West Home LLC, Holmes Homes, Inc., Sullivan Homes LLC, and Pacific Aquascape International, Inc.* United States District Court District of Utah, Central Division. *Expert Report*.

Sazerac Brands, LLC,* v. Buffalo Chip Campground, LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report*.

Nichino America, Inc., v. Valent U.S.A., LLC.* United States District Court District of Delaware. *Expert Report. Reply Report. Deposition.*

Promotion in Motion Inc.,* v. The J.M. Smucker Company. United States District Court District of New Jersey. *Rebuttal Report.*

Chartwell Studio Inc., v. Team Impressions, Inc., and The Peel People, LLC.* United States District Court Northern District of Illinois Eastern Division. *Rebuttal Report. Deposition.*

Brooks Sports, Inc.* v. SPARC Group, LLC, Authentic Brands Group LLC, BB IPCO, LLC, BB OPCO, LLC., Simon Property Group, Inc., Simon Property Group, L.P. United States District Court Western District of Washington at Seattle. *Expert Report.*

Shanghai Zhenglang Technology Co., Ltd,* v. Mengku Technology Co., Ltd, and Qianan Li. United States District Court Eastern District Of New York. *Rebuttal Report.*

Harman International Industries, Inc.,* v. Jem Accessories, Inc. United States District Court for the Central District of California. *Expert Report*.

PepsiCo* v. Rockstar Industries, LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

Sarah Butler

EBIN New York v. SIC Enterprise, Inc.* United States District Court Eastern District of New York. *Expert Report. Rebuttal Report. Deposition.*

Aqua Connect, Inc. and Strategic Technology Partners, LLC. v. TeamViewer US, LLC.* United States District Court District of Delaware. *Expert Report. Deposition. Trial Testimony.*

R80 LLC* v. Société des Produits Nestlé S.A., et al. United States District Court District of Maryland Southern Division. *Expert Report. Rebuttal Report.*

H&R Block, Inc.,* and HRB Innovations, Inc. v. Block, Inc. United States District Court Western District of Missouri. *Rebuttal Declaration. Reply Declaration. Expert Report.*

Vans, Inc. and VF Outdoor, LLC v. Walmart, Inc., The Doll Maker, Inc., and Trendy Trading, LLC.* United States District Court Central District of California Southern Division. *Declaration.*

Warner Bros. Entertainment Inc. v. Brian Biggs, Dawn Biggs, and Random Tuesday, Inc. *et al.* * United States District Court Central District of California. *Expert Report. Deposition.*

*Class Action Matters*

Ann Kenney, individually v. Fruit of the Earth, Inc., CVS Pharmacy, Inc.* United States District Court Southern District of California. *Expert Report.*

Holly Blaine Vanzant, and Sherry Nevius, on behalf of themselves and all others similarly situated v. Hill's Pet Nutrition, Inc. and PetSmart, LLC.* United States District Court for the Northern District of Illinois. *Expert Report. Deposition.*

In re: National Football League Sunday Ticket Antitrust Litigation. United States District Court Central District of California. *Expert Report. Deposition. Rebuttal Report. Expert Report. Rebuttal Report. Deposition.*

Kimberly Banks and Carol Cantwell v. R.C. Bigelow, Inc., and Does 1 through 10.* United States District Court Central District of California. *Rebuttal Report. Deposition. Trial Testimony.*

Mocha Gunaratna and Renee Camenforte v. Dr. Dennis Gross Skincare, LLC.* United States District Court Central District of California. *Expert Report. Deposition.*

Paul Orshan, Christopher Endara, David Henderson, and Steven Neocleous, v. Apple Inc.* United States District Court Northern District of California. *Expert Report. Deposition.*

Elizabeth Maisel v. S. C. Johnson, Inc.* United States District Court Northern District of California. *Expert Report.*

Sarah Butler

*Other Matters*

United States ex rel. Terrence Barrett, and on behalf of various States* v. Allergan, Inc. United States District Court Central District of California. *Expert Report.*

