Sarah Carlson (SBN 344266)
sarah.carlson@sidley.com
SIDLEY AUSTIN LLP
12230 El Camino Real, Suite 300
San Diego, CA 92130
Tel.: (858) 398-0142
Fax: (858) 398-0450

Adriane Peralta (SBN 304357)
adriane.peralta@sidley.com
Alexandria Ruiz (SBN 313286)
aruiz@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Tel.: (213) 896-6000
Fax: (213) 896-6600

Judith Shopnet Sidkoff (SBN 267048)
judith.sidkoff@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars 17th Floor
Los Angeles, CA 90067
Tel.: (310) 595-9500
Fax: (310) 595-9501

*Attorneys for Defendant Vesync Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RICK CHEN, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>VESYNC CORPORATION,<br><br>    Defendant. | Case No.  3:23-cv-04458-TLT<br><br>**EXPERT REPORT OF JORDAN MILEV IN SUPPORT OF DEFENDANT VESYNC CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:        September 16, 2025<br>Time:        2:00 p.m.<br>Courtroom:  9 – 19th Floor<br>Judge:  Hon. Trina L. Thompson |

**REDACTED VERSION**

1    Pursuant to the Court's Revised Case Management Scheduling Order (ECF No. 122), and

2    Federal Rule of Civil Procedure Rule 26(a)(2), Defendant Vesync Corporation submits Jordan Milev's

3    Expert Report in support of its forthcoming Opposition to Plaintiff's Motion for Class Certification.

4

5    Dated:  June 20, 2025                    SIDLEY AUSTIN LLP

6

7                                            By:  _/s/ Sarah Carlson_____

8                                            Sarah Carlson (SBN 344266)
                                             sarah.carlson@sidley.com
9                                            SIDLEY AUSTIN LLP
                                             12230 El Camino Real, Suite 300
10                                           San Diego, CA 92130
                                             Tel.: (858) 398-0142
11                                           Fax: (858) 398-0450

12                                           Adriane Peralta (SBN 304357)
                                             adriane.peralta@sidley.com
13                                           Alexandria Ruiz (SBN 313286)
                                             aruiz@sidley.com
14                                           SIDLEY AUSTIN LLP
                                             350 South Grand Avenue
15                                           Los Angeles, CA 90071
                                             Tel.: (213) 896-6000
16                                           Fax: (213) 896-6600

17                                           Judith Shophet Sidkoff (SBN 267048)
                                             judith.sidkoff@sidley.com
18                                           SIDLEY AUSTIN LLP
                                             1999 Avenue of the Stars 17th Floor
19                                           Los Angeles, CA 90067
                                             Tel.: (310) 595-9500
20                                           Fax: (310) 595-9501

21                                           *Attorneys for Defendant*
                                             VESYNC CORPORATION
22

23

24

25

26

27

28

**United States District Court**
**Northern District of California**

| |
|---|
| RICK CHEN, individually and on behalf of all others similarly situated, |
| |
| Plaintiffs, |
| |
| v. |
| |
| VESYNC CORPORATION, |
| |
| Defendants. |

Case No. 3:23-cv-04458-TLT

# Expert Report of Jordan Milev, Ph.D.

# June 20, 2025

## Contents

I.   Background and Scope of Analysis ........................................................................1

   A.   Allegations...........................................................................................................1

   B.   Parties ..................................................................................................................3

   C.   Scope of Analysis and Materials Relied Upon ...................................................3

   D.   Qualifications and Remuneration .......................................................................5

II.   Summary of Opinions ..........................................................................................6

III.   The Gaskin-Weir Methodology provides no empirical analysis supportive of Plaintiff's allegations, is untethered to the specific allegations in this case, and is not a valid basis for a reliable class-wide estimate of price premium in this case. ................................9

   A.   The Gaskin-Weir Methodology is not yet implemented, with very little analysis performed to date..................................................................................................9

   B.   The Gaskin-Weir Methodology would not measure the specific allegation Plaintiff makes relating to either the 99.97% filtration efficiency at 0.3 microns or for all Contested Products....................................................................................15

   C.   The Gaskin-Weir Methodology is incomplete and therefore unreliable because it ignores other factors, including supply-side factors, that affect prices. .........18

      1.   The Gaskin-Weir Methodology fails to properly consider supply-side factors that determine market pricing. ......................................................................18

      2.   The Gaskin-Weir Methodology fails to use actual market prices or market shares. ...25

      3.   The Gaskin-Weir Methodology incorrectly assumes a single price premium across all putative class members, all time, all sales channels, and all Contested Products....32

      4.   The Gaskin-Weir Methodology incorrectly assumes all consumers receive the same information and choices. ..................................................................................35

IV.   The Gaskin-Weir Methodology ignores data that does not support Plaintiff's assertions...35

   A.   The Contested Air Purifiers are not systematically sold at a price premium relative to competitors. ......................................................................................................36

   B.   There is no systematic pricing difference between VeSync's same products sold with and without the Contested Statements...............................................................39

V.   Proper analysis of consumer harm relating to Plaintiff's allegations requires individualized inquiry. ..............................................................................................................47

   A.   Different consumers paid different prices and took advantage of different discounts that are not always percent of price. ......................................................................47

   B.   Air purifier purchase decisions themselves are highly individualized and not solely price-driven...........................................................................................................54

   C.   Air purifiers are complex devices that appeal to consumers via a variety of different features. ..............................................................................................................58

VI.   Miscellaneous.......................................................................................................61

# I.    Background and Scope of Analysis

## A.    Allegations

1.    Plaintiff Rick Chen ("Plaintiff"), individually and on behalf of others, alleges that Defendant VeSync Corporation ("VeSync") used misleading advertising and misrepresented the air purification efficiency of some of their products (collectively, the "Contested Products").[1] Plaintiff alleges that VeSync incorrectly marketed the Levoit-branded Core 300, Core 300-RAC,[2] Core 300S, and Core P350 air purifiers (collectively, the "Contested Air Purifiers") and their respective replacement filters (collectively, the "Contested Replacement Filters")[3] as high efficiency particulate air ("HEPA") filters.[4] Plaintiff alleges that the Contested Products did not meet the minimum requirements of HEPA as defined by the U.S. Environmental Protection Agency ("EPA"), *i.e.*, being able to "remove at least 99.97% of dust, pollen, mold, bacteria, and any airborne particles with a size of 0.3 microns (μm)."[5]

2.    Plaintiff alleges that VeSync made false and misleading HEPA representations on its website, in its advertising, and on the websites of online stores (*e.g.*, Amazon) related to the

---

[1] *Rick Chen et al. v. VeSync Corporation*, Third Amended Class Action Complaint, filed January 9, 2025 (hereinafter "Third Amended Complaint"). The Third Amended Complaint also lists Mindy Aiello as a named Plaintiff. Counsel has informed me that she is no longer part of this case.

[2] I have been instructed by Counsel for VeSync ("Counsel") that the Core 300-RAC air purifier is the same product as the Core 300.

[3] I understand that the "Core Series" of air purifiers all use the same type of filter and replacement filter as described in the Third Amended Complaint, ¶1, fn. 1.

[4] Plaintiff includes Levoit's H13 and H13 True HEPA designated filters in his allegations. Third Amended Complaint, ¶¶1-2. Also *see* Order Denying Request For Judicial Notice and Granting Motion to Dismiss, December 4, 2024, p. 6 ("Because Defendants only represented that its filters captured 99.97% of 0.3 microns, and because Plaintiffs initially define a HEPA filter as a filter that captures 99.97% of particles at a size of 0.3 microns, Plaintiffs fail to demonstrate that Defendant falsely advertised its products by showing test results at 0.0340 microns and 0.1 microns."). The Third Amended Complaint also lists Levoit's EverestAir product, but I understand that this product is no longer included among the Contested Products.

[5] Third Amended Complaint, ¶25. See: "What is a HEPA Filter?" EPA, accessed May 9, 2025, https://www.epa.gov/indoor-air-quality-iaq/what-hepa-filter.

"Core Series" air purifiers ("Contested Statements").[6] Plaintiff alleges that he relied on VeSync's representations and, absent the Contested Statements, he "would not have purchased the Product or would have paid substantially less for it."[7] Plaintiff alleges that due to VeSync's "HEPA misrepresentations," VeSync was able to "overcharge the class in the amount of the HEPA-related price premium."[8] Plaintiff seeks the "return of the HEPA-related premiums that Defendant charged for its Products."[9]

3.       Plaintiff notes that, in July 2023, VeSync changed the product pages for the Core 300 series Air Purifiers to remove the Contested Statements.[10]

4.       In connection with these allegations, Plaintiff seeks to certify a "California Class" defined as "[a]ll persons in California who, within the relevant statute of limitations period, purchased one or more Levoit Core 300 True HEPA, Core 300-RAC True HEPA, Core P350 True HEPA, and Core 300S True HEPA home air purifiers or replacement filters bearing the 'True HEPA' claim."[11] Plaintiff also seeks to certify a "Multi-State Express Warranty Class" defined as "[a]ll persons in California, Delaware, D.C., Kansas, Missouri, New Jersey, Ohio, Utah, Virginia, and West Virginia who, within the relevant statute of limitations period, purchased one or more Levoit Core 300 True HEPA, Core 300-RAC True HEPA, Core P350 True HEPA, and Core 300S True HEPA home air purifiers or replacement filters bearing the 'True HEPA' claim."[12] Plaintiff defines the class period as "[d]uring the relevant statutory periods."[13] Counsel has informed me that the relevant statutory period begins August 29, 2019 and ends around late July 2023, when VeSync removed the Contested Statements from packaging of the Contested Products and from its own and Amazon's websites, or August 2023,

---

[6] Third Amended Complaint, ¶38.

[7] Third Amended Complaint, ¶12.

[8] Third Amended Complaint, ¶7.

[9] Third Amended Complaint, ¶10 and ¶29.

[10] Third Amended Complaint, ¶42.

[11] Plaintiff's Notice of Motion and Motion for Class Certification, May 2, 2025, p. 2.

[12] Plaintiff's Notice of Motion and Motion for Class Certification, May 2, 2025, pp. 2-3.

[13] Plaintiff's Notice of Motion and Motion for Class Certification, May 2, 2025, p. 4.

in the event that other third-party retailers needed time to process the removal of the Contested Statements from their websites.[14]

## B.    Parties

5.     VeSync produces a suite of home appliance products, including the Levoit-branded air purifiers and replacement filters at issue.[15] VeSync sells the Levoit-branded products through multiple retail channels, for example through Amazon, Staples, and through its own website.[16]

6.     Plaintiff is a California resident and purchased certain of the Contested Products while in California. On September 23, 2020, Mr. Chen purchased a Core 300 air purifier for $99.99 from Amazon.[17] On December 30, 2020, Mr. Chen purchased a second Core 300 air purifier for $99.99 and a replacement filter for $23.99.[18]

## C.    Scope of Analysis and Materials Relied Upon

7.     I received an expert report by Steven P. Gaskin dated April 17, 2025 ("Gaskin Report"). Mr. Gaskin was "asked by counsel for Plaintiffs to design and describe a market research survey and analysis that would enable [him] to assess the market price premium (measured in dollars and/or percentage terms) resulting from the True HEPA Claim in the labeling and marketing of the Class Products – meaning, the difference in the market value of the

---

[14] For the purpose of this report, I was asked to assume the class period begins August 29, 2019 and ends on August 29, 2023. I can revise these dates, if needed, based on discovery evidence or a Court ruling.

[15] Third Amended Complaint, ¶1.

[16] For example, see Vesync_Chen_00001692, STAPLES000002, and "Levoit Core® 300 Air Purifier," Levoit, accessed May 9, 2025, https://levoit.com/products/core300-air-purifier.

[17] The Third Amended Complaint alleges that Mr. Chen purchased this product on September 27, 2020 but the corresponding document shows the order was placed on September 23, 2020 and shipped on September 27, 2020 (CHEN000013; Third Amended Complaint, ¶11).

[18] The Third Amended Complaint alleges that Mr. Chen purchased this product on December 31, 2020 but the corresponding document shows the order was placed on December 30, 2020 and shipped on December 31, 2020 (CHEN000014; Third Amended Complaint, ¶11).

Class Products with the True HEPA Claim compared to the market value of the same Class Products without the True HEPA Claim."[19]

8.      Mr. Gaskin has not yet conducted any conjoint survey analysis in this matter.[20] Nevertheless, Mr. Gaskin opines that his proposed "analysis will estimate the market price premium (measured in dollars and/or percentage terms) resulting from the True HEPA Claim."[21]

9.      I also received an expert report by Colin B. Weir dated April 17, 2025 ("Weir Report") and, subsequently, a corresponding errata prepared by Mr. Weir dated May 30, 2025. Mr. Weir was "asked to work with Mr. Steven Gaskin to help design (from an economic perspective), and to evaluate the economic suitability of a conjoint survey (to be designed, implemented, and analyzed by Mr. Gaskin) to measure the price premium for the [Contested] Products solely attributable to the [Contested Statements]."[22] Mr. Weir opines that it "is possible to determine class-wide damages in this case using Defendant's own available business records, third-party records, and industry resources"[23] and "propose[s] the use of conjoint analysis to calculate any price premium damages."[24]

10.     Mr. Weir's proposed damages calculation is dependent on an estimated "price premium" he and Mr. Gaskin claim can be derived from Mr. Gaskin's eventual implementation of his proposal for a conjoint survey. I will refer to Messrs. Gaskin and Weir's promised methodology as the "Gaskin-Weir Methodology."

