**REDACTED**

1 Sarah Carlson (SBN 344266)
sarah.carlson@sidley.com
2 SIDLEY AUSTIN LLP
12230 El Camino Real Suite 300
3 San Diego, CA 92130
Telephone: (858) 398-0150
4 Facsimile: (858) 398-0450

5 Judith Shophet Sidkoff (SBN 267048)
judith.sidkoff@sidley.com
6 SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
7 Los Angeles, CA 90067
Telephone: (310) 595-9473
8 Facsimile: (310) 595-9501

9 Adriane Peralta (SBN 304357)
adriane.peralta@sidley.com
10 SIDLEY AUSTIN LLP
350 South Grand Avenue
11 Los Angeles, CA 90071
Telephone: (213) 896-6000
12 Facsimile: (213) 896-6600

13 *Attorneys for Defendant Vesync Corporation*

14 **UNITED STATES DISTRICT COURT**

15 **NORTHERN DISTRICT OF CALIFORNIA**

16 **SAN FRANCISCO DIVISION**

17 RICK CHEN, individually and on behalf of all
others similarly situated,

18                 Plaintiff,

19   vs.

20 VESYNC CORPORATION,

21                 Defendant.

22

Case No. 3:23-CV-04458-TLT

**DEFENDANT VESYNC CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Date:        September 16, 2025
Time:        2:00 p.m.
Courtroom:  9 – 19th Floor
Judge:      Hon. Trina L. Thompson

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 2

    A.    HEPA Designation and Testing .................................................... 3

    B.    Plaintiff's Purchasing Decisions and Use of the Products ........................... 3

    C.    Proposed Class Definitions and Claims .................................... 4

    D.    Plaintiff's Proffered Experts ...................................................... 4

LEGAL STANDARD ............................................................................................... 5

ARGUMENT ............................................................................................................ 6

I.    DIFFERENCES IN STATE LAW DEFEAT THE MULTI-STATE PUTATIVE CLASS ..... 6

    A.    Step 1: Material Differences Exist Between State Laws ........................... 7

    B.    Step 2: Each Jurisdiction Has an Interest in Applying Its Laws ............... 8

    C.    Step 3: Foreign Jurisdictions Have a Prevailing Interest ........................... 8

II.    LACK OF CLASS-WIDE PROOF SINKS THE CALIFORNIA PUTATIVE CLASS .......... 9

    A.    The California Claims All Require Class-Wide Materiality and/or Reliance ............. 9

        1.    There Is No Common Understanding of HEPA Among Consumers ............ 10

        2.    The HEPA Claim Was Not Material to the Majority of Consumers ............. 12

        3.    Plaintiff Offers No Evidence of the Materiality of the HEPA Claim ............. 13

        4.    Plaintiff Cannot Presume that Consumers Relied on the HEPA Claim .......... 14

    B.    Plaintiff's Unjust Enrichment Claim Fails ........................................ 15

III.    CLASS-WIDE DAMAGES ARE NOT CAPABLE OF MEASUREMENT ........................ 15

    A.    Plaintiff's Conjoint Survey Does Not Match Plaintiff's Liability Theory ............... 15

    B.    Plaintiff Has Failed to Demonstrate that a Price Premium Exists ........................ 16

    C.    Plaintiff's Price Premium Methodology Requires a Series of Individual Analyses ... 17

    D.    Replacement Filters Must Be Excluded From the Putative Classes ...................... 18

    E.    The Proposed Classes Necessarily Include Uninjured Members ..................... 18

i

1.     Individualized Testing Is Required to Determine HEPA Compliance ..........19

2.     How the Products Were Used Affects Individual Performance ..................20

IV.    PLAINTIFF CANNOT SATISFY ALL OF THE REQUIREMENTS OF

RULE 23(a)................................................................................................................21

A.    Plaintiff's Claims Are Atypical and Subject to Unique Defenses ...........................21

1.     HEPA Was Not a Significant Purchase Driver For Most Consumers ..........22

2.     Plaintiff Relied on a New York Times Article in Making His Purchases .....22

3.     Plaintiff Still Uses the Product Today, Demonstrating Satisfaction.............23

B.    Plaintiff Is Not an Adequate Class Representative ...................................................23

C.    Plaintiff Fails to Establish that Uniform Evidence Exists for Commonality............24

D.    Putative Class Members Are Subject to Varying Arbitration Agreements ...............25

CONCLUSION .............................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*,
  2017 WL 2559615 (C.D. Cal. June 7, 2017) ....................................................11, 13

*Algarin v. Maybelline, LLC*,
  300 F.R.D. 445 (S.D. Cal. 2014) ....................................................................11, 16

*Amavizca v. Nutra Mfg., LLC*,
  2021 WL 682113 (C.D. Cal. Jan. 27, 2021) ..............................................................9

*Astiana v. Ben & Jerry's Homemade, Inc.*,
  2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ................................................................16

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013) ..............................................................................9

*Banh v. Am. Honda Motor Co., Inc.*,
  2020 WL 4390371 (C.D. Cal. July 20, 2020) ...........................................................7

*Bargetto v. Walgreens Co.*,
  2024 WL 3493260 (N.D. Cal. June 14, 2024) .........................................................15

*BK Trucking Co. v. Paccar, Inc.*,
  2016 WL 3566723 (D.N.J. June 30, 2016) ................................................................8

*Bodner v. Oreck Direct, LLC*,
  2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) .........................................................24

*Brickman v. Fitbit, Inc.*,
  2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) .........................................................10

*Buttonwood Tree Value Partners, LP v. Sweeney*,
  2013 WL 12125980 (C.D. Cal. Sept. 12, 2013) ......................................................22

*Cancino v. Motor Corp., U.S.A.*,
  2010 WL 2607251 (S.D. Ohio June 24, 2010) ..........................................................8

*Cholakyan v. Mercedes-Benz USA LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) ............................................................................21

*Chow v. Neutrogena Corp.*,
  2013 WL 5629777 (C.D. Cal. Jan. 22, 2013) .........................................................19

*Coleman v. Bos. Sci. Corp.*,
  2011 WL 3813173 (E.D. Cal. Aug. 29, 2011) ...........................................................7

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................................................6

*In re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014) ........................................................15

*Conde v. Sensa*,
   2018 WL 4297056 (S.D. Cal. Sept. 10, 2018) ....................................25

*Darisse v. Nest Labs*, *Inc.*,
   2016 WL 4385849 (N.D. Cal. Aug. 15, 2016) ......................................7

*Dyson, Inc. v. Bissell Homecare, Inc.*,
   951 F. Supp. 2d 1009 (N.D. Ill. 2013) ................................................13

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
   326 F.R.D. 592 (N.D. Cal. 2018) ..................................................10, 17

*Flodin v. Cent. Garden & Pet Co.*,
   2024 WL 4565340 (N.D. Cal. Oct. 23, 2024) ....................................15

*Fugal v. Wright Med. Grp., Inc.*,
   2019 WL 1406613 (D. Utah Mar. 28, 2019) ........................................7

*Hall v. Marriott Int'l, Inc.*,
   344 F.R.D. 247 (S.D. Cal. 2023) ........................................................19

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ..............................................................22

*Indep. Living Res. Ctr. S.F. v. Lyft, Inc.*,
   2020 WL 6802410 (N.D. Cal. Nov. 19, 2020) ....................................25

*Jones v. ConAgra Foods, Inc.*,
   2014 WL 2702726 (N.D. Cal. June 13, 2014) ..............................10, 11

*Kerr v. Hunter Div.*,
   1981 WL 394232 (Va. Cir. Ct. 1981) ..................................................8

*In re Lidoderm Antitrust Litig.*,
   2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ......................................19

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ..............................................................25

*Martin v. Am. Med. Sys., Inc.*,
   116 F.3d 102 (4th Cir. 1997) ................................................................7

*Martinelli v. Johnson & Johnson*,
   2019 WL 1429653 (E.D. Cal. Mar. 29, 2019) ....................................9

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) .................................................................. *passim*

*Melgar v. Zicam*,
  2016 WL 1267870 (E.D. Cal. March 31, 2016) .................................................9

*Moheb v. Nutramax Labs., Inc.*,
  2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ...................................................21

*Moore v. Apple Inc.*,
  309 F.R.D. 532 (N.D. Cal. 2015) .........................................................20, 21

*In re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) .......................................................12

*Noll v. eBay*,
  2013 WL 2384250 (N.D. Cal. May 30, 2013) ...................................................23

*Norcold, Inc. v. Gateway Supply Co.*,
  154 Ohio App. 3d 594 (2003) ...................................................................7

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ...................................................................5