2021

*Intellectual Property Matters*

Power Home Remodeling Group, LLC* v. Power Home Solar LLC d/b/a Powerhome Solar, also d/b/a Powerhome Solar & Roofing, also d/b/a Power Home Solar and Roofing. United States District Court Eastern District of Pennsylvania. *Expert Report.*

Honda Motor Co., LTD., v. Microsoft Corporation.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

Kaifi LLC v. T-Mobile US, Inc.; LAYER3 TV, Inc.; L3TV Dallas Cable System, LLC; METROPCS Texas, LLC; T-Mobile License LLC; T-Mobile USA, INC.; T-Mobile West LLC; T-Mobile West Tower LLC; IBSV LLC; Theory Mobile, Inc.; T-Mobile PCS Holdings LLC; T-Mobile Resources Corporation; and T-Mobile Subsidiary IV Corporation.* United States District Court Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

Premier Specialty Brands LLC, d/b/a Kamado Joe v. Dansons US, LLC and Dansons, Inc. d/b/a Louisiana Grills.* United States District Court for the Northern District of Atlanta, Georgia Division. *Expert Report. Deposition.*

Crocs, Inc.* v. Effervescent, Inc. et. al. United States District Court for the District of Colorado. *Expert Report. Deposition.*

Theia Technologies LLC v. Theia Group, Inc. and Theia Holdings A, Inc.* United States District Court for the Eastern District of Pennsylvania. *Expert Report.*

Lambda Labs, Inc.* v. Lambda Inc.* United States District Court for the Northern District of California Oakland Division. *Expert Report.*

Storage Cap Management LP* v. Robarco, Inc. and SpareSpace Storage, LLC. United States District Court for the Southern District of Ohio Eastern Division. *Expert Report. Deposition.*

Clear Imaging Research, LLC v. Samsung Electronics Co. LTD and Samsung Electronics America.* *Expert Report. Deposition.*

Patagonia, Inc. and Patagonia Provisions, Inc. v. Anheuser-Busch, LLC dba Patagonia Brewing Co.* United States District Court for the Central District of California Western Division, Los Angeles. *Expert Report.*

Sarah Butler

In the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same. United States International Trade Commission, Washington DC. *Expert Report*. *Deposition*. *Trial Testimony*.

Vivint Inc.* v. Alarm.com. United States District Court for the District of Utah. *Expert Report*. *Deposition*.

*Class Action Matters*

Kristen Schertzer, Meagan Hicks, Brittany Covell* v. Bank of America, N.A., Cardtronics, Inc., FCTI, Inc., Cash Depot, Ltd. And DOES 1-50. United States District Court Southern District of California. *Expert Report*. *Deposition*.

Warren Gross, Deborah Levin, Shelby Cooper, and Edward Buchannan v. Vilore Foods Company, Inc., Arizona Canning Company, LLC.* United States District Court Southern District of California. *Expert Report*. *Rebuttal Report. Deposition.*

Scott and Rhonda Burnett, Ryan Hendrickson, Jerod Breit, Scott Trupiano, and Jeremy Keel v. The National Association of Realtors, Realogy Holdings Corp., Homeservices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max LLC, and Keller Williams Realty, Inc.* United States District Court for the Western District of Missouri, Western Division. *Expert Report.*

In re: Marriott International, Inc., Customer Data Security Breach Litigation. United States District Court of Maryland, Southern Division. *Expert Report. Deposition.*

Christopher Julian et. al. v. TTE Technology, Inc., dba TCL North America.* United States District Court for the Northern District of California. *Expert Report.*

Kaylan Morris, et. al. v. Walmart Inc., f/k/a/ Wal-mart Stores Inc.* United States District Court, Northern District of Alabama, Southern Division. *Expert Report. Deposition. Class Certification Testimony.*

Ricardo R. Garcia, Duane K. Glover, Paul E. Jacobson, Gaetano Calise, Mykhalo I. Holovatyuk, Brian Garcia, Paul Thompson, and David Hartman* v. Volkswagen Group of America, Inc. a/k/a Audi of America, Inc. and Volkswagen Aktiengesellschaff. United States District Court for the Eastern District of Virginia, Alexandria Division. *Expert Report. Deposition.*