11.     Counsel has asked me to evaluate and respond to the Weir Report and to the portion of the Gaskin Report that opines on Plaintiff's damages and related economic issues. I have been asked to evaluate whether these two reports have put forth economic expert evidence

---

[19] Declaration of Steven P. Gaskin in Support of Class Certification, April 17, 2025 (hereinafter "Gaskin Report"), ¶10 [internal citation excluded].

[20] Gaskin Report, ¶11.

[21] Gaskin Report, ¶11 [internal citation excluded].

[22] Declaration of Colin B. Weir, April 17, 2025 (hereinafter "Weir Report"), ¶8.

[23] Weir Report, ¶11.

[24] Weir Report, ¶12.

regarding the existence of a price premium, and whether they contain analysis to show that the single "price premium" estimate would be applicable to the price paid for the Contested Products due to the Contested Statements. I have also been asked to evaluate whether the proposed Gaskin-Weir Methodology is sufficiently detailed and specific to allow for a determination that it would result in a reliable calculation of class-wide damages in this case.

12.     This report presents my opinions and the bases for them. I reserve the right to expand, amend, and/or change this report based upon additional information I receive or information that may be otherwise provided to or obtained by me.

13.     Materials reviewed and relied upon in the preparation of this report are listed in *Appendix B* and/or listed in the text and footnotes to this report.

## D.     Qualifications and Remuneration

14.     I am a Managing Director at NERA Economic Consulting ("NERA"). NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. The firm was established in 1961 and currently employs over 500 people in more than 20 offices worldwide. The practice counts the following among its clients: Fortune 500 companies; global law firms; major securities exchanges; risk managers; regulatory bodies; investigation and enforcement agencies; principals needing valuation services; and parties in litigation and arbitration.

15.     I have a Ph.D. degree in economics from Yale University and B.A. degrees in mathematics and in economics, *summa cum laude*, from Amherst College. I specialize in performing economic expert analysis relevant to litigation, arbitration, regulatory investigations and enforcement actions. I have been retained as an expert in several consumer class actions. I have published in various areas, including economic analysis at class certification, class action litigation trends, and other practical applications of statistical and econometric quantitative analysis. I am the coauthor of a chapter on Covered Bonds in the 7th edition of *The Handbook of Mortgage-Backed Securities*, published by Oxford University Press and edited by Frank Fabozzi. My class action trends analyses have been cited in a brief filed by law professors as *amici curiae* in the U.S. Supreme Court case *Halliburton Co. v. Erica P. John Fund, Inc.* (No. 13-317).

16.    A copy of my curriculum vitae is attached as *Appendix A*.

17.    Professionals employed by NERA work under my supervision and direction. NERA is compensated through hourly billing rates for work performed by its employees. My current hourly billing rate is $975. Payments to NERA are not contingent on the opinions expressed in my report, or on the outcome of this matter.

## II.    Summary of Opinions

18.    The Gaskin-Weir Methodology falls short as a basis for a reliable class-wide estimate of price premium in this case for the following reasons:

a. The Weir Report and Gaskin Report amount to ***proposals*** of analyses to be performed at a later to be determined date and contain no analysis of market data that supports the existence of class-wide damages. The proposed methodology implementation cannot be fully tested due to the lack of concrete analyses performed by Mr. Gaskin and Mr. Weir. There is no known or potential rate of error of the eventual methodology implementation, as there have been no quantitative calculations or survey work performed. The Weir Report and the Gaskin Report provide only a preliminary sketch of potential analyses and generic descriptions of analyses to be implemented later based on further choices Mr. Gaskin and Mr. Weir proposed to make but have not yet disclosed.

b. The Gaskin-Weir Methodology would **not** measure the effect of the specific allegation Plaintiff makes in the Third Amended Complaint. Plaintiff alleges that he received a product filtering 98.65%-99.87% of approximately 0.3-micron airborne particles whereas he paid for a product filtering 99.97% of 0.3-micron airborne particles.[25] However, Mr. Gaskin's proposed conjoint survey does not test how respondents react to the difference between (A) a product filtering 99.97% of 0.3-micron airborne particles versus (B) a product filtering 98.65%-

---

[25] Also *see* Order Denying Request For Judicial Notice and Granting Motion to Dismiss, December 4, 2024, p. 6 ("Defendants only represented that its filters captured 99.97% of 0.3 microns…").

6

99.87% of approximately 0.3-micron airborne particles. Instead, Mr. Gaskin's proposed conjoint survey will, at best, test how survey respondents react to (A) a "True HEPA" claim (*i.e.*, 99.97% of 0.3-micron airborne particles) compared to (C) the absence of a HEPA claim. The alternatives, (B) and (C), are not the same. The Gaskin-Weir Methodology will **not** test the influence of advertising an air purifier with a filter that has a 99.97% filtration efficiency versus another specific efficiency. Hence, the Gaskin-Weir Methodology is **not tethered** to the specific allegation Plaintiff makes in this case.

c. Mr. Gaskin's proposed survey would be focused solely on purchases of air *purifiers*, as opposed to replacement *filters*, which are also within the set of Contested Products. The consumer purchase decision for replacement air filters is different than the purchase decision for air purifiers. It is not appropriate to extrapolate a price premium estimate from one product (air purifiers) onto a different product (replacement filters), which have different supply and demand considerations. This further underscores that the Gaskin-Weir Methodology is not tethered to all Contested Products in this case and cannot reliably calculate class-wide damages.

d. The Gaskin-Weir Methodology is unreliable because it ignores factors that affect prices. The Gaskin-Weir Methodology fails to properly consider the **supply-side** factors that determine market pricing. The Gaskin-Weir Methodology proposal fails to properly use the available data on actual market prices and market shares, making the proposed analysis disconnected from the economic market in this case. The Gaskin-Weir Methodology incorrectly assumes the same price premium would apply to any putative class member, on any date, at any time, and for all products. Supply-side factors varied substantially during the class period (*e.g.*, due to COVID-19). The Gaskin-Weir Methodology incorrectly assumes all consumers were presented with the same information and choices, and relied on the Contested Statements in the same way.

7

19.    The Gaskin-Weir Methodology ignores available data that does not support Plaintiff's assertions.

a. Price data show that the Contested Air Purifiers are not systematically sold at a price premium relative to competitors. Mr. Weir states that "Air Purifiers with a claim similar the [*sic*] Claim in this case command a higher price in the marketplace" but merely cites to Plaintiff's allegations in the Third Amended Complaint.[26] Even taking Plaintiff's unsupported and simplistic price comparison, which controls for neither supply or demand factors, at its face value, an exploratory price comparison between the Contested Air Purifiers (with the alleged misconduct) and similar competitor products (without the alleged misconduct) shows no systematic price premium paid by consumers for the Contested Air Purifiers.

b. There is no evidence of a systematic pricing difference between VeSync's same products sold with and without the Contested Statements. An illustrative price comparison of Contested Product prices before and after removal of the Contested Statements shows results inconsistent with a price premium allegedly being paid by purchasers of the Contested Products due to the alleged Contested Statements. Statistical analysis of the available data shows no systematic pricing difference between the same product sold with and without the Contested Statements.

20.    The Gaskin-Weir Methodology does not outline a proper analysis of harm to consumers relating to Plaintiff's allegations, given that properly addressing supply-side and demand-side factors in this case would require an individualized inquiry.

a. Different consumers paid different prices and took advantage of different sales, coupons, or other discounts that are not always a set percentage of price. As a result, individual inquiries would be needed to identify the economic circumstances of each putative class member to properly analyze the supply and demand factors that influenced the price each consumer paid. Individual inquiry

---

[26] Third Amended Complaint, ¶15.

would be required to understand the product purchase decision, timing of purchase, price actually paid (after discounts), and to estimate any price premium that may have been paid due to reliance on the Contested Statements (and how that purchase decision and price paid was affected by discounts).

b. Air purifier purchase decisions are highly individualized and not solely price-driven. Product information that consumers would rely upon (and/or the relative importance of such information) varies across individuals who purchase air purifiers. Plaintiff uses Google searches for HEPA as evidence of consumer demand. Even according to these data, however, consumer demand varied substantially over time during the proposed class period.

c. Similar to most other consumer products, air purifiers appeal to consumers through a variety of different features. Air purifier models differ through their physical specifications and other information such as brand name, color, size, wireless connectivity, mobile app controllability, noise level, particle retention size, energy efficiency ratings and other certifications. Air purifiers vary across these dimensions, and only an individualized inquiry could determine what weight, if any, each individual consumer places on the different features of the product.

## III. The Gaskin-Weir Methodology provides no empirical analysis supportive of Plaintiff's allegations, is untethered to the specific allegations in this case, and is not a valid basis for a reliable class-wide estimate of price premium in this case.

### A. The Gaskin-Weir Methodology is not yet implemented, with very little analysis performed to date.

21.    As a threshold matter, the Weir Report and Gaskin Report amount to *proposals* of analyses to be performed at a later date and contain no analysis of market data that supports the existence of class-wide damages. The proposed methodology cannot be fully tested due to the lack of concrete analyses performed by Mr. Gaskin and Mr. Weir. There is no known or potential

rate of error, as there has yet to be any quantitative calculations or survey performed.[27] Both reports provide only a preliminary sketch of potential analyses and generic descriptions of such analyses to be performed later.

22.      Mr. Weir relies on Mr. Gaskin for critical inputs to his damages calculation. A damages model is only as reliable as its inputs. To the extent that Mr. Gaskin's conjoint analysis is flawed, then Mr. Weir's proposed damages calculation would also be flawed. I understand from Counsel that Sarah Butler has opined from a survey expert perspective that Mr. Gaskin (i) assumes his survey will yield a reliable statistical estimate of a price premium; (ii) does not define "True HEPA"; and (iii) omits key purchase drivers.[28] It logically follows that Mr. Weir's proposed damages calculation is similarly flawed, even ignoring all the other problems described within my report.

23.      As summarized in Figure 1 below and discussed throughout this report, neither the Weir Report nor the Gaskin Report contain any specific analyses of the available data, nor have they described the specific calculations and statistical tests that will be performed for each Contested Product, proposed class members, or proposed subclass members. Mr. Weir testified that "the determination of the materiality of the claim would be part and parcel to the calculation and determination of whether or not there is a statistically significant price premium that is solely

---

[27] Deposition of Steven P. Gaskin, May 14, 2025 ("Gaskin Deposition"), 100:12-20 ("Q. Well, you've not calculated the error rate for your proposed survey; is that correct? A. Right. I have not run the survey. You would have to run the survey first. Q. You've not calculated the confidence interval of your forthcoming survey, correct? A. That's pretty similar to the other question. I haven't done that because I have no data yet.") and 227:3-21 ("Q. And because you haven't conducted the survey, you haven't conducted the error rate of the price premium; is that right? A. Right. There's no way to calculate that without data... Q. Because you haven't run the survey, you haven't calculated the confidence interval either with respect to the price premium; is that correct? A. That's correct."). Deposition of Colin B. Weir, June 9, 2025 ("Weir Deposition"), 210:8-17 ("Q. So sitting here today, you don't know the error rate of the results of the damages model because the damages model has not yet been run; is that correct? A. It is correct that the damages model has not yet been run, to the best of my knowledge. Q. And so, therefore, you do not know the error rate of the damages result? A. I think that's correct.").

[28] Report of Sarah Butler, June 20, 2025 ("Butler Report"), §VII.

attributable to the use of the claim."[29] However, Mr. Weir never describes what his threshold for economic materiality is,[30] nor does Mr. Weir describe how he plans to address the difference between "statistical significance" and "economic significance."[31]

---

[29] Weir Deposition, 141:18-23. Aside from mentioning one methodology during his deposition, Mr. Weir never describes what specific statistical tests he will rely on. *See* Weir Deposition, 207:16-208:1 ("Q. If your client asked you to perform a quantitative test to assess if the price premium is statistically significant, what test would you perform? A. I would perform a holdout hit rate test, and I would examine the confidence interval around the market simulation results to determine whether they incorporate the zero or not, which would be an indicator that they are statistically significantly different from zero.").

[30] Weir Deposition, 141:9-142:5 ("Q. And when you say [the HEPA claim is] a differentiating factor, are you also saying that it's material? A. The question of materiality would be part and parcel to the determination -- well, let me start again. I'm not a lawyer, and so when I speak about materiality, I think about economic materiality. With that caveat, the determination of the materiality of the claim would be part and parcel to the calculation and determination of whether or not there is a statistically significant price premium that is solely attributable to the use of the claim. In other words, I am more than comfortable testifying that the Gaskin conjoint will be able to determine materiality. But in terms of whether or not the claim is material, we would need the results of that survey.").

[31] O'Keefe, Eamon, "Statistical Significance," Federal Reserve Bank of Richmond, 2015, accessed June 16, 2025, at https://www.richmondfed.org/publications/research/econ_focus/2015/q1/jargon_alert ("Just as it's important to distinguish between correlation and causation, it's also important to distinguish between statistical significance and economic significance. Statistical significance is about your confidence in the result, but just because a result is statistically significant doesn't mean the result is large or meaningful.").