*Pablo v. ServiceMaster Glob. Holdings Inc.*,
  2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ...................................................25

*Park-Kim v. Daikin Indus., Ltd*,
  2016 WL 5958251 (C.D. Cal. Aug. 3, 2016) ....................................................8

*Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*,
  2016 WL 5920345 (C.D. Cal. June 23, 2016) .........................................9, 14, 23

*Quezada v. Loan Ctr. of Cal, Inc.*,
  2009 WL 5113506 (E.D. Cal. Dec. 18, 2009) ..................................................22

*Red v. Kraft Foods, Inc.*,
  2012 WL 8019257 (C.D. Cal. Apr. 12, 2012) ..................................................17

*Schuman v. Microchip Tech. Inc.*,
  2020 WL 887944 (N.D. Cal. Feb. 24, 2020) ...................................................15

*Shanks v. Jarrow Formulas, Inc.*,
  2019 WL 4398506 (C.D. Cal. Aug. 27, 2019) ..................................................14

*Smith v. Stewart*,
  233 Kan. 904 (1983) ............................................................................8

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) .......................................................9, 10, 14

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
  308 F.R.D. 630 (N.D. Cal. 2015) .................................................................7

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ................................................................18

*Townsend v. Monster Beverage Corp.*,
  303 F. Supp. 3d 1010 (C.D. Cal. 2018) ..............................10, 13, 14

*In re Trader Joe's Tuna Litig.*,
  289 F. Supp. 3d 1074 (C.D. Cal. 2017) ..................................................8

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ..................................................................................19

*Turcios v. Carma Labs., Inc.*,
  296 F.R.D. 638 (C.D. Cal. 2014) ...........................................................23

*Unified Sch. Dist. No. 500 v. U.S. Gypsum Co.*,
  788 F. Supp. 1173 (D. Kan. 1992) ............................................................7

*Valentine v. Crocs, Inc.*,
  2024 WL 5339457 (N.D. Cal. Oct. 16, 2024) ...................5, 8, 21, 24

*Vrugtman v. Its Just Lunch Int'l LLC*,
  2023 WL 6369765 (C.D. Cal. Aug. 25, 2023) ...................................19

*Watkins v. MGA Ent., Inc.*,
  574 F. Supp. 3d 747 (N.D. Cal. 2021) .....................................................7

*Webb v. Carter's Inc.*,
  272 F.R.D. 489 (C.D. Cal. 2011) ............................................................14

*Weiner v. Snapple Beverage Corp.*,
  2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ......................................17

*Weinstat v. Dentsply Int'l, Inc.*,
  180 Cal. App. 4th 1213 (2010) ...................................................................7

*Zinser v. Accufix Rsch. Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) ..................................................................6

**Statutes and Rules**

California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*.............................4, 9

California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*. ....................4, 9, 10

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ..................4, 9, 10

vi

Fed. R. Civ. P. 23 ...................................................................................................... *passim*

Fed. R. Evid. 702 ...............................................................................................................4

# **INTRODUCTION**

This case is an opportunistic shakedown by Plaintiff's attorneys resulting from their trolling of National Advertising Division ("NAD") press releases. The claims—challenging Levoit-branded air purifiers marketed as containing HEPA filters capable of capturing "at least 99.97% of 0.3-micron airborne particles"—are appropriated without basis from a competitor and disconnected from the actual experience of Defendant Vesync Corporation's ("Levoit's") customers who were never harmed.

To bring this lawsuit, Plaintiff's attorneys found a professional storyteller. Rick Chen's ("Plaintiff's") LinkedIn profile proudly declares: "I've made storytelling my living." That is apparent upon review of his testimony. According to Plaintiff, his decision to purchase a Levoit air purifier was influenced by a New York Times article that was not published until *after* he bought his first unit. And despite his feigned disappointment, not only does Plaintiff continue to use his air purifier to date, the device was so nice, he purchased it twice. Plaintiff, a purported clean air enthusiast, admits that he has never once replaced the filter in five years—a glaring contradiction highlighting his fiction. And, he has no idea where the purifier he gifted his mother is located *in his own home*. Plaintiff's own actions—and inactions—paint more of a picture of an opportunistic pawn than air filtration crusader.

Yet, Rule 23 demands more than a compelling narrative—it requires common evidence, real harm, and legal substance. Plaintiff's Motion for Class Certification collapses under the weight of the individualized inquiries that permeate his claims, destroying any semblance of predominance. Aware that a nationwide class is a nonstarter, Plaintiff resorts to cobbling together a patchwork, multi-state class to try to sidestep Rule 23. But, Plaintiff's cherry-picked express warranty laws are inconsistent, and his motion ignores long-settled authority requiring governance by each consumer's home state.

Plaintiff cannot show that putative class members share a common understanding of what HEPA means—let alone that they uniformly prioritized or relied upon it when making a purchase. The story unwinds when confronted with actual consumer data; surveys conducted by Levoit's independent third-party expert, Sarah Butler, and even Plaintiff's own testimony, confirm that consumers interpret and value HEPA in widely varied ways. Some consumers, such as Plaintiff, do not know what HEPA means. Others do not care about HEPA at all. Levoit's survey shows a twist not even artful storytelling could predict: More consumers expressed interest in purchasing a Levoit air

purifier when it was *not* advertised as HEPA. In sum, the representation upon which Plaintiff fixates has no meaningful impact.

That Plaintiff speaks in sweeping generalities about what his experts' survey will hypothetically show, rather than proffer anything of substance, is no surprise. After all, this lawsuit exploited a competitor's marketing dispute before Plaintiff's counsel knew what the underlying testing showed. The plot thickens with the "non-passing" tests commissioned by Plaintiff's counsel—conducted in blatant disregard for even the most basic lab standards. In a plotline worthy of science fiction, these tests bear the name of a test supervisor who died *before* the tests were supposedly run. But as merits briefing will demonstrate, Levoit has a robust set of passing test results—real data, grounded in sound science, that must be considered by this Court.

Meanwhile, Plaintiff's narrative collapses under its own contradictions. By insisting on a rigid, 100% testing requirement for every HEPA filter, Plaintiff demands that each individual class member's unit be tested to determine compliance—thereby injecting individualized inquiries that make class certification untenable (and impractical). Plaintiff also ignores the need to assess whether the alleged HEPA representations were even material to each consumer, or whether certain class members are bound to arbitrate their claims. Plaintiff's sweeping class-wide tale quickly becomes a series of individualized questions no single narrative can resolve. Each consumer must choose their own adventure—foreclosing class certification.

Finally, Plaintiff's damages model is fatally flawed—it compares a "True HEPA" product to one with no filtration claim, ignoring the actual minuscule performance gap and grossly inflating damages. In reality, the Levoit-branded air purifiers undercut nearly all competing air purifiers on price whether labeled HEPA or not, leaving no evidence of any price premium. Plaintiff's experts also do not plan to calculate a price premium for the replacement filters; thus, the replacement filters must be excluded from the class. And, because the methodology does not account for purchase variations and includes uninjured class members, certification should be denied.

## FACTUAL BACKGROUND

Levoit manufactures and sells air purifiers and air filters intended for residential use, including the Core 300, Core 300-RAC, Core P350, and Core 300S air purifiers and their

2

replacement filters ("Products"). Third Amended Complaint ("TAC"), ECF 100, ¶ 1. The Products were sold to consumers directly via Levoit's website and through third-party retailers (such as Amazon and Target), both online and in stores. For a period of time, the Products were labeled as HEPA filters that "filter at least 99.97% of 0.3-micron airborne particles." *Id*. ¶ 38. Levoit and/or third-party retailers communicated this information to consumers in different ways, including through online product descriptions, advertisements, packaging, and labeling. *See id.* ¶ 39.

### A.     HEPA Designation and Testing

While Plaintiff suggests there is no uniform standard for a HEPA air filter, *see id.* ¶¶ 25, 56-57, he "initially define[d] a HEPA filter as a filter that captures 99.97% of particles at a size of 0.3 microns." Order Granting Mot. to Dismiss, ECF 95, at 6 (citing Second Amended Complaint, ¶ 25). Consistent with this standard, Levoit "only represented that its filters captured 99.97% of 0.3 microns." *Id.* Plaintiff claims to have commissioned uncertified tests of the Products' filters, which show that Levoit's "advertised efficiency claim of 99.97% at 0.3 microns is false." TAC ¶ 59. These tests show allegedly varying results, including: (1) "at the most penetrating particle size (0.0340 microns) was 98.701%"; (2) "at 0.2-0.3 microns the Products' filters had an efficiencies of 99.699% and 98.229%"; and (3) "at 0.3-0.5 microns the Products' filters had an efficiencies of 99.866% and 98.652%." *Id.* ¶¶ 58-59. In contrast, Levoit has produced multiple test results showing that its Products meet the 99.97% of 0.3 microns standard. *See* Declaration of Sarah Carlson ("S.C. Decl."), ¶ 9, Exs. H-J (Levoit Tests).