Charles Tillage and Joseph Loomis* v. Comcast Corporation and Comcast Cable Communications, LLC and Does 1-20. United States District Court for the Northern District of California, San Francisco Division. *Expert Report.*

Kathleen Ryan-Blaufuss, Cathleen Mills, and Khek Kuan v. Toyota Motor Corporation, Toyota Motor Sales, U.S.A., INC., and DOE Defendants 1-10.* United States District Court for the Central District of California, Western Division. *Expert Report*. *Deposition.*

Sarah Butler

H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, and Mary De Luis* v. Goldman Sachs & Co. and The Goldman Sachs Group, Inc. United States District Court for the Southern District of New York. *Expert Report. Deposition.*

Michael Testone, Collin Shanks, and Lamartine Pierre, et. al., v. Barlean's Organic Oils, LLC.* United States District Court Southern District of California. *Expert Report. Deposition.*

Susan Wang Rene Lee v. StubHub, Inc.* Superior Court of the State of California for the County of San Francisco. *Expert Report.*

Michael Madea and Rick Smith, et. al, v. Kennedy Endeavors, Inc.* United States District Court for the District of Hawai'i. *Expert Report. Deposition.*

Shelly Benson and Lisa Caparelli, et. al, v. Newell Brands, Inc.* United States District Court for the Northern District of Illinois. *Expert Report. Deposition.*

Thomas Bailey, et. al, v. Rite Aid Corporation.* United States District Court for the Northern District of California. *Expert Report. Deposition.*

2020

*Intellectual Property Matters*

What A Smoke, LLC v. Duracell U.S. Operations, Inc.* United States District Court District of New Jersey. *Expert Report. Deposition.*

Nirvana LLC v. Marc Jacobs International LLC.* United States District Court Central District of California. *Expert Report. Deposition.*

Girl Scouts of the United States of America* v. Boy Scouts of America. United States District Court Southern District of New York. *Expert Report. Deposition.*

American Dairy Queen Corporation v. W. B. Mason Co. Inc.* United States District Court for the District of Minnesota. *Expert Report. Deposition. Trial Testimony.*

Seven Networks, LLC v. Apple Inc.* United States District Court for the Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

New NGC, Inc. d/b/a National Gypsum Company, NGC Industries, LLC, and National Gypsum Properties,* LLC v. Alpinebay, Inc. *Expert Report. Deposition. Trial Testimony.*

Glaxo Group Limited* v. Respirent Pharmaceuticals Co., LTD. United States District Court Southern District of New York. *Expert Report.*

Sarah Butler

<u>Kaifi LLC v. AT&T Inc.; AT&T Corp.; AT&T Communications, LLC; AT&T Mobility, LLC; and AT&T Services, Inc.</u>* United States District Court Eastern District of Texas Marshall Division. *Expert Report*. *Deposition*.

<u>CFA Institute v. American Society of Pension Professionals & Actuaries, et. al.</u>* United States District Court for the Western District of Virginia, Charlottesville Division. *Expert Report*. *Deposition*.

<u>Match Group LLC</u>* v. Bumble Trading Inc., Bumble Holding, LTD., Badoo Trading Limited, <u>Magic Lab Co., Worldwide Vision Limited, Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited.</u> United States District Court for the Western District of Texas, Waco Division. *Expert Report*. *Deposition*.

<u>ClearPlay, Inc. v. Dish Network, L.L.C. and Echostar Technologies, L.L.C.</u>* United States District Court, District of Utah, Central Division. *Expert Report*.

*Class Action Matters*

<u>Vicky Maldonado, et. al., v. Apple, Inc.</u>* United States District Court, Northern District of California, San Francisco Division. *Expert Report*. *Deposition*.

<u>Jason DeCarlo v. Costco Wholesale Corporation and MBNR.</u>* United States District Court Southern District of California. *Expert Report*.