**Figure 1: Analyses Not Performed by Mr. Gaskin or Mr. Weir**

| | |
|---|---|
| Did they perform any survey? | **No** |
| Did they fully design the proposed survey? | **No** |
| Do they have any survey data? | **No** |
| Does the proposed survey correctly test Plaintiff's allegations as to the 99.97% filtration efficiency at 0.3 microns? | **No** |
| Did they properly consider supply-side factors? | **No** |
| Did they use actual market prices and market shares? | **No** |
| Do they have data on prices paid by all purchasers? | **No** |
| Have they described any exploratory analyses of the pricing data obtained (*e.g.*, Staples data)? | **No** |
| Have they tested their methodology using actual data? | **No** |
| Is there a known rate of error for their methodology? | **No** |
| Have they demonstrated a price premium exists? | **No** |
| Have they analyzed actual sales of the Contested Products with and without the Contested Statements? | **No** |

24.     Mr. Weir has not calculated a single input necessary for his proposed price premium damages calculation. Mr. Weir assumes that Mr. Gaskin's analysis (of the survey Mr. Gaskin has not even yet conducted) will result in a "price premium" estimate. On calculating sales of the Contested Products, which is another input to his proposed formula, Mr. Weir simply writes that he "will be prepared to analyze the sales data to provide an estimate of the total sales subject to the class definition" at some later to be determined date.[32] Based solely on these assumptions, Mr. Weir describes a proposed aggregate calculation. This calculation amounts to a simple multiplication, assumes the existence of a single price premium value for all Contested Products, and assumes that a single price premium is applicable to all members of the proposed

---

[32] Weir Report, ¶68 and ¶71.

class.[33] As described in Section III.C.3, it is inappropriate to apply a single price premium across all putative class members, all time, all sales channels, and all Contested Products.

25.     The Gaskin Report does not analyze any survey data or pricing data specific to this case.[34] The Gaskin Report includes two spreadsheets on pricing data and 14 product websites within his "Materials Reviewed for Attribute Development,"[35] but provides no quantitative analysis of these data to establish whether they are reliable and can be used with his proposed approach.[36] Mr. Gaskin purports to describe a proposed conjoint survey he *may* implement in the future, but has not provided the detailed questionnaire or any opportunity to assess the workability of his proposed approach as specific to this case.

26.     Mr. Weir reports that he has been provided with wholesale sales data from VeSync from 2019 through August 2023 and online retail sales data from Staples from March 2020 through October 2024.[37] He has not produced any analyses of these datasets to establish if they are sufficient for his proposed analysis; how they will be utilized in his analysis; or whether and/or exactly what additional data, statistical testing, and other analysis are required to estimate the necessary inputs for his damages calculation. Nevertheless, he plans to opine that the analysis he will perform will be applicable to all the Contested Products and the proposed subclasses. Mr. Weir testified that additional data would be required for his damages

---

[33] The Weir Report describes simple multiplication: the proposal is to use two generic formulas (either price premium percentage times total sales, or price premium percentage times average purchase price times number of products sold). Weir Report, ¶71.

[34] In total, Mr. Gaskin appears to have only spent 4.5 hours through May 1, 2025 (Gaskin Deposition Exhibits 5-7).

[35] Gaskin Report, Exhibit B (citing STAPLES000002 – CONFIDENTIAL.xlsx; Vesync_Chen_00000191.xlsx; among others).

[36] As described further in Section III.C.2 below, Mr. Gaskin provides a price range of $85.99 to $250.99 in his survey, ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *See* Gaskin Report, p. 23; STAPLES000002.

[37] Weir Report, ¶¶65-66.

calculation.[38] At this stage, Mr. Weir does not demonstrate that the data required for his proposed damages calculation will actually be available and will be in a form that is usable for his calculations in this case.

27. [39] Mr. Weir agreed that wholesale prices are not the prices paid by consumers at a third-party retailer.[40] Mr. Weir has not shown if the data he requires on prices paid (or sales quantities purchased) by putative class members exist for the relevant geographies, nor has he described how to estimate such data using the information he does have.

28. Mr. Weir cites to the availability of price data from only one retailer (Staples). [41] Mr. Weir does not explain or even address why these data would be reliable or representative of the proposed class, with respect to the types of customers that make purchases at each retailer (Staples, Amazon, etc.), directly through VeSync's website, or through the other sales channels on which the Contested Products are sold. He similarly does not demonstrate that these data are reliable or

---

[38] Weir Deposition, 94:16-95:5 ("Q. Were there any documents that you requested that you -- that would assist in forming your opinions but you did not receive? A. Yes. As noted in paragraph 67, I understand that there are ongoing third-party subpoenas for sales data that, at least to the best of my knowledge, have not yet become available. Q. And do you need that sales data to perform your damages calculation? A. At the merits phase of the case, I would need at least some of that sales data, yes.") and 96:9-14 ("Q. What is the type of sales data that is necessary? A. Documents that would reflect the sales of the class products subject to the class definition or that would permit analysis of the data to make such an identification.").

[39] Vesync_Chen_00000191.xlsx.

[40] Weir Deposition, 101:16-20 ("Q. The wholesale price is not the price a consumer pays at a third-party retailer; is that correct? A. Unless by coincidence they're the same, I would agree.").

[41] Vesync_Chen_00000191; STAPLES000002.

representative as to the prices paid by proposed class members throughout the proposed class period.

29.    Instead of providing independent analysis specific to the facts of the case, Mr. Weir simply restates allegations in the Third Amended Complaint, cites to generic studies of products unrelated to Contested Products and Contested Statements in this case, and provides generic quotes on retailer competition. First, Mr. Weir states that "Air Purifiers with a claim similar the [*sic*] Claim in this case command a higher price in the marketplace" but merely cites to Plaintiff's allegations in the Third Amended Complaint instead of performing his own analysis of actual data on prices paid for the Contested Products (and its competitors).[42] Mr. Weir's assertion is not based on any objective empirical analysis. Second, Mr. Weir cites no academic studies specific to the relevant air purifier product market or the use of conjoint analysis to study the Contested Statements at issue in this case. Mr. Weir instead cites irrelevant academic studies applying conjoint analysis to health claims in green tea, nutritional claims, and vitamin C content in orange juice.[43] These studies have nothing to do with the products or claims at issue in this case. Third, instead of performing detailed analysis on supply and demand factors specific to the Contested Products and Contested Statements during the class period, Mr. Weir provides only generic statements from retailers about how they face competition from other retailers.[44] This is not an analysis of the specific supply-side factors (*e.g.*, pricing strategies, competition, or production decisions) that give rise to prices paid by the proposed class members in this case, as I discuss further Section III.C.1 below.

## B.    The Gaskin-Weir Methodology would not measure the specific allegation Plaintiff makes relating to either the 99.97% filtration efficiency at 0.3 microns or for all Contested Products.

30.    From an economic perspective, Plaintiff's price premium theory of injury is based on the difference, if any, between the price an individual class member paid and the market value of the product received. As previously discussed, Plaintiff alleges that the products were

---

[42] Weir Report, ¶15 and fn. 5 (citing Third Amended Complaint).

[43] Weir Report, ¶¶31-33.

[44] Weir Report, ¶¶57-60.

misleadingly advertised as being able to "trap at least 99.97% of 0.3-micron airborne particles."[45] In contrast, Plaintiff purports to have done various testing and alleges that VeSync's Core Series filter achieved only 98.78%-98.70% efficiency for 0.294-0.340 microns while the Core Series Products achieve 99.70%-98.23% efficiency for approximately for 0.2-0.3 microns (and 99.87%-98.65% efficiency for approximately 0.3-0.5 microns).[46]

31.    Essentially, Plaintiff alleges that he *received* a product filtering 98.65%-99.87% of approximately 0.3-micron airborne particles whereas he *paid* for a product filtering 99.97% of 0.3-micron airborne particles. Importantly, Mr. Gaskin's proposed conjoint survey does ***not*** test this claim.

32.    Mr. Gaskin's proposed conjoint survey does not test how respondents react to the difference between (A) a product filtering 99.97% of 0.3-micron airborne particles and (B) a product filtering 98.65%-99.87% of approximately 0.3-micron airborne particles. Instead, Mr. Gaskin's proposed conjoint survey will, at best, test (A) a "True HEPA" claim (*i.e.*, 99.97% of 0.3-micron airborne particles) compared to (C) the absence of a HEPA claim.[47] Mr. Gaskin's deposition testimony similarly confirmed his survey will only measure the impact caused by the *presence* or *absence* of a "True HEPA" or "HEPA" claim,[48] and will **not** test the influence of advertising an air purifier with a filter that has a 99.97% filtration efficiency versus a 99.70% efficiency (or any other specific efficiency).[49]

---

[45] Third Amended Complaint, ¶¶37-38.

[46] Third Amended Complaint, ¶¶58-59.

[47] Gaskin Report, p. 22.

[48] Gaskin Deposition, 14:4-8 ("Q. So your proposed survey will measure the change in price for alleged overpayment and damages due to the presence or absence of the true HEPA claim? A. Pretty much, yes.") and 213:6-9 ("Q. So you intend to only calculate the price premium for true HEPA relative to a product with no reference of either true HEPA or HEPA? A. Right.").

[49] Gaskin Deposition, 15:4-17 ("Q. Your proposed survey does not measure the impact of a claim that a filter has a 99.97 percent filtration efficiency at .3 microns, correct? A. It's my understanding that it just measures the true HEPA claim itself. Q. So that would be a no? A. That's correct. Although that's what HEPA basically means. Q. And your survey will not test the influence of advertising an air purifier with a filter that has a 99.97 filtration efficiency versus a 99.7 percent efficiency, correct? A. That's correct.").

33.     Therefore, Mr. Gaskin's proposed conjoint is disconnected from Plaintiff's allegations and the facts of this case. There is no evidence to suggest that respondents will interpret the absence of a "True HEPA" claim as a product filtering 98.65%-99.87% of approximately 0.3-micron airborne particles.[50] Instead, respondents may interpret the absence of such a claim as meaning the filter is much worse than the one received by proposed class members in this case (*e.g.*, 90% of 0.3-micron airborne particles, 80% of 0.3-micron airborne particles, or worse).

34.     To the extent that survey respondents interpret the absence of the "True HEPA" claim in Mr. Gaskin's survey as meaning something other than 99.70%-99.87% of 0.3-micron airborne particles (*i.e.*, a lower filtration rate), then the measured willingness-to-pay ("WTP") will be overstated as compared to the allegations in this case. Any price premium calculated using the Gaskin-Weir Methodology will be overstated and untethered to the facts of this case because the Gaskin-Weir Methodology would not measure the difference between the product advertised and the product received.

35.     Mr. Gaskin's proposed survey would be focused solely on purchases of air *purifiers*, as opposed to replacement *filters*, which are also within the set of Contested Products.[51] This further underscores that the Gaskin-Weir Methodology is not tethered to the facts of this case. Neither Mr. Gaskin nor Mr. Weir provide any analysis to support the application of an air purifier price premium to replacement filters.

36.     The consumer purchase decision for replacement air filters is different than the purchase decision for air purifiers. For example, the set of competitor products for air filters is different than the set of competitor products for air purifiers, as a consumer who already owns an

---

[50] Mr. Gaskin testified that his proposed survey is not designed to understand how consumers will interpret the "True HEPA" claim. Gaskin Deposition, 32:23-33:9 ("Q. And so your proposed survey is not designed to understand how consumers interpret true HEPA; is that correct?... A. As I've said, I'm here to measure a change in market price, not the exact individual interpretations of the term… Q. So then I would be correct?... A. I think I agreed with you.")

[51] Gaskin Report, ¶45 ("Respondents will then be shown a set of descriptions of the features (Brand, Labels – including six labeling attribute groups – and Price) that each air purifier option shown in the conjoint exercise will include.").

air purifier would purchase replacement filters that fit the air purifier they own. A replacement air filter is a type of repeat purchase, such that a consumer would only purchase a replacement filter to continue using the air purifier. If a customer relied on the Contested Statements to buy an air purifier and the air filtration did not meet their individual expectation, then they may choose to purchase a new, different air purifier rather than a replacement filter. Thus, the supply and demand factors determining market prices (and price premiums, if any exist) are different between air purifiers and replacement filters.

37.    Since the market factors determining prices (and price premiums, if any exist) are different across the Contested Products and over time, Mr. Gaskin is incorrect to conclude that "[a]ny price premium calculated through the conjoint analysis will be equally applicable across the Class Products for which this survey is performed."[52] Mr. Weir is similarly incorrect to apply this single price premium to all Contested Products, including products that are not even studied by Mr. Gaskin's conjoint analysis.[53] Again, Mr. Gaskin's proposed conjoint analysis (and therefore Mr. Weir's subsequent damages calculation) is disconnected from Plaintiff's allegations and the facts of the case because it does not properly analyze all Contested Products. Even ignoring all other flaws, it would be inappropriate to apply Mr. Gaskin's conjoint results to the replacement air filters at issue in this case.

### C.    The Gaskin-Weir Methodology is incomplete and therefore unreliable because it ignores other factors, including supply-side factors, that affect prices.