### B.     Plaintiff's Purchasing Decisions and Use of the Products

Plaintiff, a California resident, alleges he purchased a Levoit Core 300 for $99.99 from Amazon on September 27, 2020, using a gift card. *See* S.C. Decl., Ex. C (Chen. Dep.) at 89:15-18. According to Plaintiff, he read about and relied on a New York Times article to learn about the Product's features. *See id.* at 72:6-9.[1] On December 31, 2020, Plaintiff purchased, for his mother, a second Core 300 for $99.99 and a replacement filter for $23.99. *See id.* 98:7-13. Despite living with his mother, Plaintiff knows nothing about how her Product is used. *See id.* at 112:8-113:11.

---

[1] The New York Times article that Plaintiff referenced, produced, and verified has a publication date *after* the date of his first purchase. *See* S.C. Decl., Exs. O (NYT Article), P (Interrogatory).

Plaintiff alleges he "reviewed and relied on Defendant's warranties and representations about the Product's HEPA filter and filtration capabilities prior to purchasing the Product," including the specific representation that the filters "capture 99.97% of airborne particles 0.3 microns in size," and would not have purchased these Products or paid as much had he not believed they had HEPA filters. TAC ¶¶ 11-12. Plaintiff, however, also testified he had been satisfied with the Product's performance until he "learned" the Product was allegedly not HEPA from an advertisement placed by his now-counsel in this matter. S.C. Decl., Ex. C (Chen Dep.) at 49:12-16, 99:15-16, 161:3-9. Nevertheless, Plaintiff never returned his Products to Levoit or Amazon, never wrote a customer review complaining about his Products, and continues to use his Core 300 to this day, though he has never replaced the filter (in contravention to the user manual and hardly the conduct of someone actually concerned with filtration standards). *See id.* at 96:10-12, 17-19.

## C. Proposed Class Definitions and Claims

Plaintiff alleges: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (ii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (iii) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (iv) fraud; (v) unjust enrichment; and (vi) breach of express warranty. *See* TAC ¶ 10. He seeks to certify two putative classes: (1) a California Class; and (2) a Multi-State Express Warranty Class (including California, Delaware, D.C., Kansas, Missouri, New Jersey, Ohio, Utah, Virginia, and West Virginia). *See* ECF 116 ("Mot.") at 2-3.

## D. Plaintiff's Proffered Experts

To support his Motion for Class Certification, Plaintiff submitted three expert declarations from: (1) Steven Gaskin (consumer survey); (2) Colin Weir (damages); and (3) R. Vijayakumar (technical).[2] *See* ECF 110. Importantly, Gaskin has not designed or run any consumer survey in this case. *See* S.C. Decl., Ex. B (Gaskin Dep.) at 100:2-4. Indeed, he spent only 2.75 hours writing his

---

[2] Each of these experts will be subject to Levoit's forthcoming Rule 702 Motions to Exclude. In addition to their flawed methodologies, these experts are also biased significantly: Weir has worked as an expert for Plaintiff's counsel at least 40 times, *see* S.C. Decl., Ex. E (Weir Dep.) at 60:15-21; Gaskin and Weir have worked together on no fewer than 40-50 cases, *see id.*, Ex. B (Gaskin Dep.) at 39:15-22; and Vijayakumar has an ownership stake in the same lab that ran Plaintiff's HEPA tests, *see id.*, Ex. D (Vatine Dep.) at 24:6-25:8.

declaration, *see id.* at 132:3-8; that aligns with the fact that his declaration is nothing more than a placeholder report discussing generally the merits of conjoint analyses. Gaskin's declaration lacks any specifics related to his plans to run a price premium survey or conjoint analysis. Despite providing no details regarding his proposed survey, Plaintiff asserts that Gaskin's proposed study will show "whether the [True HEPA] Claim is economically material to a reasonable person." Mot. at 10. Meanwhile, Plaintiff's damages expert, Weir, posits a "damages calculation" that is nothing more than simple multiplication: "Total Sales of the Products x Price Premium % = Price Premium Damages." ECF 110, Ex. B (Weir Decl.), ¶¶ 71-72. Without the benefit of a single survey, he concludes that consumers are willing to pay a price premium for a HEPA filter. *See id.* ¶ 15. In addition, Plaintiff's technical expert, Vijayakumar, maintains that 100% of HEPA filters—4 million by Plaintiff's count—must be individually tested to determine whether they meet the efficiency required for HEPA classification. *See* ECF 110, Ex. A (Vijayakumar Decl.) ¶¶ 15, 19. Each of these experts did the bare minimum in this case, and none of them advances class certification.

## LEGAL STANDARD

To certify a class, a court must be "satisfied, after a rigorous analysis" that a plaintiff has met the requirements of Rule 23 by a preponderance of the evidence. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65 (9th Cir. 2022). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Valentine v. Crocs, Inc.*, 2024 WL 5339457, at *3 (N.D. Cal. Oct. 16, 2024) (Thompson, J.) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

Rule 23 consists of two parts. First, Plaintiff must satisfy all four requirements of Rule 23(a): "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable;[3] (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

---

[3] Levoit does not dispute the numerosity element.

Second, Plaintiff must demonstrate through *evidentiary proof* that the class satisfies at least one of the three subsections under Rule 23(b). *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Here, Plaintiff seeks certification under Rule 23(b)(3). *See* Mot. at 16-25. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). When "the main issues in a case require the separate adjudication of each class member's individual claim or defense," common questions do not predominate and a class may not be certified. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). Plaintiff must also demonstrate that monetary damages "are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34–35.

<u>**ARGUMENT**</u>

I.  <u>**DIFFERENCES IN STATE LAW DEFEAT THE MULTI-STATE PUTATIVE CLASS**</u>

Plaintiff's putative multi-state breach of express warranty class cannot meet the predominance requirement as it is thwarted by material distinctions between California law and the laws of the nine other proposed jurisdictions. The Ninth Circuit has held improper the certification of "a class under California law that contain[s] class members who purchased [products] in different jurisdictions with materially different consumer protection laws," reasoning that "variances in state law overwhelm common issues and preclude predominance for a single . . . class." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012).[4]

Under California's choice of law rules, even if California has significant contacts to each class member's claims, "California law may only be used on a classwide basis 'if the interests of other states are not found to outweigh California's interest in having its law applied.'" *Id*. at 590. To make this determination, courts apply a three-step governmental interest test analyzing: (1) whether the relevant law of each jurisdiction is different; (2) if there is a difference, whether a true conflict exists based on each jurisdiction's interest in the application of its own law; and (3) if there

---

[4] This was true even though defendant's "corporate headquarters, the advertising agency that produced the allegedly fraudulent misrepresentations, and one fifth of the proposed class members [we]re located in California." *Mazza*, 666 F.3d at 590.

is a true conflict, which jurisdiction's interest would be more impaired if its policy were subordinated to the policy of another jurisdiction. *See id.* Application of the governmental interest test confirms that California law cannot be applied across the putative multi-state class.

## A. Step 1: Material Differences Exist Between State Laws

Plaintiff contends that the breach of warranty laws in California and the nine other jurisdictions he seeks to certify are "identical." Mot. at 19. He is wrong. *Banh v. Am. Honda Motor Co., Inc.*, is particularly instructive in highlighting why. 2020 WL 4390371, at *28 (C.D. Cal. July 20, 2020). There, plaintiffs from twenty states (including California) sought to represent a nationwide class bringing claims under California law. The court declined to certify the class because there were material differences in the express breach of warranty laws, including between California, Ohio, and Virginia (states also at issue here). *See id.* "Faced with so much variation in state law," the court feared it would "face an impossible task of instructing a jury on the relevant law." *Id.* This district is in accord. *See, e.g.*, *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 638 (N.D. Cal. 2015) (finding "material differences amongst the jurisdictions with respect to a claim for breach of express warranty"); *Darisse v. Nest Labs, Inc.*, 2016 WL 4385849, at *12 (N.D. Cal. Aug. 15, 2016) (comparing, for example, California's reliance requirement with that of Virginia and concluding that "the differences in the states' express warranty law is material").