<u>Javier Cardenas et al., Plaintiffs v. Toyota Motor Corporation et al., Defendants.</u>* United States District Court Southern District of Florida. *Expert Report*. *Deposition*. *Trial Testimony.*

<u>Brian Gozdenovich et al., v. AARP Inc., AARP Services, Inc., AARP Insurance Plan, UnitedHealth Group, Inc., and UnitedHealthCare Insurance Company.</u>* United States District Court District of New Jersey. *Expert Report*.

<u>Barbara Lewis, et al., v. Rodan & Fields, LLC.</u>* United States District Court Northern District of California Oakland Division. *Expert Report*. *Deposition*.

<u>Austin Rugg v. Johnson & Johnson Consumer Inc.</u>* United States District Court Norther District of California San Jose Division. *Expert Report*.

<u>Caryn Gorzo, et al., v. Rodan & Fields, LLC.</u>* The Superior Court of California County of San Francisco. *Expert Report*.

<u>Toya Edwards and Jamal Erakat, et al., v. Walmart, Inc.</u>* United States District Court, Central District of California. *Expert Report*. *Deposition*.

<u>Ohio State Troopers Association, Inc., et al., & Miguel Porras v. Point Blank Enterprises, Inc.</u>* United States District Court, Southern District of Florida. *Expert Report*. *Deposition*.

Sarah Butler

*Other Matters*

TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Strum Foods, Inc.,* v. Keurig Green Mountain, Inc. United States District Court for the Southern District of New York. *Expert Reports. Deposition.*

2019

*Intellectual Property Matters*

Sazerac Brands, LLC* v. Bullshine Distillery, LLC. In the United States Patent and Trademark Office Before the Trademark and Trial Appeal Board. Opposition No. 91227653. *Expert Report. Deposition.*

X One* v. Uber Technologies, Inc. United States District Court Northern District of California. *Expert Report. Deposition.*

NIKE, Inc. v. Skechers U.S.A., Inc.* United States District Court, Central District of California. *Expert Report. Deposition.*

Vital Pharmaceuticals, Inc. v. Monster Energy Company and Reign Beverage Company, LLC.* United States District Court Southern District of Florida. *Expert Report. Deposition.*

Mahindra & Mahindra, Ltd. and Mahindra Automotive North America, Inc.* v. FCA US LLC. United States District Court, Eastern District of Michigan. *Expert Report. Deposition. ITC Trial Testimony.*

Rex Real Estate I, L.P., v. Rex Real Estate Exchange, Inc.* United States District Court for the Eastern District of Texas, Sherman Division. *Expert Report.*

adidas America, Inc., et al. v. Forever 21 Inc., et al.* United States District Court District of Oregon Portland Division. *Expert Report.*

Lodestar Anstalt v. Bacardi & Company Limited, Bacardi U.S.A., Inc., and Bacardi Limited.* United States District Court Central District of California, Western Division. *Expert Report. Deposition.*

*Class Action Matters*

Paul Stockinger et al. v. Toyota Motor Sales, U.S.A., Inc.* United States District Court Central District of California. *Expert Report. Deposition.*

Thomas Allegra, et. al.* v. Luxottica Retail North America, d/b/a LensCrafters, United States District Court, Eastern District of New York, Brooklyn Division. *Expert Report. Deposition.*

Sarah Butler

Collin Shanks v. Jarrow Formulas, Inc.* United States District Court Central District of California. *Expert Report.*

Crystal Hilsley vs. Ocean Spray Cranberries, Inc.*, Arnold Worldwide LLC. United States District Court Western District Southern District of California. *Expert Report. Deposition.*

Erin Allen et al. v. Conagra Foods Inc.* United States District Court Northern District of California San Francisco Division. *Expert Report. Deposition.*

Riley Johannessohn, Daniel C. Badilla, James Kelley, Ronald Krans, Kevin R. Wonders, William Bates, James Pinion* v. Polaris Industries, Inc. United States District Court District of Minnesota. *Expert Report. Deposition.*