#### 1.    The Gaskin-Weir Methodology fails to properly consider supply-side factors that determine market pricing.

38.    Economic theory states that prices paid by consumers result from the interaction of supply and demand factors. Similarly, price premiums, if any, paid by proposed class members in this case are the result of prices actually paid (as determined by supply and demand conditions in the actual world) and the prices those consumers would have paid in the absence of

---

[52] Gaskin Report, ¶55.

[53] Weir Report, ¶64 and ¶71.

the alleged misconduct (*i.e.*, but-for prices, which are the result of but-for demand and but-for supply conditions).[54]

39.    Mr. Gaskin's proposed conjoint survey could, at best, measure the demand impact from the "True HEPA" label (*i.e.*, the change in willingness-to-pay between the actual and but-for world).[55] However, this approach ignores supply-side factors that determine actual pricing. Without accounting for supply-side factors that determine product pricing, the proposed Gaskin-Weir Methodology cannot reliably identify any price premium paid by proposed class members because it does not control for supply-side factors in order to arrive at the product price but-for the Contested Statements.

40.    Economic authorities consistently recognize that conjoint analysis, if done properly, can measure only demand-side "willingness-to-pay" preferences, but cannot estimate actual market outcomes without supply-side data. The *Handbook of the Economics of Marketing* describes how "conjoint analysis can only estimate demand. Conjoint survey data, alone, cannot be used to compute market equilibrium outcomes such as market prices… Clearly, supply assumptions and cost information must be added to conjoint data in order to compute equilibrium quantities."[56]

41.    A peer-reviewed economic article in the *Journal of Law and Economics* similarly describes how a "conjoint survey can be used to estimate demand… but the measures of value used are purely demand based and do not involve equilibrium profit calculations."[57] The authors

---

[54] "But-for prices" are the prices that would have been charged in the absence of the alleged misconduct. "But-for demand conditions" and "but-for supply conditions" are the demand and supply conditions that would have occurred in the absence of the alleged misconduct.

[55] In economics, an individual's "willingness-to-pay" is the maximum amount that a specific individual is willing to pay for a product, product feature, or service. At best, Mr. Gaskin's proposed conjoint survey and simulation approach will calculate a single willingness to pay for the respondents in his survey.

[56] Allenby, Greg M. et al., "Economic Foundations of Conjoint Analysis," in *Handbook of the Economics of Marketing*, Volume 1, Jean-Pierre H. Dubé and Peter E. Rossi, eds. (Amsterdam, Netherlands: North-Holland, 2019), pp. 151-192, at p. 153.

[57] Allenby, Greg M. et al., "Valuation of Patented Product Features," *Journal of Law and Economics*, Vol. 57, No. 3, 2014, pp. 629-663 (hereinafter "Allenby 2014"), at p. 629.

emphasize that "[willingness-to-pay] measures utilize only demand-side information and are independent of costs or the competitive structure of the industry."[58] These supply-side factors are essential for determining actual market prices but are entirely lacking from the proposed Gaskin-Weir Methodology.

42.    Mr. Gaskin is incorrect to write that, under his proposed analysis, "[t]he results obtained from conducting the conjoint analysis survey will allow [him] to calculate the market price premium."[59] At best, Mr. Gaskin's approach may be able to measure consumer willingness-to-pay, but peer-reviewed academic literature cautions that a "[willingness-to-pay] measure could overstate the value of a … feature."[60] In the context of litigation and the calculation of damages, economists have similarly noted:

> "[I]t is important to remember that consumer valuations of the misrepresented feature are not the same as the market price premium associated with the alleged misrepresentation… While conjoint estimates enable the damages expert to forecast demand for a non-misrepresented version of the accused product, additional analysis is required to determine [] the market price for this version of the accused product… the amount of this price drop [or, conversely, price premium] generally cannot be determined by consumers' valuation of the accused feature alone … If the analysis employed does not also account for costs and other market forces such as competition among suppliers, the resulting damages estimates may be significantly overstated."[61]

43.    The Gaskin-Weir Methodology attempts to sidestep these fundamental problems by arguing that they have considered supply-side factors because "(1) the price range used in the survey reflects the actual market prices that prevailed during the class period, and (2) the

---

[58] Allenby 2014, p. 647.

[59] Gaskin Report, ¶50.

[60] Allenby 2014, p. 649.

[61] Allenby, Greg M. et al., "Computing Damages in Product Mislabeling Cases: Plaintiffs' Mistaken Approach in *Briseno v. ConAgra*," *Products Safety & Liability Reporter*, 2017, p. 3.

quantity used (or assumed) in the damages calculations reflects the actual quantity of products supplied during the class period (the number of units sold being fixed as a matter of history)."[62]

44.     Both approaches are inadequate. First, as explained in Section III.C.2 below, the prices proposed to be used in the conjoint survey envisioned by Mr. Gaskin *do not* reflect the actual market prices for the Contested Products, meaning they have failed to even live up to their own standard. Second, as described in Section III.C.2 and Section V.B below, the "fixed supply" assumption is contrary to the facts of this case, as supply-side factors varied substantially during the class period (*e.g.*, due to COVID-19). The identification of units purchased by proposed class members (*i.e.*, "the number of units sold being fixed as a matter of history")[63] does not imply that supply-side factors were stable during the class period, nor does it imply that supply-side factors are the same in the actual and but-for world.

45.     Even assuming Mr. Gaskin correctly uses actual historical prices and that historical supply-side factors were stable during the class period, his proposed methodology still fails to address a fundamental requirement: determining the but-for market conditions.

46.     Calculating any price premium requires comparing actual prices paid with prices that would have prevailed in the absence of the alleged misconduct. This but-for analysis

---

[62] Gaskin Report, ¶24. Also *see* Weir Report, ¶48 and ¶54. Also see Weir Deposition, 172:17-173:16 ("Q. What supply-side factors did you consider in your damages framework? A. I've given consideration again to the use of the range of real-world market-based prices, the fixed quantity of supply, the other more nuanced elements of the Gaskin survey, the application of those results back to the actual transaction data or estimates thereof for retail purchases of the class products, and the relevant but-for construct in this case that would tell you that the but-for world is the same in every regard as the real-world except for the challenged or allegedly harmful conduct and, therefore, that the supply side of the market will be one of many things that are held constant in the analysis and that the pricing and other factors that I've discussed are sufficient to allow the but-for world to hold everything constant, including the historic supply conditions, in order to estimate the change in the market value of the class products absent the allegedly harmful conduct and holding everything else equal.").

[63] Gaskin Report, ¶24.

requires proper treatment of both but-for demand and but-for supply-side conditions. Mr. Gaskin's conjoint analysis provides no consideration about but-for supply-side conditions.[64]

47.    Neither Mr. Gaskin nor Mr. Weir demonstrate that supply-side factors are the same in the actual and but-for worlds. Without this critical analysis, the Gaskin-Weir Methodology cannot properly measure the price premium paid by proposed class members, if any.

48.    A proper analysis would need to incorporate VeSync's strategic response to a change in demand that occurs without the alleged misconduct (as well as the response from competitors, and VeSync's response to those competitor reactions). Mr. Weir ignores this complexity and oversimplifies the market when describing it as "ordinary."[65] Mr. Gaskin testified that his proposed simulation only allows for a company to respond to changing demand by changing price, even though that company could respond in ways other than a product price reduction.[66]

49.    Specifically, the methodology fails to consider several crucial supply-side factors:

---

[64] Mr. Gaskin defers to Mr. Weir on supply-side issues, and incorrectly opines that his conjoint properly considers supply-side issues because of the price range Mr. Gaskin will use in the survey and the quantity that Mr. Weir will use in his calculation of damages. Gaskin Report, ¶24 ("It is my opinion, based on conversations with Plaintiffs' economics expert, Mr. Colin Weir, that the conjoint methodology set forth in this Declaration accounts for appropriate market supply side factors, including that (1) the price range used in the survey reflects the actual market prices that prevailed during the Class Period, and (2) the quantity used (or assumed) in the damages calculations reflects the actual quantity of products supplied during the Class Period (the number of units sold being fixed as a matter of history).").

[65] Weir Report, ¶¶55-56 and ¶63.

[66] Gaskin Deposition, 232:22-233:8 ("Q. Does your simulation allow for a company to respond in any way other than a price reduction? A. I'm just varying price, and to add any other sort of changes would be confounding factors that would interfere with my analysis. Q. And you would agree though in the real world a company could respond in another way besides a price reduction? A. It could but that is not how this is supposed to work. The only thing that's supposed to vary is the price.").

    a. Pricing strategy complexities: Mr. Weir and Mr. Gaskin ignore focal point pricing (*e.g.*, "$99.99"), where companies make discrete pricing adjustments (*e.g.*, from $99.99 to $89.99) rather than smooth responses to demand changes.

    b. Joint product pricing: The methodology overlooks strategic pricing of complementary products, such as the relationship between air purifier and replacement filter pricing, including the possibility of "loss leader" pricing strategies for certain products.[67]

    c. Promotional response strategies: The methodology also does not account for possible promotional strategies. Rather than reducing base prices for all customers, companies often respond to changing demand by offering coupons, bundling, and/or temporary discounts.

    d. Non-price responses: When facing different demand conditions, companies may respond by maintaining prices while selling a lower quantity and/or changing product features in order to affect demand.

50. These and many other strategic pricing considerations on the supply-side demonstrate that it is possible that certain (or even all) putative class members would have paid the same price in the but-for world (*i.e.*, in the absence of the alleged misconduct).

51. Messrs. Gaskin and Weir compound these analytical errors through their misleading use of terms such as "market simulation," "market value," and/or "market price premium,"[68] suggesting a comprehensive economic analysis that incorporates both supply and demand factors.

52. To be clear, the methodology described by Mr. Gaskin is not an economic "market simulation" that combines demand (*e.g.*, conjoint analysis) and supply (*e.g.*, cost and

---

[67] The "razor and razor blade" model of pricing is a classic example where companies make little to no money on the razor itself (or even lose money), but then make profits on future sales of razor blades.

[68] For example, see Gaskin Report, ¶¶10, 11, 17, 24, 50, 51, 53, and 55; Weir Report, ¶¶24, 25, 37, and 54.

competitor information). What Mr. Gaskin calls "market simulation" is, at best, a demand-side willingness-to-pay estimation proposal. Mr. Weir similarly confuses the issue by explicitly testifying that "Mr. Gaskin is not calculating a willingness to pay."[69]

53.     This limitation of Mr. Gaskin's approach is acknowledged by the very software Mr. Gaskin proposes to use.[70] The Sawtooth Software website explains that their "market simulator lets you input multiple products and place them in simulated competition one with another… The choice simulator focuses on the demand side of the marketing equation; but it is also important to pay attention to the supply-side and take the costs of producing different products/services into consideration."[71] Sawtooth specifically describes the "two-product simulation approach" used by Mr. Gaskin to be willingness to pay ("WTP") and acknowledges that this approach leads to inflated estimates (which in this context will cause Mr. Weir to overstate damages):

---

[69] Weir Deposition, 211:11-212:1 ("[A.] Mr. Gaskin is not calculating a willingness to pay, at least as I understand that term, which is an inherently subjective and individualized calculation. If Mr. Gaskin makes only one calculation, we know it is not individual willingness to pay. Otherwise, there would be hundreds or thousands of calculations. It is the case that I would describe what Mr. Gaskin -- as calculating, would also be the change in the willingness to pay of the marginal consumer, but that has a different economic definition and is, by dictionary definition, a measure in the change in market price for that product.").

[70] Gaskin Report, ¶51. Mr. Gaskin proposes to analyze the survey data using Hierarchical Bayes ("HB") regression analysis (Gaskin Report, ¶¶15, 18, 19, 49, and 51). This approach models consumer demand in a probabilistic framework using the survey data, but it does not include supply-side data (*e.g.*, information on production costs, pricing strategy, or competitor reactions). Since this approach is still merely a demand-side analysis, it cannot measure market price impacts in the but-for world without incorporating additional supply-side factors and data. Thus, Mr. Weir incorrectly writes that "[t]he use of Hierarchical Bayes regression provides for, among other factors, the ability to estimate better market-level results from a conjoint survey" (Weir Report, ¶45).

[71] "Typical Questions for Market Simulators," Sawtooth Software, accessed April 22, 2025, at https://sawtoothsoftware.com/help/lighthouse-studio/manual/typical-questions-market-simulators.html.

"Two common approaches to WTP estimation do not consider competition or the ability to opt out and usually lead to inflated estimates of WTP:…2. The two-product market simulation approach that simulates respondents choosing between just two versions of the product: one with and one without the enhanced feature. The price for the enhanced version of the product is adjusted upward via trial-and-error until the shares are distributed 50/50. That price difference that equalizes the shares of preference is taken as WTP."[72]

54.     Academic literature reinforces this point. An article within the *Proceedings of the Sawtooth Software Conference* cautions that "[e]conomic valuation of feature enhancement requires a valid and realistic demand system as well as cost information and assumptions about the set of competitive products."[73] As described above, Mr. Gaskin incorporates no cost information or comprehensive supply-side analysis, and therefore cannot properly estimate the price premium, if any, attributable to the Contested Statements.