California's breach of warranty law materially differs from the laws of the nine other jurisdictions, including with respect to reliance, notice, and privity.[5] *See* S.C. Decl., Ex. Q (Multi-State Law Chart). For example, Utah requires reliance, *see Fugal v. Wright Med. Grp., Inc.*, 2019 WL 1406613, at *8 (D. Utah Mar. 28, 2019), while Virginia, Kansas, and Ohio do not, *see Martin v. Am. Med. Sys., Inc.*, 116 F.3d 102, 105 (4th Cir. 1997) (Virginia law); *Unified Sch. Dist. No. 500 v. U.S. Gypsum Co.*, 788 F. Supp. 1173, 1177 (D. Kan. 1992); *Norcold, Inc. v. Gateway Supply Co.*, 154 Ohio App. 3d 594, 601 (2003). Meanwhile, California requires reliance if there is no contractual privity. *See Coleman v. Bos. Sci. Corp.*, 2011 WL 3813173, at *5 (E.D. Cal. Aug. 29, 2011).

---

[5] Plaintiff misreads *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213 (2010), to wave off the reliance requirement. Courts have since reiterated that *Weinstat* is limited to instances where parties are in privity. *See, e.g.*, *Watkins v. MGA Ent., Inc.*, 574 F. Supp. 3d 747 (N.D. Cal. 2021).

Kansas and Virginia require pre-litigation notice, *Smith v. Stewart*, 233 Kan. 904, 914 (1983); *Kerr v. Hunter Div.*, 1981 WL 394232, at *8 (Va. Cir. Ct. 1981), while California requires it for direct purchasers, *In re Trader Joe's Tuna Litig.*, 289 F. Supp. 3d 1074, 1092 (C.D. Cal. 2017); in multiple states, sufficiency of notice is an individual fact inquiry. *E.g., BK Trucking Co. v. Paccar, Inc.*, 2016 WL 3566723, at *7 (D.N.J. June 30, 2016). Additionally, privity of contract is generally required under California law.[6] *Park-Kim v. Daikin Indus., Ltd*, 2016 WL 5958251, at *14 (C.D. Cal. Aug. 3, 2016). Meanwhile, privity is not required in Ohio. *Cancino v. Motor Corp.*, *U.S.A.*, 2010 WL 2607251, at *12 (S.D. Ohio June 24, 2010). Given these material differences, the next steps of the governmental interest test must be addressed.

**B.     Step 2: Each Jurisdiction Has an Interest in Applying Its Laws**

In *Mazza,* the Ninth Circuit recognized that a jurisdiction has an interest in: (1) having its own law apply to its residents; and (2) regulating conduct that takes place within its own borders. 666 F.3d at 590. These considerations apply equally here; each proposed state has an interest in applying its own law to its residents' purchases, including the formation of any contacts when making such purchases. Each state also has an interest in regulating the advertising conduct that occurred within its borders. As such, the second step of the governmental interest test is easily met.

**C.     Step 3: Foreign Jurisdictions Have a Prevailing Interest**

Also, the alleged exposure and reliance on HEPA claims took place in the various foreign states of each class member's residence, not only in California. These foreign states have a more compelling interest in the application of their laws to transactions between their citizens and corporations doing business within their state, including to vindicate their citizens' rights. *See Mazza*, 666 F.3d at 594 (California had a limited interest "in applying its law to residents of foreign states"). In breach of warranty cases, the place of the alleged misconduct is where the misrepresentation was received by the purchaser—in other words, the consumer's home state. *See*

---

[6] Typicality is also defeated because certain defenses that apply to Plaintiff's breach of warranty claim under California law (including defenses related to privity) will not be appliable to all putative class members under the laws of their jurisdictions. *See Valentine*, 2024 WL 5339457, at *13 (Thompson, J.) (finding no typicality because the litigation focus was likely to be whether implied warranty claim was barred by vertical privity requirement).

*id.*; *Amavizca v. Nutra Mfg., LLC*, 2021 WL 682113, at * 11 (C.D. Cal. Jan. 27, 2021). Plaintiff's theory is that each putative class member was injured when he purchased the Products in reliance on a HEPA label claim. The "place of the wrong" then, is in each state where the transaction occurred. *Mazza*, 666 F.3d at 593. As such, each class member's breach of warranty claim should be governed by the laws of the state where the transaction took place. Given that many of these transactions took place outside of California, they are more appropriately governed by non-California law. Since the third step of the governmental interest test is also easily met, the Court cannot apply California law across the multi-state putative class. Because common legal issues do not predominate, the Court must deny certification of the multi-state putative class.[7]

## II. LACK OF CLASS-WIDE PROOF SINKS THE CALIFORNIA PUTATIVE CLASS

### A. The California Claims All Require Class-Wide Materiality and/or Reliance

California's consumer protection statutes are governed by the "reasonable consumer" test. *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, 2016 WL 5920345, at *6 (C.D. Cal. June 23, 2016). Under the UCL and FAL, a plaintiff must show that members of the public are likely to be deceived by the contested label claim. *See id*. To bring a CLRA claim, a plaintiff must "show not only that a defendant's conduct was deceptive but that the deception caused [him] harm." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011), *abrogated in part on other grounds by Comcast*, 569 U.S. 27. "'[C]ausation, on a classwide basis, may be established by materiality. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.'" *Id*.

Plaintiff incorrectly assumes that the Court may infer materiality and reliance based on purportedly uniform representations made to class members. *See* Mot. at 20-21. But, Plaintiff must do much more to certify a class. A claim is material only "if a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in

---

[7] Plaintiff's cases are inapposite. In *Astiana v. Kashi Co*., the court refused to certify a nationwide class because, applying *Mazza*, it identified the same material differences in laws that exist here. 291 F.R.D. 493, 510 (S.D. Cal. 2013). Unlike here, defendant in *Martinelli v. Johnson & Johnson* did not bother to contest whether the express warranty laws of various jurisdictions at issue were identical. 2019 WL 1429653, at *7-8 (E.D. Cal. Mar. 29, 2019). And, *Melgar v. Zicam*, did not even address the issue of conflicting laws. 2016 WL 1267870, at *6 (E.D. Cal. March 31, 2016).

question." *Stearns*, 655 F.3d at 1022. Although materiality is an objective standard, Plaintiff still "need[s] to point to some type of common proof," *Jones v. ConAgra Foods, Inc*., 2014 WL 2702726, at *16 (N.D. Cal. June 13, 2014), to "demonstrate that the [challenged] statements were a factor in consumers' purchasing decision[s]," *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1045 (C.D. Cal. 2018).[8]

Beyond admitting that he does not know what HEPA means, Plaintiff cannot demonstrate a uniform understanding among consumers as to HEPA's meaning (and has no intention to do so). Likewise, Plaintiff puts forth no common evidence to show the HEPA claim was material or that putative class members relied on the HEPA claim when making their purchase (and, again, has no intention to do so).[9] The only evidence in the record shows that no common understanding of HEPA exists among consumers and most consumers did not find the HEPA claim to be material. *See* ECF 129 (Butler Rep.), ¶ 10 ("The results of my surveys demonstrate that consumers who have purchased accused models of Levoit brand air purifiers and air filters purchased these products for reasons other than a HEPA claim. Even for those who indicated HEPA mattered, purchasers did not have a common understanding of the claim.").

### 1. There Is No Common Understanding of HEPA Among Consumers

Plaintiff has not shown a likeliness to be deceived under the UCL and FAL because, as the consumer survey shows, there is no common understanding as to the meaning of HEPA among consumers.[10] *See id.*, ¶¶ 84, 91. Individual issues predominate and certification must be denied

---

[8] The materiality and reliance standards apply equally to common law fraud. *See Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc*., 326 F.R.D. 592, 613 (N.D. Cal. 2018); *Brickman v. Fitbit, Inc*., 2017 WL 5569827, at *6-7 (N.D. Cal. Nov. 20, 2017).

[9] Rather than conduct a consumer survey specifically designed to test materiality, Plaintiff's survey expert will assume improperly that the HEPA claim is material if a price premium exists. *See* S.C. Decl., Ex. B (Gaskin Dep.) at 197:16-24 ("If there's a price premium that's statistically significant and greater than zero, then I can say that the HEPA -- true HEPA claim was material to consumers because it affected the -- their purchase decisions."). Moreover, Plaintiff's survey expert has no intention to test reliance. *See id*. at 113:19-114:1 ("Q. Your proposed model does not enable you to determine whether a consumer was exposed to a true HEPA claim prior to purchase; is that correct? A. It doesn't measure exactly what they looked at or something like that. The -- whether the claim -- claim the true HEPA claim can be relied upon I think is more of a legal question.").