*Other Matters*

In re: Windstream Holdings, Inc., et al., Debtors. Windstream Holdings Inc., et. al.* v. Charter Communications, Inc. and Charter Communications Operating, LLC. United States Bankruptcy Court, Southern District of New York. Chapter 11, Case No. 19-22312 (RDD). *Expert Report.*

Belcher Pharmaceuticals, LLC v. Hospira, Inc.* United States District Court for the Middle District of Florida, Tampa Division. *Expert Report. Deposition.*

State of Washington* v. TVI, INC., d/b/a Value Village. State of Washington King County Superior Court. *Expert Report. Deposition. Trial Testimony.*

Obagi Cosmeceuticals LLC* v. ZO Skin Health, Inc. and Zein E. Obagi, M.D. JAMS Arbitration Proceeding. *Expert Report. Deposition. Arbitration Testimony.*

James Pudlowski, Louis C. Cross, III, Gail Henry, Steve Henry v. St. Louis Rams, LLC, St. Louis Rams Partnership, ITB Football Company, LLC.* *Expert Report.*

People of the State of California vs. The Hertz Corporation, American Traffic Solutions, Inc., ATS Processing Services, L.L.C., American Traffic Solutions Consolidated, L.L.C., PlatePass, L.L.C.* *Deposition.*


\* Retaining party

## Publications and Presentations

NABE Panel – "Hypothetical Case for Challenge Panel: Using Surveys to Estimate the Value of Features in a Bundled Product." National Association for Business Economics Transfer Pricing Symposium, Washington, DC (July 2023).

Sarah Butler

"Proving and Arguing Monetary Remedies in Copyright, Trade Secret and Trademark Disputes." Panel on Damages at the *USC Gould Intellectual Property Institute Annual Meeting*, Santa Monica, California (March 2023).

"Examining the Confusion Survey Threshold in Trademark Cases." Debevoise and Plimpton Webinar, with David Bernstein and Christopher Ford (March 2022).

FDLI Panel – "Consumer Perceptions in Class Actions: Plaintiff Surveys, Defendant Surveys, and Everything in Between." Food and Drug Law Institute Food Advertising, Labeling, and Litigation Conference (September 2021).

"A tale of two cups: Acquired distinctiveness and survey evidence before the TTAB." (May-June 2020), with Healey Whitsett. *The Trademark Reporter.*

"Survey response bias and the 'privacy paradox': Evidence from a discrete choice experiment." (May, 2020), with Garrett Glasgow and Samantha Iyengar in *Applied Economics Letters.* DOI: 10.1080/13504851.2020.1770183.

NAD Panel – "Consumer Perception Survey Design Safeguards & Pitfalls." National Advertising Division Annual Meeting, New York, NY (September, 2019).

INTA Panel – "Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of Online Shopping, Influencers and Hashtags." Annual Meeting, Boston MA (May, 2019).

"The value of non-personally identifiable information to consumers of online services: evidence from a discrete choice experiment," (2016) with Garrett Glasgow in *Applied Economics Letters*, DOI: 10.1080/13504851.2016.1197357.

"Using Survey Methods to Demonstrate the Value of Personal Information and Privacy" (May 2015) *Panel on Privacy, Security and IRBs – American Association for Public Opinion Research,* Annual Meeting, Hollywood Florida.

"Battle of the Experts—Deploying the Proper Scientific Methodology for Supporting or Challenging Claims" (March 13, 2015) invited panelist at the *Advanced Forum on Resolving & Litigating Advertising Disputes.*

"Effective Use of Surveys in Trademark Litigation," (August, 2014) *Knowledge Group Webinar.*

"The Use of Statistical Sampling Post-Duran," (August, 2014) *Law360.*

"The Value of Personal Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," (June 19, 2014). *National Economic Research, Inc.*

"An assessment of the nonmarket benefits of the Water Framework Directive for households in England and Wales," with Metcalfe, Baker, Andrews, Atkinson, Bateman, Carson, East, Gueron,

Sarah Butler

Sheldon and Train in *Water Resources Research,* 48:W10516. (Paper awarded Editor's Choice Award for 2013).