### 2.    The Gaskin-Weir Methodology fails to use actual market prices or market shares.

55.     Mr. Gaskin (and by extension, Mr. Weir) claims to rely upon actual historical market prices within his proposed analysis.[74] However, Mr. Gaskin fails to use actual market prices in his survey, meaning his proposed analysis is disconnected from the economic market in this case.[75] Specifically, Mr. Gaskin proposes utilizing a price range of $85.99 to $250.99 in his

---

[72] "Understanding Willingness to Pay (WTP)," Sawtooth Software, accessed June 12, 2025 at https://sawtoothsoftware.com/help/lighthouse-studio/manual/understanding-willingness-to-pay.html [emphasis removed].

[73] Allenby, Greg M. et al., "Using Conjoint Analysis to Determine the Market Value of Product Features," Proceedings of the Sawtooth Software Conference (2013), pp. 341-355, at p. 349.

[74] Gaskin Report, ¶24 ("[T]he conjoint methodology set forth in this Declaration accounts for … the price range used in the survey reflect[ing] the actual market prices that prevailed during the Class Period") and p. 23, fn. 37 ("The range of market prices is based on the best data available at the time of this Declaration"). Also *see* Weir Report, ¶53 ("I understand that Mr. Gaskin will rely upon these historical data in setting the prices used in his conjoint survey.").

[75] Mr. Gaskin reviewed various product websites with prices advertised at the time of his report (not during the proposed class period), Vesync_Chen_00000191 (wholesale data), and STAPLES000002████████████████████████████████████. *See* Gaskin Report, Exhibit B.

survey.[76] ███████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████ [77] Without utilizing market prices within his proposed survey, all subsequent outputs from his survey will be flawed and uninformative to the issues in this case. Since Mr. Weir intends to rely on these flawed outputs from Mr. Gaskin, the calculated damages are similarly flawed and uninformative as to what price premium, if any, was paid by some putative class members purchasing some Contested Product in reliance on the Contested Statements in this case.

56.     Mr. Gaskin's proposed simulation is similarly untethered from economic reality when it comes to market shares and available products because he has not properly considered the supply-side factors previously discussed. Mr. Gaskin's proposed "market simulation" assumes there are two products (one with the "True HEPA" label and one without), each of which have 50% "market share":

> "[The proposed simulation] sets up a hypothetical situation in which, for the True HEPA Claim, there are only two alternative air purifier options in the choice set: one with the True HEPA Claim, and the other without the True HEPA Claim."[78]

> "Since these two configurations of alternative Class Products are the only products available in this market simulation, their shares add to 100%."[79]

> "[The proposed simulation will] find the lower price of the Class Products option without the True HEPA Claim such that half of the market (i.e., as represented by the data from all of the respondents in our analysis) chooses the Class Product option with the True HEPA Claim and half of the market chooses the alternative Class

---

[76] Gaskin Report, p. 23.

[77] STAPLES000002 ████████████████████████████████████
████████████████████████████████████████████████████████

[78] Gaskin Report, ¶52.

[79] Gaskin Report, ¶53.

Product option without the True HEPA Claim (i.e., each one has a market share of 50%)."[80]

57.    Mr. Gaskin appears to equate "preference shares" (or "choice probabilities") with "market shares." Since a conjoint survey is a demand-side analysis, it can only predict preference shares (*i.e.*, share of respondents who prefer one product over another). However, market shares are the result of supply and demand conditions (which also give rise to prices paid by consumers in the actual and but-for world), as described above. The textbook cited by Mr. Gaskin (and Mr. Weir) notes that "[c]onjoint analysis predicts preference, not market share."[81] The textbook explicitly cautions against the equivalency apparently made by Mr. Gaskin. It states that "the share of preference predictions usually should not be interpreted as market shares, but as relative indications of preference. Divorcing oneself from the idea that conjoint simulations predict market shares is one of the most important steps to getting value from a conjoint analysis study and the resulting simulator."[82]

58.    At best, Mr. Gaskin's simulation approach may be able to provide a demand-side "willingness to pay" estimate for survey respondents, but any estimate of actual price premium should incorporate supply-side factors (*i.e.*, use a different type of economic simulation that incorporates supply-side factors and market shares, as previously discussed). Mr. Gaskin testified that his simulated market share is "an entirely different sort of market share," and he did not

---

[80] Gaskin Report, ¶53.

[81] Orme, Bryan K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, 4th Edition (Manhattan Beach, CA: Research Publishers LLC, 2020), pp. 26, 91.

[82] Orme, Bryan K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research,* 4th Edition (Manhattan Beach, CA: Research Publishers LLC, 2020), p. 105.

know what VeSync's actual market share was.[83] Mr. Gaskin does not do any analysis of the real-world market shares that result from supply and demand conditions in this case. ███████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████. More generally, the application of any single constant value for the market share during the entire class period is contrary to the facts of the case. The stylized model Gaskin purports to be able to estimate is not the same thing as an actual analysis of the product market. The supply of air purifiers (and the Contested Products specifically) is dynamic and changed during the class period, which further renders the "fixed supply" assumption of the Gaskin-Weir model disconnected from market realities, as previously discussed.

---

[83] Gaskin Deposition, 231:5-232:17 ("Q. And the simulation assumes each product has a 50 percent market share? A. That's the goal for attaining the price premium. Q. Does Levoit have 50 percent of the market share? A. No. What that means is that consumers are indifferent between the two products, so the volume would remain the same for them. Q. My question was does Levoit have a 50 percent market share? A. Well, that's an entirely different sort of market share. This is in the simulation the share between these two identical products, except for the true HEPA claim. It doesn't really compare to Levoit's market share in the market. Q. I -- I -- I'll repeat the question. I understand you think that the two aren't related, which is fine. But does Levoit have a 50 percent market share? A. I do not know what Levoit's market share is. Q. And during the class period do you know what Levoit's market share was? A. No. I think I read it's a leading product. It might have a reasonably high market share, but that doesn't have any bearing on my use of the 50-50 share in my simulations. Q. Do you know what the actual market share is for HEPA products generally, not just Levoit products? A. I believe I read in the third amended complaint that there are hardly any non-HEPA products left, so it must be very high. Q. And you understand that Levoit products today do not have the HEPA claim? A. Right.").



59.    The actual market for air purifiers is more complex than the proposed Gaskin survey.



60.    Economic literature clearly describes how a conjoint analysis needs to be calibrated to real world economic data because it is merely a demand side survey of hypothetical product choices:

> "[A] conjoint survey, in and of itself, is not adequate to form the basis for equilibrium firm profit calculations. Not only must we calibrate demand for products, but we must also compute industry equilibria. This requires measures of costs, a demand system not only for the focal product but also for the major competing products, and an equilibrium concept."[86]

61.    The textbook cited by Mr. Gaskin (and Mr. Weir) similarly notes:

> "[C]onjoint utilities cannot account for many real-world factors that shape market shares, such as length of time on the market, distribution, out-of-stock conditions, advertising, effectiveness of sales force, and awareness. Conjoint analysis predictions also assume that all relevant attributes that influence share have been measured."[87]

62.    Mr. Weir directly contracts his own citation (and Mr. Gaskin's testimony) when opining that his analysis will account for out-of-stock conditions.[88]

63.    The Gaskin-Weir Methodology fails to use actual market prices or market shares (among other disconnections from economic reality described throughout this report). Therefore, it is disconnected from the facts of the economic market and cannot correctly identify the price premium paid by consumers, if any, due to the Contested Statements.

---

[86] Allenby 2014, p. 630.

[87] Orme, Bryan K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, 4th Edition (Manhattan Beach, CA: Research Publishers LLC, 2020), pp. 104-105.

[88] Weir Deposition, 223:11-22 ("Q. Does your damages calculation account for out-of-stock conditions? A. Yes. Q. How so? A. The totality of units sold would be reflective of the units that were sold because they were available. And the conjoint analysis is capable of holding constant the out-of-stock conditions to the extent that out-of-stock conditions ever influenced the market price of these products during the class period."). Also see Gaskin Deposition, 120:6-11 ("Q. And your conjoint analysis can't account for out-of-stock conditions; is that right? A. It does not explicitly account for them, but these people have all bought them, and I think any issues like that would be more dealt with by Mr. Weir.").

### 3.    The Gaskin-Weir Methodology incorrectly assumes a single price premium across all putative class members, all time, all sales channels, and all Contested Products.

64.    The Gaskin-Weir Methodology incorrectly assumes that their single calculated price premium can be applied to all putative class members, no matter the product, purchase date, sales channel (online vs. in-store), or retailer (Amazon, Staples, *etc*.).[89]

65.    The Gaskin-Weir Methodology inappropriately assumes that a calculated willingness-to-pay for the "True HEPA" label for some set of respondents in the future (*e.g.*, in 2025 or later) can be applied as far back as August 2019 (the beginning of the class period). Messrs. Gaskin and Weir inappropriately ignore the idiosyncratic variation in demand and supply factors across the proposed class period and across individual putative class members, as described in Section V.

66.    There are major changes in supply and demand trends over time during the class period (*e.g.*, COVID-19 pandemic, variation in competing products, changing market shares, presence/absence of discounts, *etc*.). These variations in supply and demand (including variations in willingness-to-pay over time) mean that individual putative class members paid different prices at different times during the class period. Any price premium may have similarly varied over time or could be present (or absent) only at some points in time. Neither Mr. Gaskin nor Mr. Weir have performed any analysis to establish the stability of market demand over time. It is not appropriate to extrapolate a willingness-to-pay estimate from 2025 (or later) to a class period where Plaintiff admits demand has varied over time (*e.g.*, due to the COVID-19 pandemic).[90]

67.    Mr. Gaskin testified that he intends to extrapolate the results from his single survey of Core 300 air purifiers to all class products (*i.e.*, including replacement filters), but then contradicted that opinion by testifying that he did not intend to apply his results to replacement

---

[89] Gaskin Deposition, 224:1-3 ("Q. So your proposed survey will calculate one price premium; is that right? A. One percentage price premium, yes.").

[90] Third Amended Complaint, ¶6, ¶22, and ¶23.

filters.[91] To the extent that Mr. Gaskin (and/or Mr. Weir) plans to apply his calculated price premium for air purifiers to replacement filters, the Gaskin-Weir Methodology also incorrectly assumes that a single calculated estimate of the willingness-to-pay for a "True HEPA" label on air *purifiers* can be applied to air *filters*. As previously discussed, Mr. Gaskin's proposed survey is focused on purchases of air *purifiers*, as opposed to replacement *filters*. There is no proposed analysis to study the impact on consumer demand or prices of the contested air filters in this case. It is not appropriate to extrapolate a willingness-to-pay estimate from one product (air purifiers) onto a different product (replacement filters), which have very different supply and demand considerations. For example, the demand for filters is determined in part by the air purifier that putative class members already own, which is not explicitly the case when purchasing an air purifier.

68.     The Gaskin-Weir Methodology also inappropriately assumes that a calculated willingness-to-pay estimate for a "True HEPA" label can be applied to putative class members who bought at all retailers and all sales channels. As discussed in Section V.A and Section IV.B, below, different consumers paid different prices in part because of purchasing through different retail outlets. These different retail outlets do not always exhibit the same pricing trends, as shown by the Amazon and Staples data described in Section IV.B. Neither Mr. Gaskin nor Mr. Weir have performed any analysis to establish the existence of common supply and demand trends across retailers (beyond generic statements by Mr. Weir, which are not specific to the products in this case, as previously noted). Thus, it is not appropriate to extrapolate a single willingness-to-pay estimate to all putative class members who purchased through different sales channels.

---

[91] Gaskin Deposition, 227:24-228:19 ("Q. In your proposed survey, you intend to perform one survey for the Core 300 products; is that right? A. I intend to perform one survey, yes, to cover the class products, that's correct. Q. And you do not intend to conduct a survey for the replacement filters; is that correct? A. That's correct. I was not asked to. Q. And you intend to extrapolate the results from this single survey across all products in the putative class; is that correct? A. Yes. Q. And you intend to extrapolate the results from a single survey of the Core 300 air purifier to the replacement filters, as well? A. I don't recall saying that. Did I say that? Q. That was a question. A. I don't intend to. Q. So you do not intend to have any price premium for the replacement filters? A. It's not part of the survey.").

69.    Mr. Weir opines that damages can be calculated "from the top down" by applying a single overcharge,[92] but this is an oversimplification that can lead to incorrect conclusions. Consider a simple hypothetical where a proposed class includes 50% of consumers who paid a 20% overcharge and 50% of consumers who paid 0% overcharge (and were thus unharmed). Mr. Weir's approach would estimate that 100% of consumers paid a 10% overcharge, when no consumer paid a 10% overcharge. Importantly, his approach can attribute damages where none exist even when assuming, *arguendo*, that his total damages number is correct in aggregate. In the above hypothetical, uninjured putative class members receive a windfall while injured putative class members are not properly compensated. Mr. Weir's approach cannot demonstrate that all, virtually all, or even most putative class members were harmed. Mr. Weir's use of averages simply assumes all putative class members were harmed in the same amount, but it does not demonstrate that all putative class members were harmed (nor harmed in the same amount).

70.    Finally, Mr. Weir opines that "[i]f the market price for the Class Products was higher with the No HEPA Claim, then ALL consumers will have paid a higher price than if the Claim was not used by Defendant."[93] However, again, this assumes there is a single market across all geographies, all time, all retailers, and all Contested Products. Variations in prices paid demonstrate there is not a single market across all of these dimensions, as described in Section V.A below. If such a single market existed, then every putative class member would have paid the exact same price, regardless of the date, location, or product purchased. This is clearly not the case. As a result, certain subsets of purchasers may or may not have paid the same price premium (or any price premium) even while assuming that other purchasers did pay a price premium. My analysis demonstrates that consumers paid different prices at different times because supply and/or demand factors varied, which means that damages are likely to vary by consumer (assuming damages even exist at all).[94] It is not appropriate for the Gaskin-Weir

---

[92] Weir Report, ¶74.