[10] Plaintiff offered no evidence of what consumers understand HEPA to mean, and does not intend

when, "even if the challenged statements were *facially* uniform, consumers' *understanding* of those representations would not be." *Jones*, 2014 WL 2702726, at *17; *see also In re 5-Hour Energy Mktg. & Sales Pracs. Litig. ("5-Hour Energy")*, 2017 WL 2559615, at *8 (C.D. Cal. June 7, 2017) ("Predominance . . . fails for lack of a common definition for the term 'energy.'"); *Algarin v. Maybelline, LLC*, 300 F.R.D. 445, 457-59 (S.D. Cal. 2014) (rejecting certification where evidence showed some consumers did not interpret "24 hour" to mean cosmetics would last for 24 hours).

While there might be a scientific consensus about the term, the record evidence establishes that consumers lack a uniform understanding of HEPA.[11] Butler's Past Purchaser Study consisted of 298 respondents and was designed to determine what Product features or characteristics caused consumers to purchase a Levoit-brand air purifier and the extent to which, if at all, HEPA claims affected those purchasing decisions. *See* ECF 129 (Butler Rep.), ¶ 9. Respondents who indicated that HEPA was a reason for purchasing a Levoit-brand air purifier were asked to explain what HEPA means in their own words. *See id*. ¶ 84. They offered a range of descriptions, with many providing answers about general quality, or the ability to trap dust, pollen, allergens or environmental pollution. *See id*. Only ten respondents, or 9.6% of those asked, indicated HEPA meant some specific standard or filtration percentage was met. *See id*. In other words, 90.4% of respondents did not offer a definition related to either standards or filtration percentages at all. *See id*.

Even when respondents who indicated that HEPA was a reason for purchase were given a list options for what HEPA means, they still were inconsistent in their responses. *See id*. at ¶¶ 85-86. The list of response options included two statements related to Plaintiff's claims: One that HEPA means a specific filtration standard is met and another, that the filter is tested with a specific standard or protocol. *See id*. More than one quarter (27.9%) of these respondents did not indicate (even as one non-exclusive option) that HEPA meant either of these things (*i.e.*, did not have the same

---

to run such a survey. *See* S.C. Decl., Ex. B (Gaskin Dep.) at 181:3-6 ("Q. Will your pretest ask respondents what true HEPA means? A. I would say probably not because that's not something I'm trying to measure in my survey.").

[11] This lack of uniformity is unsurprising given that HEPA originated from military and nuclear applications, and HEPA standards do not extend to commercial or residential use. *See* ECF 134 (Siegel Rep.), ¶ 17.

understanding of HEPA as Plaintiff alleges). *See id.* Meanwhile, unlike Plaintiff, 28.5% thought HEPA meant the filter traps dust, pollen, mold, and bacteria. *See id.*

Tellingly, Plaintiff's own understanding of HEPA does not match the attorney-authored definition in the TAC. At the time of purchase, Plaintiff thought HEPA meant that "it is the most effective in purifying or cleaning air." S.C. Decl., Ex. C (Chen Dep.) at 68:23-69:3. He did not think HEPA referred to a specific filtration standard being met, and was not aware of what standard must be met to be considered HEPA. *See id.* at 69:18-20 ("Q. Are you aware of what standard an air filter must meet to be considered HEPA? A. No. I am not a scientist."). Because there is no common understanding of HEPA among consumers, the putative classes cannot be certified.

### 2.    The HEPA Claim Was Not Material to the Majority of Consumers

Class certification also must be denied because the only record evidence shows that the majority of putative class members did not or do not find a HEPA claim to be material, or as important as other unrelated Product features when making purchasing decisions.[12] *See In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1109 (C.D. Cal. 2015) (denying certification where consumers "could easily have decided to purchase [the product] for reasons other than having seen or heard an advertisement with the implied safety message"). Butler's Past Purchaser Study revealed that a total of only eleven respondents, or 3.7%, stated that HEPA (or a specific filtration percentage) was a reason for their purchase. *See* ECF 129 (Butler Rep.), ¶ 11. In other words, a near unanimous 96.3% of respondents who purchased a Levoit-brand air purifier did not even mention HEPA when asked about their purchase. *See id.* Rather, they prioritized other features such as price, product reviews, size, and design. *See id.*

Butler's second study, a Prospective Purchaser Study, consisting of 795 respondents, tested whether consumers would be less, more, or equally likely to purchase a Levoit air purifier if references to HEPA and/or 99.97% filtration at 0.3 microns were removed from the Product packaging and online Product description. *See id.* ¶ 12. The study similarly demonstrated that HEPA

---

[12] Similarly, Levoit's internal studies demonstrate that consumers consider a wide range of features—entirely unrelated to HEPA—when deciding which air purifier to purchase. *See* S.C. Decl., Exs. F-G (Levoit Consumer Surveys).

has no material impact on consumers' purchasing decisions. Only 58.1% of respondents shown the Product packaging and description that included the HEPA and 99.97% filtration at 0.3 microns claims indicated they would be very likely to purchase the Product; this compares to 53.8% for the "No HEPA" group (Control 1), 56.8% for the "No Filtration" group (Control 2), *and 59.3%* for the "No HEPA and No Filtration" group (Control 3). *See id.* ¶ 13. These findings show that HEPA is not material to consumers, as potential purchasers of air purifiers were even more likely to purchase the Product when there was no reference to HEPA or 99.97% filtration at 0.3 microns.

### 3. Plaintiff Offers No Evidence of the Materiality of the HEPA Claim

In contrast, Plaintiff has not shown that the HEPA label "factored into consumers' purchasing decision on a classwide basis." *Townsend*, 303 F. Supp. 3d at 1047. Plaintiff did not (nor does he plan to) conduct a materiality survey or provide any other reliable common evidence to support his conclusory assertion that consumers found the HEPA label statement to be material when making purchasing decisions.[13] The best Plaintiff could come up with is a *proposed* price premium survey, to be performed at some later date, that—if conducted—*should* show "whether the [True HEPA] Claim is economically material to a reasonable person." Mot. at 10. Plaintiff claims, without any basis, that the survey is "economically and scientifically sound and will provide common proof of the significant value that consumers attach to the True HEPA claim." *Id*.

Such subjective (and unreliable) claims of materiality cannot survive the rigorous analysis required for certification, particularly when stacked against the verifiable and objective evidence presented by Butler. *See 5-Hour Energy*, 2017 WL 2559615, at *7 (plaintiffs' "evidence of materiality . . . [was] limited" because they did "not provide any consumer survey that suggested

---

[13] Plaintiff's reliance on *Dyson, Inc. v. Bissell Homecare, Inc.* to show materiality is misplaced. *See* Mot. at 9-10. In *Bissell*, the products at issue were vacuum cleaners and the claims served a fundamentally different purpose than they would in the context of air purifiers. 951 F. Supp. 2d 1009 (N.D. Ill. 2013). Here, Plaintiff has presented no evidence (or argument) that a reasonable consumer of vacuum cleaners is the same as one for air purifiers. Further, the claims contested in *Bissell* were different and included that the vacuum cleaners "capture[d] over 99.9%" of certain allergens. *Id*. at 1014. *Bissell* also found materiality based on undisputed facts, including defendant's studies showing filtration efficiency was important to consumers and employee testimony that the filtration efficiency was a "key feature" for customers. *Id*. at 1032. No such facts exist here. Rather, the opposite is true. The record evidence affirmatively shows HEPA is not a significant factor for consumers and does not materially influence their purchasing decisions.

that [their] belief [was] common across the class"); *see also Townsend*, 303 F. Supp. 3d at 1045 (plaintiffs failed to present adequate evidence that the label statement was material to consumers' and likely to deceive a reasonable consumer); *Shanks v. Jarrow Formulas, Inc*., 2019 WL 4398506, at *6 (C.D. Cal. Aug. 27, 2019) (plaintiff failed to show materiality where defendant's expert survey showed consumers did not typically "conclude based on the challenged statements that Defendant's coconut oil is healthy, and then purchase Defendant's coconut oil based on that belief"); *Pierce-Nunes*, 2016 WL 5920345, at *8 (plaintiff failed "to demonstrate with common proof that the [product] label was *material* to consumers' purchasing decision" where consumer surveys pointed to a variety of reasons driving their purchasing decisions) (emphasis in original).

Without having conducted his price premium survey, Plaintiff has not shown whether a price premium even exists. Therefore, he cannot say whether the HEPA claim commanded a price premium or whether it was material (even based on his flawed logic that a price premium somehow equates to materiality). In addition, and as explained by Butler, finding a price premium does not automatically make a claim material. ECF 129 (Butler Rep.), ¶ 131. Most importantly, there is no evidence that Plaintiff's proposed survey will be sound. No one at this point (not even Plaintiff) can say that the survey will be reliable because Plaintiff's expert has not fully designed his survey or performed reliability pretesting. Without a reliable showing of materiality, the Court cannot certify the California class.