ABA Webinar "The Use of Surveys in Advertising Substantiation" (June 23, 2011).

"Meeting the New Standards for Reasonable Royalties," (February, 2011) with Mario Lopez. *Law360.*

"Survey Evidence in False Advertising Cases," (Winter, 2010). *The Antritrust Trial Practice Newsletter.*

"The Use of Surveys in Litigation: Recent Trends," (April, 2010) with Kent Van Liere. National Economic Research Associates, Inc.

"Emerging Issues in the Use of Surveys in Trademark Infringement on the Web," with Kent Van Liere. Paper published in the *Advanced Trademark & Advertising Law Conference* proceedings, September 2007, Seattle, WA.

"An Analysis of the Hypothetical Situations in Willingness to Pay Studies." Paper presented at the July 2006 Thematic Seminar "Quality Criteria in Survey Research," hosted by World Association for Public Opinion Research, Lake Como, Italy.

"Use of Surveys in Intellectual Property Disputes," (2005) with Eugene P. Ericksen, in *Economic Approaches to Intellectual Property Policy, Litigation and Management Issues,* Gregory K. Leonard and Lauren J. Stiroh (eds.) National Economic Research Associates, Inc.

"Response Rate Standards: Lessons from the 2004 Presidential Polls." Paper presented at the 2005 Annual Meeting of American Association of Public Opinion Research, Miami Beach, FL.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, March 2004 Charlotte, NC.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, January 2004 San Diego, CA.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, June 2003, McLean, VA.

## Professional Associations

Member, American Association of Public Opinion Research and World Association for Public Opinion Research, Member, American Statistical Association, Member, American Bar Association, Intellectual Property Section, Member, International Trademark Association (INTA), Reviewer for *Trademark Reporter*, Member, American Marketing Association.

# Exhibit B

**Materials Considered**

Court Documents

- Plaintiff's Notice of Motion and Motion for Class Certification, *Rick Chen, individually and on behalf of all others similarly situated v. VeSync Corporation*, United States District Court for the Northern District of California, Case No. 3:23-cv-004458-TLT, dated May 2, 2025.

- Third Amended Class Action Complaint, *Rick Chen and Mindy Aiello, individually and on behalf of all other similarly situated v. VeSync Corporation*, United States District Court Northern District of California, Case No. 3:23-cv-04458-TLT, dated December 23, 2024.

Expert Reports

- Declaration of Steven P. Gaskin in Support of Class Certification, dated April 17, 2025.

Depositions

- Deposition of Colin B. Weir, dated June 9, 2025.

- Deposition of Rick Chen, dated May 15, 2025.

- Deposition of Steven P. Gaskin, dated May 14, 2025.

Literature

- Barber, W. G., & Yaquinto, G. E. (2022). "The Universe," *Trademark and Deception Advertising Surveys, Law Science and Design, Second Edition*, pp. 31-56.

- Bedi, S., & Reibstein, D. (2021). "Damaged Damages: Errors in Patent and False Advertising Litigation," *Alabama Law Review, 73*(2), pp. 385-436.

- Befurt, R., MacMenamin, N., & Mohammad, A.P. (2023). "Use of Conjoint Analysis in Litigation: Challenges, Best Practices, and Common Mistakes." *The Cambridge Handbook of Marketing and the Law*; edited by Gersen, J. E. and Steckel, J., pp. 221-235

- Diamond, S. S. (2011). "Reference Guide on Survey Research," Reference Manual on Scientific Evidence, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 359-423.

- Orme, B. K. (2020). "Formulating Attributes and Levels in Conjoint Analysis," *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research, Fourth Edition,* pp. 49-56.

- Orme, B. K., & Chrzan, K. (2017). "Reducing Hypothetical Bias," *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros*, pp. 11-20.

- Orme, B. K., & Chrzan, K. (2017). "Statistical Testing," *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros*, pp. 169-190.

- Steckel, J., Kirk Fair, R., Shampanier, K. & Cai, A. (2023). "Choice Experiments: Reducing Complexity and Measuring Behavior Rather than Perception." *The Cambridge Handbook of Marketing and the Law*; edited by Gersen, J. E. and Steckel, J., pp. 207-220.