[93] Weir Report, ¶76.

[94] For example, see Section V.A and Section V.B below.

Methodology to assume a single overcharge across all putative class members, all time, and all products.

### 4. The Gaskin-Weir Methodology incorrectly assumes all consumers receive the same information and choices.

71.     The Gaskin-Weir Methodology is further disconnected from the economic market in this case because Mr. Gaskin's simulation incorrectly assumes that all consumers receive the same information and choices. Mr. Gaskin describes how his proposed survey will provide the same feature descriptions to each respondent.[95] He similarly notes that "[t]he Market-Based Method uses the HB partworths to simulate a market in which all customers react to the *same choice set* of products and prices."[96] In reality, not all putative class members have the same information, nor do they have the same choice set of products and prices. Supply and demand factors have changed over time, such that a putative class member who purchased a product in late 2019 (*e.g.*, just before the COVID-19 pandemic) faced different information and choices than a putative class member who purchased in April 2020 (*e.g.*, during the COVID-19 pandemic) or in 2023 (*e.g.*, after the COVID-19 pandemic). ██████████████████ ███████████████████████████████████████████████████ █████████████████[97]

## IV.  The Gaskin-Weir Methodology ignores data that does not support Plaintiff's assertions.

72.     Economists often look to actual purchase data in order to understand consumer choices, as consumer preferences are revealed from their actual purchase decisions in the marketplace. For consumers to systematically pay a price premium in this case, the alleged misconduct needs to materially shift consumer demand relative to the but-for world (*i.e.*, consumer demand must be lower in the absence of the alleged misconduct). If an advertisement caused consumer demand to shift in a manner that results in higher prices, then, holding all else equal, we would expect to see higher prices for the Contested Products relative to comparable

---

[95] Gaskin Report, ¶45.

[96] Gaskin Report, ¶51 [emphases added].

[97] Vesync_Chen_00001691.

products. However, a comparison of the same Contested Products with and without the Contested Statements shows no evidence of a price premium paid by consumers, and Messrs. Gaskin and Weir have put forth no model to demonstrate anything contrary. In this case, real-world market price data measure how consumers and markets actually behave (as opposed to how consumers say they will behave) and are thus preferable to a survey of hypothetical consumers when performing an analysis of damages.

### A. The Contested Air Purifiers are not systematically sold at a price premium relative to competitors.

73. Mr. Weir states that "Air Purifiers with a claim similar the [*sic*] Claim in this case command a higher price in the marketplace" but merely cites to Plaintiff's unsupported allegations in the Third Amended Complaint.[98] This table lists no data source, retailer, sales channel, time period, or any details about the specific air purifier models being reviewed, but alleges that it is comparing the price per square foot of coverage for brands selling both HEPA and non-HEPA air purifiers.[99] There is no discussion of other features of these air filters, and it is unclear if the described "HEPA premium" has provided any meaningful comparison or accounted for other features that can result in the claimed pricing difference.[100] However, to the extent that Plaintiff's simplistic price comparison is appropriate, an exploratory price comparison between the Contested Air Purifiers and similar competitor products shows no systematic price premium paid by consumers for the Contested Air Purifiers.

74. 

---

[98] Weir Report, ¶15 and fn. 5 (citing Third Amended Complaint).

[99] Third Amended Complaint, ¶29, Table A. Without additional information, there is no way to test the accuracy or reliability of these claims.

[100] The comparison also cannot be reconciled with current data on the listed brand's website; for example, the table purports to compare Molekule air purifiers that are "HEPA" and "Non-HEPA", but Molekule's own website only offers a "PECO-HEPA Tri-Power filter." *See* "Shop all," Molekule, accessed June 16, 2025, at https://molekule.com/collections/all.

[101] No comparable products were identified for the Core 300S models.

██████████████████████████████████████████
█████████████████████████████████████

████████████████████████████ Thus, this simple comparison of competing products with and without the Contested Statements does not support Plaintiffs' claims that the Contested Air Purifiers are systematically sold at a price premium due to the alleged misconduct at issue in this case. In contrast, the Contested Air Purifiers were sold at a discount to almost all primary competitor air purifiers during the class period.





75.     The notion that customers were deceived and experienced a product worse than expected due to the alleged misconduct is also contradicted by Plaintiff's own purchase history. As previously noted, Mr. Chen initially purchased a Core 300 air purifier on September 23, 2020 and then purchased a second Core 300 air purifier on December 30, 2020.[102] If Mr. Chen had not received a product that filtered air particles to the level he expected (or paid for), then Mr. Chen logically would not have purchased a second air purifier three months later for the same price. The fact that Mr. Chen did purchase a second air purifier at the same price speaks as to the value of the product he received given the cost of the product. Mr. Chen testified that he was pleased with the performance of his first Core 300 air purifier and it was working as he expected before

---

[102] CHEN000013; CHEN000014.

he purchased a second air purifier.[103] ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████ These data indicate that many purchasers received the product

value they expected given the price they paid (*i.e.*, they were either not deceived or placed little

value on the Contested Statements at issue in this case). If these customers had not received a

product that filtered air particles to the level they expected (or paid for), or were not satisfied

with the filtration performance then presumably they would not have made repeat purchases.

## B.    There is no systematic pricing difference between VeSync's same products sold with and without the Contested Statements.

76.    An exploratory analysis of pricing for the Contested Air Purifiers with and

without the alleged false advertising demonstrates no systematic price premium paid by putative

class members due to the alleged misconduct.[105] As alleged by Plaintiff, VeSync removed the

contested HEPA labeling and online advertising on or around July 23, 2023.[106] For the purposes

of my analysis, counsel has instructed me to assume that the proposed class period ends on

August 29, 2023, *i.e.*, after the removal of the Contested Statements occurred in July 2023.

77.    Monthly pricing data exist for the same exact products at issue in this case with

and without the Contested Statements (*i.e.*, during and after the proposed class period). ████████



██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████. These graphs do

not show an immediate and persistent pricing impact across all products and across all retailers.

---

[103] Deposition of Rick Chen, May 15, 2025 ("Chen Deposition"), 93:25-94:4 ("Q. Were you pleased with the performance of your Core 300 prior to your December 2020 purchase? A. Generally, yes. Q. Was it working as you expected? A. I think so."), 94:12-19 ("[Q.] Did you experience anything personally with your air purifier that made you believe that it was not -- did not have a HEPA grade filter? A. At that time?... No.") and 95:4-6 ("Q. Okay. So the products worked as you expected. Fair to say? A. Sure.").

[104] STAPLES000002.

[105] The analyses in this section showing no evidence of price premiums are also consistent with the survey performed by Sarah Butler, which showed no statistically significant change in purchase likelihood from the contested labeling claims in this case. Butler Report, §VI.H.

[106] Third Amended Complaint, ¶42.

Thus, a before-and-after analysis of the same products sold with and without the contested false advertising shows no affirmative evidence that prices paid by consumers were affected by the Contested Statements.







78. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████[107] Again, collectively, these data do not provide any affirmative support for the notion of a class-wide price premium for the Contested Air Purifiers as a result of the alleged misconduct.

_____

[107] █████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

79.

.[108] This further suggests that there is no affirmative evidence of any systematic price effect associated with the Contested Statements.

---

[108] 



80.  As explained further in Section V.A, the inconsistency in prices paid over time across retailers underscores the need

for an individualized inquiry to provide a reliable support for any damages analysis regarding the price premium, if any, associated with the contested HEPA label.



81.    Mr. Weir testified that looking at actual sales data before and after a product change is "one of the worst ways to incorrectly measure a price premium" because certain

factors (*e.g.*, inflation) are changing over time and may also be influencing price.[109] While Mr. Weir's concern may be theoretically valid over longer time periods, it has to be supported by additional analysis, and an initial analysis of actual pricing data in this case provides an important input into whether the underlying raw data aligns with Plaintiff's allegations. Importantly, Mr. Weir has not provided any empirical analysis that shows a systematic pricing difference when looking at narrow windows around the labeling change in this case.

82.    Collectively, these exploratory analyses of prices paid by putative class members before and after removal of the Contested Statements do not support Plaintiffs' claims that there is a price premium allegedly paid by putative class members due to the alleged misstatements in this case.[110] There is no systematic pricing difference between VeSync's same products sold with and without the Contested Statements. This analysis is also consistent with the survey of prospective purchasers performed by Sarah Butler, who found that "HEPA/True HEPA/H13" and "99.97% filtration at 0.3 microns" statements do not impact consumers' interest in and likelihood of purchasing the product.[111]

---

[109] Weir Deposition, 195:19-197:4 ("Q. Would you agree that real-world data is an important data point when assessing price premium? A. When you say 'real-world data,' if you're referring to that concept of looking at sales data before and after a change in a product, then I would say absolutely not. That's one of the worst ways to incorrectly measure a price premium. Q. And why is that? A. Implied in the concept of before and after is that there is a passage of time, and the passage of time itself would interject a number of confounding factors that would make that analysis very difficult to do while isolating something specific, like the change in the HEPA claim. For example, we've been going through a period of high retail inflation. And you might see the removal of the HEPA claim and note in the retail data that the price of the product actually went up. But that doesn't tell you whether the increase is due to inflation, other macroeconomic factors or confounding variables, other changes at the time, product's configuration, or advertising and a whole bunch of other things such that that analysis, unlike conjoint analysis that is perfectly designed to be able to isolate and control and hold all -- hold all other elements constant, you would not be able to use the before and after to isolate the price premium.").

[110] A complete analysis would need to account for all major changing supply and demand factors over time. As a rebuttal expert, it is outside the current scope of my report to perform such a complete affirmative analysis.

[111] Butler Report, §VI.H.

## V.    Proper analysis of consumer harm relating to Plaintiff's allegations requires individualized inquiry.

83.    The evidence in this case demonstrates that individual consumers had different economic experiences such that individual inquiry is required in order to properly calculate consumer harm, if any, in this case. Applying a class-wide damages model in this case requires the assumption of uniform economic experiences across putative class members, which is contrary to the economic evidence. As described below, there is variation in prices paid by consumers due to product discounts, date of purchase, and retailer of purchase. The variations in supply and demand factors in this case result in individualized economic experiences (and individualized damages, if any).

### A.    Different consumers paid different prices and took advantage of different discounts that are not always percent of price.

84.    Individual consumers paid different prices in part because product discounts varied over time and across products. ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████





86. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
█████████████████████████████████████████
████████████[112]

87.     As a result, individual inquiries are needed to analyze the economic circumstances of each putative class member to know what prices they actually paid for the products. Specifically, individual inquiry is required to understand the product purchased, timing of purchase, price actually paid (after discounts), and to estimate any price premium that may have

---

[112] Vesync_Chen_00001693.

been paid due to the alleged misconduct in this case (and how that may have been affected by discounts). The variation in prices paid due to individual product discounts and other varying supply and demand factors across consumers is also corroborated by the detailed transactional data produced in this case. ███████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████████████████████ When pooling together all Contested Products across all retailers, the range of prices paid by individual putative class members likely becomes even larger.





████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

88.    In addition, prices paid by putative class members varied across retailers. ████

████████████████████████████████████████████
████████████████████ [113] ████████████████ [114] ████
██████████████████████ [115] ████████████
████████████████████████████████████████
████████████████████████████████████████

---

[113] Vesync_Chen_00001692. ██████████████████████████

[114] STAPLES000002 (████████████████████████).

[115] Vesync_Chen_00001691.

███████████████████████████████████████ [116] Thus, even when focusing on a single product, individual putative class members paid different prices during approximately the same time, depending on which retailer they purchased from. Again, the range of prices paid only increases when considering all Contested Products. Moreover, this analysis of prices paid during a single month understates the amount of pricing variation paid by individuals since it uses average price data for the Amazon and NPD datasets, and there is likely to be additional variation by consumers within the month even if they purchased the same product at the same retailer (*e.g.*, due to promotional discounts).

89.    The reports of Messrs. Gaskin and Weir also do not address how their methodology would account for any individualized (or widespread) use of gift cards. Plaintiff testified that he used a gift card, which was given to him (and purchased by someone else). [117] Mr. Weir testified that he "would not, again unless required by the court, control separately for gift cards" because if "[a consumer] had paid less for their air purifier on the gift card, they would have more money on the gift card to spend, and so, therefore, they've been economically harmed in the same fashion as everyone else." [118] Mr. Weir is implicitly assuming that payment method does not impact a consumer's purchase decision, merchant decision, willingness to pay (or, price premium paid). However, gift cards would generally not be equivalent to cash, and may affect consumer choices and purchase decisions when they are restricted to be spent at a

---

[116] Vesync_Chen_00001692 (Amazon data); STAPLES000002 (███████████████ ██████████); Vesync_Chen_00001691 (NPD data).