### 4. Plaintiff Cannot Presume that Consumers Relied on the HEPA Claim

Plaintiff admits that the Court can only infer reliance "as to the entire class if the representations were objectively material." Mot. at 20. Because Plaintiff has not demonstrated that the HEPA label claim is material, the Court cannot presume such reliance. *See Stearns*, 655 F.3d 1013, 1022-23 ("If the misrepresentation . . . is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified."); *Townsend*, 303 F. Supp. 3d at 1043-44 (denying certification because plaintiffs failed to show that "the alleged misrepresentations . . . justif[ied] a presumption of reliance"); *Webb v. Carter's Inc*., 272 F.R.D. 489, 502 (C.D. Cal. 2011) ("[W]here individual issues as to materiality predominate, the record will not permit [an inference of reliance as to the entire class].").

**B.** **Plaintiff's Unjust Enrichment Claim Fails**

Plaintiff relies on a single conclusory statement that common questions of law predominate as to his unjust enrichment claim. *See* Mot. at 21. That is not enough. Plaintiff must show that Levoit gained assets or profits from wrongful conduct. *See Schuman v. Microchip Tech. Inc.*, 2020 WL 887944, *12 (N.D. Cal. Feb. 24, 2020) ("The profit for which the wrongdoer is liable . . . is the net increase in the assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong."). But Plaintiff would have to resort to individual inquiries, such as whether a particular Product met the HEPA standard, whether a consumer bought the Product because of the HEPA claim label, and the amount a consumer paid; "[i]t is not sufficient that Defendant had a net increase in assets during the Class Period due to the sale of [the Products]." *Bargetto v. Walgreens Co.*, 2024 WL 3493260, at *9 (N.D. Cal. June 14, 2024) (no common evidence as to unjust enrichment claim where individual inquiries were required to show wrongful conduct). He has not demonstrated "a connection between the increase in assets and the alleged underlying wrong." *Id*.

**III.** **CLASS-WIDE DAMAGES ARE NOT CAPABLE OF MEASUREMENT**

**A.** **Plaintiff's Conjoint Survey Does Not Match Plaintiff's Liability Theory**

Plaintiff alleges that the Product he paid for did not perform at the filtration level advertised. *See* TAC ¶¶ 59, 66. Plaintiff's experts' proposed conjoint survey and damages model, however, do not measure the value attributable to this difference in filtration efficiency. Because there is a mismatch between Plaintiff's liability theory and his experts' damages model, class certification should be denied. *See, e.g., Flodin v. Cent. Garden & Pet Co.*, 2024 WL 4565340 (N.D. Cal. Oct. 23, 2024) (denying certification where *Gaskin and Weir's* damages model did not match plaintiffs' theory of liability); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014) (same).

Plaintiff alleges that he paid for a Product that met a HEPA standard of 99.97% filtration of 0.3-micron airborne particles, but received a Product filtering 99.87%-98.65% of 0.3-micron airborne particles. *See* TAC ¶¶ 3, 12. Gaskin's proposed conjoint survey does not test this claim. Plaintiff's damages should reflect the difference in value between a product filtering 99.97% of 0.3-micron airborne particles versus a product filtering 99.87%-98.65% of 0.3-micron airborne particles. Instead, Gaskin's proposed survey will, at best, test the difference between 99.97% of 0.3-

micron airborne particles versus a product with no filtration efficiency. *See* ECF 110, Ex. C (Gaskin Decl.) at 22. That is because he is comparing a True HEPA claim (*i.e.*, 99.97% of 0.3-micron airborne particles) to the absence of a HEPA claim. *See* S.C. Decl., Ex. B (Gaskin Dep.) at 14:4-8. But, even assuming Plaintiff's test reports were valid (which they are not), what he should be comparing is a HEPA claim (*i.e.*, 99.97% of 0.3-micron airborne particles) to a product filtering 99.87%-98.65% of 0.3-micron airborne particles. By comparing HEPA to no filtering standard at all, the calculated price premium will be inaccurate and inflated. *See* ECF 132 (Milev Rep.), ¶¶ 18(b), 30-34. Because Gaskin's conjoint survey is untethered to Plaintiff's claims, his proposed method for calculating class-wide damages is unreliable and certification should be denied.

**B.     Plaintiff Has Failed to Demonstrate that a Price Premium Exists**

Plaintiff has offered nothing more than mere speculation that a price premium may exist for the HEPA claim because Gaskin has not run his proposed conjoint survey. Courts reject such price premium theories that offer nothing more than conjecture that a price premium may exists. In *Astiana v. Ben & Jerry's Homemade, Inc.*, for example, the court denied certification because plaintiff had not proffered expert testimony that the market price of ice cream labeled "all natural" was higher than the market price of the ice cream without that label. 2014 WL 60097, at *12-13 (N.D. Cal. Jan. 7, 2014). Plaintiff also did not proffer evidence that a consumer would be willing to pay a premium for "all natural" ice cream. *Id*. The court also noted that "[e]stablishing a higher price for a comparable product would be difficult because prices in the retail market differ and are affected by the nature and location of the outlet in which they are sold." *Id*.; *see also Maybelline, LLC*, 300 F.R.D. at 459–61 (rejecting price premium methodology plaintiffs proposed because they proffered nothing more than speculation that a price premium existed).

Here, Gaskin admitted that the "price premium could be zero" and his survey could find "no market price premium." S.C. Decl., Ex. B (Gaskin Dep.) at 154:6-9. Indeed, the only record evidence suggests that a price premium does not exist. Levoit's damages expert, Jordan Milev, compared the Core 300 air purifier to competitor HEPA and non-HEPA labeled products. *See* ECF 132 (Milev Rep.), ¶ 74. ████████████████████████████████████████

This is the opposite of what would be expected if a price premium existed due to the HEPA claim. *See id.*

### C. Plaintiff's Price Premium Methodology Requires a Series of Individual Analyses

Courts in the Ninth Circuit and elsewhere have denied certification in cases where the "individualized nature of the damages calculations" necessitated by a "price premium" theory predominates. For example, in *Red v. Kraft Foods, Inc*., the court held that "memory issues as to what products were purchased where and in what quantities, as well as price differences at the vast array of retail establishments" would require an "individualized" analysis of "damages calculations." 2012 WL 8019257, at *11 (C.D. Cal. Apr. 12, 2012). Similarly, in *Weiner v. Snapple Beverage Corp*., the court refused to certify a class where plaintiffs failed to proffer "a reliable methodology" to calculate the "premium" allegedly paid as a result of "All Natural" labeling on a class-wide basis. 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010). As in *Kraft* and *Snapple*, Plaintiff has not offered a reliable methodology to calculate a price premium because it is nearly impossible to determine the threshold issue of how much each class member paid for their Products.

As demonstrated by Milev, individual consumers paid different prices in part because discounts varied over time,[14] across Products, channels, and retailers. *See* ECF 132 (Milev Rep.), ¶¶ 80-88. Therefore, putative class members purchased the same products at substantially different prices during the class period. As a result, individual inquiries are needed to analyze the economic circumstances of each class member to understand the Product purchased, timing of purchase, price

actually paid (after discounts), and any purported price premium that may have been paid due to the alleged misconduct in this case. Plaintiff's experts are silent as to how their proposed methodology would account for such individualized inquiries. As such, class certification should be denied.

### D. Replacement Filters Must Be Excluded From the Putative Classes

Plaintiff's proposed classes cannot include purchasers of replacement filters because Gaskin does not propose any method for calculating a price premium for them. Instead, Gaskin plans to run a conjoint survey on the Core 300 air purifier to determine a single price premium related to the True HEPA claim. *See* S.C. Decl., Ex. B (Gaskin Dep.) at 227:24-228:3 ("Q. In your proposed survey, you intend to perform one survey for the Core 300 products; is that right? A. I intend to perform one survey, yes, to cover the class products, that's correct."). Although Gaskin initially testified that he would extrapolate the results from his single survey across all class Products (which would include the replacement filters), *see id.* at 228:7-10 ("Q. And you intend to extrapolate the results from this single survey across all products in the putative class; is that correct? A. Yes."), he later clarified that he would neither extrapolate his calculated price premium to the replacement filters nor otherwise determine a price premium related to them, *see id.* at 228:11-19 ("Q. And you intend to extrapolate the results from a single survey of the Core 300 air purifier to the replacement filters, as well? . . . A. I don't intend to. Q. So you do not intend to have any price premium for the replacement filters? A. It's not part of the survey.").[15] Because Plaintiff's proposed conjoint analysis omits any method for calculating damages related to the replacement filters (*see* ECF 110, Ex. B (Weir Decl.), ¶ 71 (requiring a price premium to calculate damages)), at minimum, the purchasers of replacement filters must be excluded from the class entirely.