- The Federal Judicial Center. (2004). *Manual for Complex Litigation, Fourth Edition*, §11.493.

Websites

- https://cloud.google.com/security/products/recaptcha

- https://levoit.com/products/core300-air-purifier

- https://levoit.com/products/core-mini-air-purifier

- https://levoit.com/products/everestair-smart-air-purifier

- https://levoit.com/products/lv-h132-compact-air-purifier

- https://levoit.com/products/vital100-air-purifier

- https://levoit.com/products/vital-100s-smart-air-purifier

- https://web.archive.org/web/20230106105701/https://www.amazon.com/LEVOIT-Purifier-Home-Allergies-Pets/dp/B07VVK39F7

- https://www.amazon.com/Core-300-Replacement-Core300-P-300s/dp/B08CXFL9RK

- https://www.amazon.com/Core-300-Replacement-Filter-Compared/dp/B09RJ2L994

- https://www.amazon.com/EverestAir-Replacement-Puri-fier-Efficiency-EverestAir-RF/dp/B0CGYZ1SYG

- https://www.amazon.com/Improvedhand-Core-300-Replacement-Filtration/dp/B0C1B79PRY?th=1

- https://www.amazon.com/Nispira-EverestAir-P-EverestAir-RF-Replacement-EverestAir/dp/B0DGBT18KQ?ref_=ast_sto_dp

- https://www.amazon.com/Nispira-Replacement-Compatible-Purifier-Compared/dp/B08WS4BRH6?ref_=ast_sto_dp

- https://www.amazon.com/Replacement-Filter-Compatible-Purifier%EF%BC%8C3-Compare/dp/B0C8FDXC42?th=1

- https://www.amazon.com/Replacement-Filters-LEVOIT-Purifier-Compare/dp/B0B74KZPX2?ref_=ast_sto_dp&th=1

- https://www.blueair.com/

- https://cowaymega.com/pages/air-purifiers

- https://www.ebay.ca/itm/325526022541

- https://www.ebay.com/p/24048608911

- https://www.ebay.com/p/5047265694

- https://www.ebay.com/itm/197000215974?chn=ps&mkevt=1&mkcid=28&google_free_listing_action=view_item&gQT=2

- https://www.ebay.com/itm/387095153190?chn=ps&norover=1&mkevt=1&mkrid=711-117182-37290-0&mkcid=2&mkscid=101&itemid=387095153190&targetid=2299003955955&device=c&mkty

- https://guardiantechnologies.com/collections/all-air-purifiers

- https://www.honeywellstore.com/store/category/air-purifiers.htm

- https://www.insightsassociation.org/About-Us

- https://www.insightsassociation.org/Portals/INSIGHTS/IA%20Code_1_6_23_Final.pdf

- https://medifyair.com/?srsltid=AfmBOoqieVcjYTCm1DnKQ-rm2s52s3AnEFdIOXy94DpJLhzFyHp8jAbc

- https://molekule.com/

- https://www.sharkclean.com/page/air-purifiers?srsltid=AfmBOoq8nO7fRh97bEuBm330gTOu9bPQHfHIAq2T2gJd3RuxhU6AgDKL

- https://veridatainsights.com
- https://www.walmart.com/ip/Medify-Air-MA-40-Air-Purifier-with-HEPA-H13-Filters-250-Sq-ft-Coverage-for-Pollen-White-1-Pack/484605507?wmlspartner=wlpa&selectedSellerId=101039042&sourceid=dsn_ad_82a1172e
- https://www.winixamerica.com/product-category/air-purifiers/

Other Documents

- Vesync_Chen_00001550.xlsx
- Vesync_Chen_00001551.pdf
- Vesync_Chen_00001588.xlsx
- Vesync_Chen_00001589.pdf
- Vesync_Chen_00001611.xlsx
- Vesync_Chen_00001612.pdf
- Vesync_Chen_00001651.xlsx
- Vesync_Chen_00001652.pdf