[117] Chen Deposition, 89:15-24 ("Q. But you used a gift card -- or you've previously testified that you used a gift card to purchase the Core 300 from Amazon. Is that correct? A. Yes. It was my gift card. Q. Who gave you that gift card? A. I don't remember. Q. Someone else purchased it though? A. Purchased the gift card? Q. Yes? A. Yes, to give to me."). Mr. Chen's first order (placed on September 23, 2020) was covered entirely by a gift card, while Mr. Chen's second order (placed on December 30, 2020) was covered partially by a gift card (CHEN000013; CHEN000014).

[118] Weir Deposition, 193:7-20 ("Q. Does your calculation of the price premium account for gift cards? A. So I will, of course, defer to any certification order given by the court, but whether a consumer pays by cash, check, credit card, gift card, they would still be economically harmed. So I would not, again unless required by the court, control separately for gift cards. If they had paid less for their air purifier on the gift card, they would have more money on the gift card to spend, and so therefore, they've been economically harmed in the same fashion as everyone else.").

certain retailer, expire after a certain date, or possess other features that may change consumer behavior. Individual inquiry is required to understand which putative class members utilized gift cards and what retailer limitations were associated with those specific gift cards, as well as how the use of gifts cards may have impacted consumer purchase decisions (and any price premium paid). Messrs. Gaskin and Weir do not address how a consumer's willingness to pay (or any market price premium) will be impacted by the use of gift cards.

90.     The branded gift card may have caused some consumers to buy a Contested Product from a particular retailer and thus pay that retailer's higher (or lower) price as compared to purchasing from other retailers. Mr. Gaskin and Mr. Weir do not explain why the harm for such a consumer, according to the Gaskin-Weir Methodology, should be higher (or lower) with the difference being on account of the retailer and not on account of the Contested Statements.

91.     Thus, proper analysis of consumer harm relating to Plaintiff's allegations requires individualized inquiry in part because different consumers paid different prices (and likely different price premiums, if any) due to different supply and demand factors in effect across different dates, locations, retail channels, discounts, and products purchased.

## B.    Air purifier purchase decisions themselves are highly individualized and not solely price-driven.

92.     The product information that consumers rely upon (and/or relative importance of such information) also likely varies across individual putative class members as well. As a general matter, consumers may get information from a variety of sources to inform their purchase decisions, and the relative weight of that information may vary. For example, some consumers may place more or less weight on customer review ratings, third-party product review websites, retailer marketing, or product information from the manufacturer.[119] In this case, Plaintiff reported reviewing information on Amazon's website as well as "the New York Times

---

[119] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See* Vesync_Chen_00001652-688 at 664-665.

Article, Wirecutter's 5 Most Popular Picks in September 2020."[120] This further supports the existence of idiosyncratic variation in demand across proposed class members, as different putative class members likely viewed different information from different sources at different points in time during the class period. This idiosyncratic variation is ignored by Mr. Gaskin, who incorrectly assumes all consumers receive the same information and choices, as previously discussed in Section III.C.4.

93.    In addition, consumer demand varied substantially over time during the proposed class period, which Counsel has informed me runs from August 29, 2019 to approximately August 29, 2023. The Third Amended Complaint describes "the explosion in the air-purifier market brought about by the ongoing COVID-19 pandemic and yearly 'once-in-a-lifetime' wildfires that have ravaged the United States."[121] Plaintiff alleges that "[c]oncern about air quality skyrocketed in 2020… as wildfires intensified and the airborne COVID-19 virus shut down the globe"[122] and explicitly note that "the COVID-19 pandemic has increased the demand for air purifiers."[123] Thus, not only do demand factors vary across individuals and across time, but the aggregate macroeconomic factors that give rise to prices paid by putative class members will also vary across time (and thus across individual putative class members who purchased at different times) due to the COVID-19 pandemic.

---

[120] Plaintiff Rick Chen's Supplemental Responses to Defendant VeSync Corporation's Interrogatories, Set One, April 4, 2025, p. 5. Also *see* Chen Deposition, 67:14-15 ("A. I read -- before I bought the Levoit air purifier, I read a New York Times article.").

[121] Third Amended Complaint, ¶6.

[122] Third Amended Complaint, ¶22.

[123] Third Amended Complaint, ¶23. Plaintiff similarly testified that he purchased the product because of a New York Times article and was motivated to buy it because of both the California wildfires and COVID-19 pandemic in 2020. Chen Deposition, 72:6-17 ("Q. Why did you purchase the Core 300? A. I read a New York Times article, and it said top picks of September 2020, and the Levoit Core 300 HEPA filter was on that list. Q. Top picks of September 2020? A. Yeah, something like that, but. Q. Were you experiencing, at the time, any specific issues related to the air quality in your home? A. I was motivated to buy because the sky was orange in September 2020 from the wildfires in Northern California, and, obviously, the COVID-19 pandemic during that time. It was 2020.").

94.    Plaintiff's own Class Certification Motion also highlights the change in demand factors over time, noting "Google searches for HEPA filters ([Figure 17] below) spiked right as the pandemic was declared, hitting an all-time high in March of 2020… Air-purifier manufacturers were quick to take note of the explosion in consumer demand for HEPA filters[.]"[124] To the extent that Google searches are evidence of demand for HEPA filters, as assumed by Plaintiff's Class Certification Motion, it demonstrates that demand varied across the time period and an individualized analysis is required because each consumer who purchased the product at different points in time faced very different economic circumstances around consumer demand for air purifiers.

**Figure 17: Plaintiff's Evidence of Demand for HEPA Filters: Google searches[125]**



95.    Similarly, regarding the supply-side factors that influence pricing and product availability, it is well-known that international trade dynamics changed sharply before, during, and after the COVID-19 pandemic. During this time, I understand the Contested Products were designed in California and manufactured in China, and thus would need to be transported from China to the United States before being sold.[126] For many retailers, these China-to-US supply chains were delicately balanced to provide inventory "just-in-time" for sale, thus avoiding high

---

[124] Plaintiff's Notice of Motion and Motion for Class Certification, May 2, 2025, p. 1.

[125] *See* Figure 1 in Plaintiff's Notice of Motion and Motion for Class Certification, May 2, 2025, p. 1.

[126] *See* Levoit's response that all of their products are designed in California and manufactured in China. "Q: Where are Levoit air purifiers made?" Amazon, August 4, 2020, accessed May 9, 2025, at https://www.amazon.com/ask/questions/Tx10NS0IN57T4ZA.

warehousing costs.[127] However, the onset of the COVID-19 crisis brought about widespread government lockdowns in China, which had the immediate effect of halting or severely slowing down production at factories across the country.[128] Slowed production rippled through established supply chains designed to bring manufactured goods from China to the United States.[129] When initial production issues abated, the supply chain issues continued, with record demand for shipping container space and large back-ups of ships at ports bringing goods from China to the United States.[130] Thus, the supply-side factors influencing pricing have changed throughout the proposed class period, such that putative class members who purchased the products at different times may have faced substantially different economic realities (*e.g.*, in terms of product availability, *etc*.).

96.     Even when assuming that a price premium does exist due to the Contested Statements in this case, there are at least three purchase decisions available to any individual consumer in the absence of the alleged misconduct: (i) purchase the product at a lower price (as assumed by the Gaskin-Weir Methodology); (ii) purchase a different product at a different (and likely higher) price; or (iii) make no purchase at all. Mr. Weir ignores the individualized nature of these purchase decisions. Mr. Weir is further incorrect to write:

> "[I]f one were to assume, *arguendo*, that Defendant would not have lowered the price in concert with demand (indicating that Defendant priced above the market clearing price), then the economic outcome would be that many or all of the purchases would not have taken place at all. As such, any reduction in

---

[127] *See* Terlep, Sharon and Annie Gasparro, "Why Are There Still Not Enough Paper Towels?" The Wall Street Journal, August 21, 2020, accessed May 9, 2025, at https://www.wsj.com/articles/why-arent-there-enough-paper-towels-11598020793.

[128] *See* Page, Paul, "Here's How Supply Chains Are Being Reshaped for a New Era of Global Trade," The Wall Street Journal, April 24, 2023, accessed May 9, 2025, at https://www.wsj.com/articles/supply-chains-have-changed-forever-819d9afd.

[129] *See* Page, Paul, "Here's How Supply Chains Are Being Reshaped for a New Era of Global Trade," The Wall Street Journal, April 24, 2023, accessed May 9, 2025, at https://www.wsj.com/articles/supply-chains-have-changed-forever-819d9afd.

[130] *See* Page, Paul, "Here's How Supply Chains Are Being Reshaped for a New Era of Global Trade," The Wall Street Journal, April 24, 2023, accessed May 9, 2025, at https://www.wsj.com/articles/supply-chains-have-changed-forever-819d9afd.

economic value calculated by Mr. Gaskin will be an inherently conservative measure."[131]

97.     To the extent that prices remain the same in the but-for world, then there is no price premium. If certain sales would not have occurred in this but-for scenario due to lower demand, then there is no harm to those consumers who would have purchased the same product at the same price (*i.e.*, they paid no price premium due to the alleged misconduct). However, the Gaskin-Weir Methodology assumes that all consumers pay the same price premium; thus Mr. Weir is wrong to write that "any reduction in economic value calculated by Mr. Gaskin will be an inherently conservative measure."[132]

98.     His analysis is similarly wrong (*i.e.*, Mr. Gaskin's calculate will not be "an inherently conservative measure") when applied to purchases that would not have taken place at all since, in the but-for world, those consumers would not have expended any funds but they also would not have received any air purifier of any value. Any suggestion that Mr. Gaskin's price premium is conservative because it does not give a full refund to those who would have not purchased the product in the but-for world is economically incorrect because it ignores the value of the product received.

## C.    Air purifiers are complex devices that appeal to consumers via a variety of different features.

99.     The Contested Products (and competing products) contain multiple elements that drive consumer demand. In general, air purifiers may include varying product features, specifications, or information such as brand name, perceived quality (*e.g.*, online reviews, star rating), color, size, WiFi connectivity, mobile app control, noise level, particle retention size, or certifications (Energy Star, ETL, etc.). Air purifiers vary across these dimensions in part because individual consumers place varying weight on certain aspects of the product. Put differently, two different consumers may ultimately purchase the same product but-for different reasons (*e.g.*,

---

[131] Weir Report, ¶50.

[132] Weir Report, ¶50.

one consumer may highly value the low noise level, whereas another consumer may highly value the Energy Star Certification indicating an energy efficient device).

100.    Figure 18 below provides an example of the various features and product specifications that are advertised for the Core 300, Core 300S, and Core P350 products. Beyond the contested HEPA labeling at issue in this case, each of the Contested Air Purifiers contain multiple elements that have value to consumers.[133] The relative influence of demand factors (including demand for HEPA filters and related air purification claims) likely varies across individual putative class members.



101.    Thus, proper analysis of consumer harm relating to Plaintiff's allegations requires individualized inquiry in part because air purifiers are complex devices that appeal to consumers via a variety of different features.

---

[133] Variation in consumer demand is further corroborated by the survey of past purchasers performed by Sarah Butler which showed that: (i) consumers purchase air purifiers for a variety of reasons; (ii) the vast majority of respondents did not purchase an air purifier for the HEPA attribute; and (iii) consumers do not have a uniform understanding of HEPA. *See* Butler Report §V.H.

[134] Vesync_Chen_00001652-668, at 664-665.

[135] Vesync_Chen_00001652-668, at 664-665.

**Figure 18: Features of the Contested Products**

| Number | Product Feature or Specification | Core 300 | Core 300S | Core P350 |
|:---:|:---|:---:|:---:|:---:|
| **(1)** | **(2)** | **(3)** | **(4)** | **(5)** |
| 1 | 1-24 Hour Timer | | x | |
| 2 | 2-8 Hour Timer | x | | x |
| 3 | 3-Stage Filtration | x | x | x |
| 4 | ARC Formula | | | x |
| 5 | CADR: 140 CFM | | | x |
| 6 | CADR: 141 CFM | | x | |
| 7 | CADR: 143 CFM | x | | |
| 8 | Check Filter Indicator | x | x | x |
| 9 | Improved Pre-Filter | | | x |
| 10 | Ozone Free | x | x | x |
| 11 | Pet Lock Button | | | x |
| 12 | QuietKEAP$^{TM}$ Technology | x | x | x |
| 13 | Sleep Mode | x | x | |
| 14 | Smart Controls | | x | |
| 15 | VortexAir$^{TM}$ Technology | x | x | x |

**Notes and Sources:**

Features and specifications are as advertised in their respective "Features" or "Product Specifications" drop down menus on levoit.com. See:

"Levoit Core® 300 Air Purifier," Levoit, accessed May 9, 2025, https://levoit.com/products/core300-air-purifier,

"Levoit Core® 300S Smart Air Purifier," Levoit, accessed May 9, 2025, https://levoit.com/products/core-300s-smart-air-purifier, and

"Levoit Core® P350 Pet Care Air Purifier," Levoit, accessed May 9, 2025, https://levoit.com/products/corep350-pet-care-air-purifier

# VI.    Miscellaneous

102.    This report outlines my opinions and bases for them. I reserve the right to expand, amend, and/or change this report based upon additional information that may be subsequently provided to or obtained by me.