### E. The Proposed Classes Necessarily Include Uninjured Members

In the Ninth Circuit, courts must "ensure that the class is not 'defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct.'" *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016).

---

[15] To the extent Gaskin changes course and attempts to apply his air purifier price premium to the replacement filters, such an extrapolation is not appropriate given the differing supply and demand considerations for each type of Product. *See* ECF 132 (Milev Rep.), ¶ 67.

"[S]uch overinclusiveness" defeats class certification if "the uninjured parties represent [more than] a *de minimis* portion of the class." *In re Lidoderm Antitrust Litig*., 2017 WL 679367, at *11 (N.D. Cal. Feb. 21, 2017); *see also, e.g.*, *Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247, 277-78 (S.D. Cal. 2023) (denying certification where class definition "encompasse[d] a potentially significant number of unharmed consumers").

Further, certification must be denied where "there are significant individualized questions as to whether the product worked as advertised for each individual class member." *Chow v. Neutrogena Corp*., 2013 WL 5629777, at *2 (C.D. Cal. Jan. 22, 2013) ("Because those class members for whom the product worked as advertised would not have suffered the same injury as Plaintiff, the class cannot be sustained without resorting to individualized inquiries into the merits of each class member's claims."); *see also Vrugtman v. Its Just Lunch Int'l LLC*, 2023 WL 6369765, at *10 (C.D. Cal. Aug. 25, 2023) (denying certification because the court would "have to rely on 'individual testimony to establish the existence of an injury'") (quoting *Bowerman v. Field Asset Servs., Inc*., 60 F.4th 459, 469-70 (9th Cir. 2023)).

Here, "parsing out the injured class members from the uninjured would require an overwhelming number of individualized inquiries." *Hall*, 344 F.R.D. at 277-78. Indeed, figuring out which Products met the HEPA standard and which did not would require individualized testing of each air filter and testimony from each putative class member related to Product use.

### 1. Individualized Testing Is Required to Determine HEPA Compliance

Whether a particular consumer actually received a technically compliant HEPA filter is an individualized question that will inevitably lead to varying results. As asserted by Plaintiff's own technical expert, Vijayakumar, there is no way of knowing whether the Products do or do not meet HEPA classification unless you *test every single filter* individually.[16] *See* S.C. Decl., Ex. A (Vijayakumar Dep.) at 149:10-155:8; *see also* ECF 110, Ex. A (Vijayakumar Decl.), ¶¶ 15, 19

---

[16] Because Plaintiff's own Products have not been tested, he does not know whether his Products meet a HEPA standard. As such, Plaintiff lacks standing because he has not proven an injury. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("Every class member must have Article III standing in order to recover individual damages. 'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.'") (citation omitted).

("[T]he standards require 100% testing for HEPA filters."). Setting aside the impracticalities of this approach (with which Levoit and its expert disagree), Vijayakumar maintains that this is true "even if a manufacturer believes [the filters have] all been created, designed, made the same way, some could pass testing and others might not." *Id.* at 155:4-8.

As explained by Levoit's technical expert, Jeffrey Siegel, unavoidable variances in the raw materials, filtration efficiency (impacted by particle composition, air flow rate, humidity, and other environmental conditions), and variations in test standards, conditions, and parameters necessarily result in varying results. *See* ECF 134 (Siegel Rep.), ¶¶ 35-48. In fact, fluctuating test results could exist for different filters within the same batch—*or even for the same filter* tested in two different locations. *See id.* ¶ 44. This explains the minor variations in the several test reports the parties have exchanged. *Compare* S.C. Decl., Exs. H-J (Levoit Test Results) (showing filters met HEPA standard) *with* TAC, Exs. B-C (Plaintiff's Test Results). When dealing with such miniscule percentage differences (which are inconsequential in real world applications), and the massive quantities of Products sold, it is clear that significantly more testing would be required to establish class-wide non-compliance with a HEPA standard.

At bottom, whether Levoit made a misrepresentation about an individual's unit—let alone whether a class member suffered an alleged injury—requires an analysis of whether their particular Product was HEPA-compliant (which alone is a complex determination—governed not by binding regulatory standards, but by voluntary industry benchmarks subject to inherent variability and significant inherent testing discrepancies). This precludes the Court's ability to find common questions susceptible of being answered with common proof. The individualized proof required to establish the existence of an injury creates an insurmountable barrier to class certification.

### 2. How the Products Were Used Affects Individual Performance

Beyond the same factors that may produce testing variances (such as temperature and humidity), there are also real world use considerations that affect product performance, demanding individualized inquiries. Where real world use affects the falsity of contested label claims, class certification is inappropriate. In *Moore v. Apple Inc*., for example, the court denied class certification because individualized inquiries were necessary to determine "the circumstances under which the

individual class member failed to receive a particular message." 309 F.R.D. 532, 546-47 (N.D. Cal. 2015). The court reasoned that individual factual questions were required given the breadth of reasons why text-message delivery could fail in the real world. *See id.*

Here, a consumer's personalized use of the Products will create variances in filtration efficiency. Where the air purifier is placed in a room, the room's size, whether a window is open, the settings used, whether the air purifier is continuously running, and whether the filter is changed, will all affect performance and efficiency. *See* ECF 134 (Siegel Rep.), ¶¶ 49-50. So, while a putative class member may have an air purifier capable of meeting a HEPA standard under certain conditions (*e.g.*, at a certain setting or room placement), their individual use may prevent the Product from achieving that standard.[17] To make this determination, the Court would have to understand each putative class member's use of the Product, making class certification inappropriate.

## IV.    PLAINTIFF CANNOT SATISFY ALL OF THE REQUIREMENTS OF RULE 23(a)

### A.    Plaintiff's Claims Are Atypical and Subject to Unique Defenses

A representative party must have claims and defenses that are "typical of the claim or defenses of the class." *Valentine*, 2024 WL 5339457, at *11 (Thompson, J.) (holding plaintiff had not established typicality). Claims are atypical, and class certification is inappropriate, where, *inter alia*, "the putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Moheb v. Nutramax Labs., Inc.*, 2012 WL 6951904, at *3 (C.D. Cal. Sept. 4, 2012) (denying class certification where plaintiff's interpretation of labeling differed from the putative class); *see also Cholakyan v. Mercedes-Benz USA LLC*, 281 F.R.D. 534, 557 (C.D. Cal. 2012) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class.").

The typicality requirement serves a critical function: Putative class members' claims will rise and fall with those of the named plaintiff, even though they may not be subject to the named

---

[17] Plaintiff has no idea how one of the two Products he purchased is being used. *See* S.C., Decl., Ex. C (Chen Dep.) at 112:11-15 ("Q. . . Do you know how your mother actually uses the Core 300? A. I do not. Q. Do you know where she placed it? A. I do not."). He also admits that he never once changed the filter, in direct contravention to Product instructions. *See id.* at 96:10-12, 17-19.

plaintiff's same defenses. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("[A] named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'"); *Quezada v. Loan Ctr. of Cal, Inc.*, 2009 WL 5113506, *7-8 (E.D. Cal. Dec. 18, 2009). "[I]t is the threat of unique defenses to preoccupy class representatives, rather than the viability of those defenses, that determines whether a proposed class representative should be deemed typical for purposes of class certification." *Buttonwood Tree Value Partners, LP v. Sweeney*, 2013 WL 12125980, at *4 (C.D. Cal. Sept. 12, 2013). Here, Plaintiff is subject to myriad unique defenses.[18]

### 1. HEPA Was Not a Significant Purchase Driver For Most Consumers

While Plaintiff alleges that he purchased the Core 300 air purifier specifically for its HEPA filter, *see* S.C. Decl., Ex. C (Chen Dep.) at 81:11-15, 86:17-87:6 ("I wanted to buy one that was HEPA. . . ."), his purchasing decision is distinct from typical consumers. The consumer survey data (*see supra* § II.A) shows, and Plaintiff admits, that consumers provide a wide range of reasons for purchasing the Products. *See id*. at 87:24-88:3. These reasons include reviews and recommendations, price, performance, size, features such as quiet mode and smart technology, and the brand. *See* ECF 129 (Butler Rep.), ¶¶ 65-76. While a fraction of consumers, such as Plaintiff, may prioritize whether an air purifier contains a HEPA filter, the majority of consumers do not. *See id*. ¶¶ 77-78. Indeed, only 3.7% of those surveyed mentioned HEPA as a reason for their purchase. *See id*. The data demonstrates that Plaintiff is dissimilar from other putative class members because HEPA was not a significant purchase driver for the majority of consumers surveyed.