Jordan Milev



**Jordan Milev, Ph.D.**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas, 24FL
New York, New York 10036
Tel: 212-345-5516  Fax: 212-345-4650
Jordan.Milev@NERA.com
www.nera.com

# APPENDIX A

# JORDAN MILEV, PH.D.
### Managing Director

## Education

**Yale University, New Haven, CT**
Ph.D. (with M.Phil. and M.A. *en route*), Economics, 2004
Fields of concentration: Econometrics and Financial Economics

**Amherst College, Amherst, MA**
B.A., *summa cum laude*, with distinction, Economics and Mathematics, 1998

## Professional Experience

**NERA Economic Consulting, New York, NY**
2023 – present      Managing Director
2016 – 2022         Associate Director
2014 – 2016         Vice President
2007 – 2014         Senior Consultant
2004 – 2007         Consultant
2001, 2002          Summer Research Associate

**Yale University, New Haven, CT**
2000 – 2003         TA (Microeconomics, Statistics, Econometrics)

## Honors

Economics Department Fellowship, Yale University, summer 2002
Yale University Dissertation Fellowship, fall 2002
Yale University Graduate Student Fellowship, 1998-2002
Dwight Hitchcock Memorial Fellowship, 1998/99, 2000/01, 2003/04
Bernstein Prize for Best Senior Thesis in Economics, Amherst College, 1998

## Testimony (Last 4 years)

Arbitration testimony of Jordan Milev, Ph.D. in the matter of a confidential arbitration proceeding in front of the American Arbitration Association, January 2025.

Supplemental deposition testimony of Jordan Milev, Ph.D. in the matter of a confidential arbitration proceeding in front of the American Arbitration Association, December 2024.

Deposition testimony of Jordan Milev, Ph.D. in the matter of a confidential arbitration proceeding in front of the American Arbitration Association, December 2024.

Trial testimony of Jordan Milev, Ph.D. in the matter of *Serpouhie Sarkissian v. Antranik Baghdassarian et al.*, Los Angeles County Superior Court, Central District, October 2024.

Deposition testimony of Jordan Milev, Ph.D. in the matter of *Hedgeye Risk Management, LLC v. Dale et al.*, United States District Court for the Southern District of New York, September 2024.

Deposition testimony of Jordan Milev, Ph.D. in the matter of *Serpouhie Sarkissian v. Antranik Baghdassarian et al.*, civil litigation before Los Angeles County Superior Court, Central District, December 2023.

Arbitration testimony of Jordan Milev, Ph.D. in the matter of *Cary E. Losson et al. v. Passco Companies, LLC*, an arbitration before the American Arbitration Association, April 2023.

Arbitration testimony of Jordan Milev, Ph.D. in the matter of *Steven M. Mariano v. UBS Financial Services, Inc.*, Financial Industry Regulatory Authority, June 2022.

Trial testimony of Jordan Milev, Ph.D. in the matter of *Gruber v. Gilbertson, et al.*, before the United States District Court for the Southern District of New York, June 2022.

Deposition testimony of Jordan Milev, Ph.D. in the matter of *Zornoza v. Terraform Global, Inc. et al.*, United States District Court for the Southern District of New York, December 2021.

Sentencing hearing testimony of Jordan Milev, Ph.D. in the matter of *USA v. Chartier et al.*, United States District Court for the Eastern District of New York, September 2021.

Trial testimony of Jordan Milev, Ph.D. in the matter of *Monteagudo v. Braccia, et al.*, United States District Court for the Eastern District of New York, July 2021.

Arbitration testimony of Jordan Milev, Ph.D. in a confidential arbitration filed under the Arbitration Act 1996 (England and Wales), May 2021.

Arbitration testimony of Jordan Milev, Ph.D. in a confidential arbitration before the American Arbitration Association, April 2021.

**Jordan Milev, Ph.D.**

## Publications

"Class Action Lawsuits: Opportunities to Apply Econometrics and Statistics," (with L. L. Ang and J. Scalf), *Notices of the American Mathematical Society*, 2021.

"COVID-19 Market Decline Will Have Diverse Repercussions for Companies," *Law360 Expert Analysis*, 2020.

"Crypto Market Surveillance Has Arrived" (with S. Brown-Hruska and T. Wagener), *Law360 Expert Analysis*, 2018.

"Introduction to Covered Bonds" (with T. Schopflocher), in *The Handbook of Mortgage-Backed Securities*, ed. Frank Fabozzi, Oxford University Press, 2016.

"Money Market Mutual Funds: Stress Testing and the New Regulatory Requirements" (with J. Berkowitz and P. Conroy), *NERA paper*, 2015.

"Insurance Coverage Towers and Predicted Settlements" (with P. Conroy), *NERA paper*, 2012.

"Recent Trends in Securities Class Action Litigation: 2011 Year-End Review" (with R. Patton, S. Starykh, and J. Montgomery), *NERA paper*, 2011.

"Recent Trends in Securities Class Action Litigation: 2011 Mid-Year Review" (with R. Patton and S. Starykh), *NERA paper*, 2011.

"NERA Trends 2010 Year-End Update" (with R. Patton and S. Starykh), *NERA Paper*, 2010.

"Alternative Funding Sources" (with P. Hinton and T. Schopflocher), in *The Covered Bonds Handbook*, ed. A. Pinedo and J. Tanenbaum, Practicing Law Institute, 2010.

"NERA Trends 2010 Mid-Year Study" (with R. Patton, S. Plancich, and S. Starykh), *NERA Paper*, 2010.

**Jordan Milev, Ph.D.**

## Presentations

Artificial Intelligence and machine Learning in Financial Economics, NERA Securities Conference, Park City, UT, July 2024.

Cryptocurrency, Blockchain and Fintech: Innovation and Regulation, FMA Legal and Legislative Conference, Washington, DC, October 2018.

Initial Coin Offerings (ICO) Crackdown: Demystifying SEC's Sweeping Probes, New York, June 2018.

Why Is This Class Action Different from All Others: Securities Class Actions and SEC Investigations, New York, February 2016.

Assessing Potential Exposure and Damages from Cybersecurity Breaches, ABA Criminal Justice Section Fourth International White Collar Crime Institute, London, United Kingdom, October 2015.

Government Investigations and Securities Litigation: Connecting the Dots, New York, May 2015.

The Economics of Privacy and Data Sharing: Approaches to Quantifying Damages in Data Breach and Privacy Cases, New York, March 2015.

Fraud-on-the-Market: Significant Issues and Updates for 2014 and Beyond, New York, August 2014.

Quantitative Analysis of Litigation & Payout Risk, American Council of Life Insurers Annual Conference, Legal & Compliance Session, New Orleans, October 2013.

Recent Trends in Securities Class Action Filings and Settlements, Vincent C. Ross Institute of Accounting Research, New York University, New York, February 2011.

NERA Law and Economics Securities Litigation Seminar, Jackson Hole, WY, July 2010.

Genetic Programming Techniques Applied to Accounting Earnings, CEMAF/ISCTE 9th Anniversary Finance Meeting, Lisbon, Portugal, March 2004.

Search for a Structural Specification of the Earnings-Returns Relationship, 11th Symposium of the Society for Nonlinear Dynamics and Econometrics, Florence, Italy, March 2003.

**Appendix B**
**Materials Considered**

| No. | Item |
|:---:|:---:|
| **(1)** | **(2)** |

### Expert Reports & Declarations

| | |
|:---:|:---|
| 1. | Declaration of Steven P. Gaskin in Support of Class Certification, (*Rick Chen and Mindy Aiello*, *individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), April 17, 2025. |
| 2. | Declaration of Colin B. Weir, (*Rick Chen and Mindy Aiello*, *individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), April 17, 2025. |
| 3. | Plaintiff's Errata Re Exhibit B to Expert Opening Reports in Support of Class Certification, (*Rick Chen and Mindy Aiello, individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), May 30, 2025. |
| 4. | Expert Report of Sarah Butler, (*Rick Chen and Mindy Aiello, individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), June 20, 2025. |

### Legal Filings

| | |
|:---:|:---|
| 5. | Order Denying Request For Judicial Notice and Granting Motion to Dismiss, (*Rick Chen and Mindy Aiello, individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), December 4, 2024. |
| 6. | Third Amended Class Action Complaint, (*Rick Chen and Mindy Aiello, individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-04458-TLT), filed January 9, 2025. |
| 7. | Plaintiff's Notice of Motion and Motion for Class Certification, (*Rick Chen, individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), May 2, 2025. |
| 8. | Deposition of Steven P. Gaskin, (*Rick Chen and Mindy Aiello*, *individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), May 14, 2025. |
| 8a. | Gaskin Deposition Exhibits 5-7. |
| 9. | Deposition of Rick Chen, (*Rick Chen and Mindy Aiello*, *individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), May 15, 2025. |
| 10. | Deposition of Colin B. Weir, (*Rick Chen and Mindy Aiello*, *individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), June 9, 2025. |
| 11. | Plaintiff Rick Chen's Supplemental Responses to Defendant VeSync Corporation's Interrogatories, Set One (*Rick Chen, individually and on behalf of all others similarly situated v. VeSync Corporation*, U.S.D.C. Northern California District Court No. 3:23-cv-004458-TLT), April 4, 2025. |

### Academic Sources

| | |
|:---:|:---|
| 12. | Allenby, Greg M. et al., "Computing Damages in Product Mislabeling Cases: Plaintiffs' Mistaken Approach in *Briseno v. ConAgra*," *Products Safety & Liability Reporter*, 2017. |
| 13. | Allenby, Greg M. et al., "Economic Foundations of Conjoint Analysis," in *Handbooks of the Economics of Marketing*, Volume 1, edited by Jean-Pierre H. Dubé and Peter E. Rossi, eds, (Amsterdam, Netherlands: North-Holland, 2019), pp. 151-192. |
| 14. | Allenby, Greg M. et al., "Using Conjoint Analysis to Determine the Market Value of Product Features," Proceedings of the Sawtooth Software Conference (2013), pp. 341-355. |

**Appendix B**
**Materials Considered**

| No. | Item |
|-----|------|
| **(1)** | **(2)** |

**Academic Sources (cont.)**

| 15. | Allenby, Greg M. et al., "Valuation of Patented Product Features," *Journal of Law and Economics* , Vol. 57, No. 3, 2014, pp. 629-663. |
| 16. | Orme, Bryan K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research* , 4th Edition (Manhattan Beach, CA: Research Publishers LLC, 2020). |

**Webpages**

| 17. | "Q: Where are Levoit air purifiers made?" Amazon, August 4, 2020, accessed May 9, 2025, at https://www.amazon.com/ask/questions/Tx10NS0IN57T4ZA. |
| 18. | "Levoit Core® 300 Air Purifier," Levoit, accessed May 9, 2025, https://levoit.com/products/core300-air-purifier. |
| 19. | "Levoit Core® 300S Smart Air Purifier," Levoit, accessed May 9, 2025, https://levoit.com/products/core-300s-smart-air-purifier. |
| 20. | "Levoit Core® P350 Pet Care Air Purifier," Levoit, accessed May 9, 2025, https://levoit.com/products/core350-pet-care-air-purifier. |
| 21. | "QuietClean® Tower w/ Permanent Washable Filter – Medium Rooms, HFD120Q," Honeywell Pluggedin, accessed May 9, 2025, https://www.honeywellpluggedin.com/air_purifiers/honeywell-tower-air-purifier. |
| 22. | "Shop All," Molekule, accessed June 16, 2025, at https://molekule.com/collections/all. |
| 23. | "Typical Questions for Market Simulators," Sawtooth Software, accessed April 22, 2025, https://sawtoothsoftware.com/help/lighthouse-studio/manual/typical-questions-market-simulators.html. |
| 24. | "Understanding Willingness to Pay," Sawtooth Software, accessed June 12, 2025, https://sawtoothsoftware.com/help/lighthouse-studio/manual/understanding-willingness-to-pay.html. |
| 25. | "What is a HEPA Filter?" EPA, accessed May 9, 2025,  https://www.epa.gov/indoor-air-quality-iaq/what-hepa-filter. |
| 26. | O'Keefe, Eamon, "Statistical Significance," Federal Reserve Bank of Richmond, 2015, accessed June 16, 2025, at https://www.richmondfed.org/publications/research/econ_focus/2015/q1/jargon_alert. |
| 27. | Page, Paul, "Here's How Supply Chains Are Being Reshaped for a New Era of Global Trade," The Wall Street Journal, April 24, 2023, accessed May 9, 2025, at https://www.wsj.com/articles/supply-chains-have-changed-forever-819d9afd. |
| 28. | Terlep, Sharon and Annie Gasparro, "Why Are There Still Not Enough Paper Towels?" The Wall Street Journal, August 21, 2020, accessed May 9, 2025, at https://www.wsj.com/articles/why-arent-there-enough-paper-towels-11598020793. |

**Data**

| 29. | CHEN000013 |
| 30. | CHEN000014 |
| 31. | STAPLES000001 |
| 32. | STAPLES000002 |
| 31. | Vesync_Chen_00000191 |
| 32. | Vesync_Chen_00001652-688 |
| 33. | Vesync_Chen_00001691 (NPD Data) |
| 34. | Vesync_Chen_00001692 (Amazon Data) |
| 35. | Vesync_Chen_00001693 |
| 36. | Vesync_Chen_00001694 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of June, 2025, I electronically filed the foregoing with the Court using the CM/ECF system, and thereby delivered the foregoing by electronic means to all counsel of record.


*/s/ Adriane Peralta*
Adriane Peralta