### 2. Plaintiff Relied on a New York Times Article in Making His Purchases

Plaintiff's claims are further atypical because he purportedly learned about the Products' features from and relied exclusively on a New York Times article in making his purchasing

---

[18] Plaintiff is also atypical because he used a gift card to make his purchase. *See* S.C. Decl., Ex. C (Chen Dep.) at 89:15-24 ("Q. [Y]ou've previously testified that you used a gift card to purchase the Core 300 from Amazon. Is that correct? A. Yes. It was my gift card. . . . Q. Someone else purchased it though? . . . A. Yes, to give to me."). As further explained by Milev, individualized inquiries are required to understand which putative class members utilized gift cards and what retailer limitations were associated with those specific gift cards, how the use of gifts cards may have impacted consumer purchase decisions (and any price premium paid). *See* ECF 132 (Milev Rep.), ¶¶ 89-90.

decisions. *See* S.C. Decl., Ex. C (Chen Dep.) at 72:6-9. Even setting aside the significant credibility issues associated with Plaintiff's testimony—*i.e.*, that he relied on an article that was in fact published *after* the date of his first purchase—his sworn testimony undercuts typicality. It remains unknown how many putative class members would have seen, let alone relied, on the same New York Times article that influenced Plaintiff's purchase. Further, Levoit cannot be held liable based on representations made by the New York Times. In *Pierce-Nunes*, for example, the court denied class certification because "many consumers would have learned about LED TVs based on information from Defendants, other manufacturers, retailers, third-parties, and media made freely available," so even "assuming that each class member may have been exposed to the LED TV label, [plaintiff] will not be able to demonstrate with common proof . . . that each class member had the same understanding of the product labeling." 2016 WL 5920345, at *7. Because Plaintiff's understanding of the Product was uniquely informed by a specific news article, he is atypical.

### 3. Plaintiff Still Uses the Product Today, Demonstrating Satisfaction

Plaintiff is not typical because he continues to use his air purifier to date (without ever having changed the air filter), despite learning of the Product's alleged defects from his counsel's advertisement. *See* S.C. Decl., Ex. C (Chen Dep.) at 96:10-12, 17-19; *id*. at 38:21-39:13. Levoit can rely on such evidence to prove Plaintiff believed the product worked and was worth what he paid for it, and that his continued (mis)use reflects that HEPA does not actually matter to him. *See Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 643-44 (C.D. Cal. 2014) (holding plaintiff had no standing because he continued to purchase product with full knowledge of alleged slack fill); *Noll v. eBay*, 2013 WL 2384250, at *4 (N.D. Cal. May 30, 2013) (finding lack of reliance because plaintiffs continued to use service "after discovering the recurring fees"). And still, Plaintiff maintains he is entitled to *more than a full refund* (*i.e.*, damages that exceed the amount he paid for his two products). *See* S.C. Decl., Ex. C (Chen Dep.) at 115:19-25 ("Q: But do you believe you are entitled to more than you paid for the products? A. I believe so. Q: Why? A: I believe that generally in these types of situations, the sum is more than, you know, what you paid for the products.").

### B. Plaintiff Is Not an Adequate Class Representative

A representative party must "fairly and adequately protect the interests of the class." Fed. R.

Civ. P. 23(a)(4). This Court must consider whether the named plaintiff has any conflicts of interest with other class members and if he will prosecute the action vigorously on behalf of the class. *Valentine*, 2024 WL 5339457, at *10 (Thompson, J). Plaintiff's ignorance of his own claims reveal he is not an adequate representative. He has no idea what HEPA means despite his insistence that it is the "gold standard." S.C. Decl., Ex. C (Chen Dep.) at 67:21-68:11 ("Q: What do you understand HEPA to mean? A. It's the kind of gold standard of what you would want in an air purifier if you were to buy one. Q. Do you know what the acronym means? A. I did not know it was an acronym."). He maintains Levoit's HEPA claims were misleading and he would not have otherwise purchased his air purifier, yet he continues to use his air purifier to date—albeit without once having changed the filter in five years, seriously undermining the purported import of HEPA to him. *See id.* at 96:10-12, 17-19. He is entirely unfamiliar with the NAD proceeding that forms the basis of this attorney-driven lawsuit. *See id.* at 44:1-9. He testified that he is owed a full refund (and then some), despite his experts' price premium damages model. *See id.* at 115:19-21. All of this makes clear that Plaintiff cannot be an adequate class representative. *See Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, at *2 (N.D. Cal. Apr. 25, 2007) ("In light of plaintiff's undeniable and overwhelming ignorance regarding the nature of this action, the facts alleged, and the theories of relief against defendant, the court cannot conclude that he has met the threshold typicality or adequacy requirements of Rule 23(a). It is clear from the record that plaintiff's counsel, and not plaintiff, is the driving force behind this action.").

### C. Plaintiff Fails to Establish that Uniform Evidence Exists for Commonality

Plaintiff cannot establish commonality for the same reasons discussed in the predominance analysis, *see supra* §§ I-III. Plaintiff's proposed common issues include "whether the True HEPA claim on every unit . . . is false or misleading" and "whether the True HEPA claim is material to reasonable consumers." Mot. at 13-14. Plaintiff, however, fails to cite any competent evidence that these questions can be resolved on a class-wide basis. *See Mazza*, 666 F.3d at 596 ("[V]acat[ing] class certification . . . because common questions of fact do not predominate. . . ."). According to Plaintiff's technical expert, each individual unit must be tested to determine whether it meets HEPA standards (*i.e.*, one test cannot be extrapolated across all units). *See* S.C. Decl., Ex. A (Vijayakumar

Dep.) at 149:10-155:8. In addition, Plaintiff's proposed price premium model is deficient, *see supra* § III, and Plaintiff lacks evidence related to the reasonable consumer test, *see supra* § II.A.

### D. Putative Class Members Are Subject to Varying Arbitration Agreements

The Court would also have to conduct individualized inquiries to determine whether certain class members are subject to arbitration. Where some class members were subject to contracts containing arbitration clauses, courts have not found sufficient commonality or typicality to certify a class. *See Indep. Living Res. Ctr. S.F. v. Lyft, Inc*., 2020 WL 6802410, at *1 (N.D. Cal. Nov. 19, 2020) ("Certifying a class of those [] subject to" arbitration "would simply lead to interminable satellite litigation over who would be subject to the [class action] waiver. . . ."); *Conde v. Sensa*, 2018 WL 4297056, at *11 (S.D. Cal. Sept. 10, 2018) (denying class certification because certain class members could be subject to arbitration); *Pablo v. ServiceMaster Glob. Holdings Inc.*, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011) (denying certification where, "[a]lthough it is not clear how many putative class members signed arbitration agreements, . . . a significant portion of this litigation would be devoted to discovering which class members signed such agreements").

The Products are sold to consumers directly by Levoit on its website and through third-party retailers. *See* S.C. Decl., ¶ 11. Tens of thousands of individuals who purchased Products on the Levoit website agreed to Levoit's terms and conditions, including an arbitration clause and class action waiver. *See id*. Third-party retailers that sold the Products, including Target, likewise include arbitration agreements in their terms and conditions. *See id*. ¶¶ 12-14, Exs. L-N (Third-Party Retailer Arbitration Clauses). If the proposed classes are certified, the Court will be forced to determine which class members are bound by an arbitration provision, and whether any properly opted out. The Court will also have to analyze the enforceability of the arbitration clauses (including by a non-signatory) and class action waivers. *See Lozano v. AT&T Wireless Servs., Inc.,* 504 F.3d 718, 728 (9th Cir. 2007). These individualized issues and defenses would necessarily overshadow common issues and typicality, likely preventing many putative class members from participation.

### <u>CONCLUSION</u>

Levoit respectfully requests that the Court deny Plaintiff's Motion for Class Certification.

Dated: June 27, 2025

Respectfully submitted,

SIDLEY AUSTIN LLP


By: */s/ Sarah Carlson*
    Sarah Carlson

*Attorney for Defendant Vesync Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June 2025, I electronically filed the foregoing with the Court using the CM/ECF system, and thereby delivered the foregoing by electronic means to all counsel of record.

*/s/ Sarah Carlson*
Sarah Carlson